MC–275

Name _Condalee Morris_

Address _P.O Box 5005_

_7013 Blair road Calipatria_

_CA 92233- 5005_

CDC or ID Number _V-96203_

FILING FEE PAID
Yes ☐   No ☑
IFP MOTION FILED
Yes ☐   No ☑
COPIES SENT TO
Court ☐   ProSe ☑

**FILED**

AUG 1 2 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

_The Supreme Court of the_
_State of California in San Francisco_
(Court)

| | |
|---|---|
| _Condalee Morris_<br>Petitioner<br><br>vs.<br><br>_People Of the state of California_<br>Respondent | **PETITION FOR WRIT OF HABEAS CORPUS**<br><br>No. _BA279836_<br>*(To be supplied by the Clerk of the Court)*<br><br>**'08 CV 1468 H POR** |

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under rule 8.380 of the California Rules of Court [as amended effective January 1, 2007]. Subsequent amendments to rule 8.380 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page 1 of 6

Form Approved for Optional Use
Judicial Council of California
MC-275 [Rev. January 1, 2007]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 8.380
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

This petition concerns:

☑ A conviction                    ☐ Parole

☑ A sentence                      ☐ Credits

☐ Jail or prison conditions       ☐ Prison discipline

☐ Other (specify): _____

1. Your name: Condalee Morris

2. Where are you incarcerated? Calipatria State Prison

3. Why are you in custody? ☑ Criminal Conviction  ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   Count 1,2 (211 robbery) (count 6 422 making a criminal threats) (count 7,9 254 (A)(2) assult with weapon) ( count 10 att 211 robbery)

   b. Penal or other code sections: Count 1,2 and 10 12022.53(b) 12022.5 (A)(1) in count 6,7,9

   c. Name and location of sentencing or committing court: Superior Court of California in the County of Los Angele at (CCB)

   d. Case number: BA27936 / B185476

   e. Date convicted or committed: 3-4-05 in the county of Los Angeles

   f. Date sentenced: On 8-3-05 at 11am in Central District Dept 101

   g. Length of sentence: 35-year with 85%

   h. When do you expect to be released? 2033

   i. Were you represented by counsel in the trial court? ☑ Yes.  ☐ No. If yes, state the attorney's name and address:

   Steven F. Fisher Deputy Public Defender 19-513 clara 210 West Temple str shartridge foltz criminal justice center LA CA 90012

4. What was the LAST plea you entered? *(check one)*

   ☑ Not guilty  ☐ Guilty  ☐ Nolo Contendere  ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   ☑ Jury  ☐ Judge without a jury  ☐ Submitted on transcript  ☐ Awaiting trial

PETITION FOR WRIT OF HABEAS CORPUS

MC-275 [Rev. January 1, 2007]

# Legal Argument 1

Punishment for the robbery in Count 1 and the robbery in Count 2 violates Pen code Section 654 and the Double Jeopardy clause of the united states Constitution

Appellant was convicted in Count 1 of robbery (Mr Heladio Rayos) and in Count 2 of robbery (Katherine Rayos) The Court imposed consecutive sentence for each offense, It should have stayed the robbery in Count 2 under Penal code Section 654 because both offense were part of a continuous transaction and ~~anansawaytwee~~ ~~warwaenwasate~~ arising from single Incident

Section 654, subdivision (a) states in relevant part: "An act or omission that is punishable in different way by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more then one provision" The double jeopardy clause of the federal constitution also protects against multiple punishments for the same offense. (Brown v Ohio (1977) 432 U.S. 161, 165; North Carolina V Pearce (1969) 395 U.S. 711, 717; People v Bradley (2002) 111 Cal App 4th 765, 769; CR 3d. 166.

1       Section 654, precludes double punishment
2   not only for a single act, but also for an
3   indivisible course of conduct motivated by a
4   single intent or objective (People v. Latimer (1993)
5   5 Cal 1203, 1207, 1209,) The divisibility of a course
6   of conduct depends upon the intent and
7   objective of the actor, and if all the offenses
8   are incident to one objective, the defendant
9   may be punished for any one of them but
10  not for more then one (Id at p 1208)

11

12       — Sentencing issues —
13

14      (4) Defendant, contends the imposition
15  of separate sentence for both robbery's
16  constituted multiple punishment in violation
17  of 654, with the gun enhancements

18

19      For Example, Section 654 precludes
20  multiple punishment for a single act or
21  omission, or an indivisible course of conduct
22  (3 654 People v. Miller (1977) 18 cal 3d 873,
23  880, (135 Cal Rptr 654, 558 P2d 522) If, for
24  example, a defendant suffers two convictions
25  punishment for one of which is precluded
26  by section 654, that section require the
27  sentence for one conviction to be imposed,
28  and the other imposed, and then stayed (People

V. Miller supr, 18 Cal 3d at p 886.) Section 654 does not allow any multiple punishment, including either concurrent or consecutive sentence (In re Wright (1967) 65 Cal 2d 650 652, 655 (56 Cal Rptr. 110, 422, P2d 998.) (the trial court erred in imposing concurrent sentences for two conviction for which section 654 prohibited multiple punishment People v Miller, supra 18 Cal 3d at p 886.) (Robbery of a victim at gunpoint has been held to be an act of violence such as to preclude application of section 654 in the case of multiple conviction involving multiple victims

Court must impose the longest term, To determine which term is longest the court must take into account applicable specific enhancements

For example (People v. Kramer (2002) 29 C4th 720 128 CR2d 407.) In Kramer the defendant was convicted of pen code section 246 (seven-year maximum) and 245 (a) (four-year maximum) But with four-year gun enhancement) The defendant argued that the § 246 conviction was longer and that the § 245 (a)₃ count with the gun

1  enhancement should be stayed, The court
2  ruled that the enhancement(s) must be
3  included in the calculation and ordered that
4  the § 245 (a) sentence enhanced for the
5  gun use be imposed

7       For example, However brandishing
8  of firearm in the presence of a police
9  officer (Pen code § 417 (c) is subject to
10 the limitation of 654, Brandishing a
11 firearm in front of Multiple police officers
12 may only be punished once). People v
13 Hall (2002) 83 Cal 546 101 CR2d 376

15      Accordingly the court must stay
16 the robbery in count 2 and the gun
17 enhancements, Where a trial court erroneously
18 fail to stay term subject to section
19 654, the court must stay sentence on
20 the lesser offense while premitting
21 execution of the greater offense consistent
22 with the intent of the sentencing court"
23 People v Pena (1992) 7 Cal App 4th 1294 1312)
24 People v Austin (1994) 23 Cal App 4th 1596
25 1614)
26      While the punishment for the home
27 invasion robbery in count 1 is (9-years
28 with the 10-year gun enhancement,

While the punishment for the home invasion robbery in count 2 is (2 year and with the 3 - year and 4 months gun enhancements

Accordingly this court must modify the sentence to stay imposition of the term for the robbery in count 2 together with the term for the gun use enhancements attached to the offense

Appellant perfunctorily asserts in his heading that multiple punishment (as to counts 1, 2 violates the federal double jeopardy clause, Moreover, if one offense contains the same element as the other offense, the offenses are the same for purpose of double jeopardy clause analysis, and the double jeopardy is applicable, Also as to count(s) 1 and 2 that said defendant(s) Condalee Morris personally used a firearm, a handgun, with the meaning of Penal code section 12022.53 (b). Also current convictions arising from single incident

**FILED**

Los Angeles Superior Court

:233

AUG 0 3 2005

John A. Clarke, Executive Officer/Clerk

By _____, Deputy

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| The People of the State of California | CASE NUMBER | DEPARTMENT |
|---|---|---|
| Plaintiff, | BA279836 | 101 |
| vs. | | |
| 01- MORRIS, CONDALEE | **VERDICT (Guilty)** | |
| Defendant. | **(COUNT 1)** | |

We, the jury in the above-entitled action, find the Defendant, CONDALEE MORRIS, guilty of the crime of HOME INVASION ROBBERY of HELADIO RAYOS, in violation of Penal Code Section 211, a Felony, as charged in Count One of the Information and find it to be Robbery of the ___First___ Degree.

(Insert "First" or "Second")

We further find the allegation that the above offense was committed by the defendant who voluntarily acted in concert and entered a structure within the meaning of Penal Code Section 213(a)(1)(A) to be ___TRUE___.

(Insert "TRUE" or "NOT TRUE")

We further find the allegation that the Defendant CONDALEE MORRIS personally used a firearm, to wit: a handgun, within the meaning of Penal Code Section 12022.53(b) to be ___TRUE___

(Insert "TRUE" or "NOT TRUE")

This _3_ day of _Aug_ 2005,

**VERDICT (GUILTY)**

HELADIO RAYOS,

CALLED AS A WITNESS BY THE PEOPLE, WAS SWORN AND

TESTIFIED THROUGH THE SPANISH INTERPRETER AS FOLLOWS:

THE CLERK:  PLEASE RAISE YOUR RIGHT HAND TO BE

SWORN.

DO YOU SOLEMNLY STATE THAT THE TESTIMONY YOU

MAY GIVE IN THE CAUSE NOW PENDING BEFORE THIS COURT,

SHALL BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT

THE TRUTH, SO HELP YOU GOD?

THE WITNESS:  I DO.

THE CLERK:  PLEASE TAKE THE WITNESS STAND.

WOULD YOU PLEASE STATE AND SPELL YOUR FULL

NAME FOR THE RECORD.

THE WITNESS:  HELADIO RAYOS.

THE INTERPRETER:  INTERPRETER SPELLING, YOUR

HONOR?

THE COURT:  PLEASE.

THE INTERPRETER:  H-E-L-A-D-I-O, LAST NAME

R-A-Y-O-S.

DIRECT EXAMINATION

BY MS. MILLER:

Q.   MR. RAYOS, YOU UNDERSTAND ENGLISH; IS THAT

CORRECT?

A.   A LITTLE BIT.

Q.   BEFORE YOU ANSWER THE QUESTIONS, I NEED TO

MAKE SURE YOU LET ME FINISH, LET THE INTERPRETER

INTERPRET COMPLETELY AND THEN RESPOND IN SPANISH SO THE

INTERPRETER CAN GO AHEAD AND TELL ME WHAT YOU SAID,

1    OKAY.

2    SIR, I WANT TO TAKE YOU BACK TO MARCH FOUR,

3    2004, AT APPROXIMATELY 1:00 IN THE MORNING.

4    WERE YOU AT 1806 WEST 42ND PLACE IN THE CITY

5    AND COUNTY OF LOS ANGELES?

6    A.    YES.

7    Q.    THAT IS 2005, JUST A COUPLE WEEKS AGO,

8    RIGHT?

9    A.    YES.

10    Q.    AT THAT DATE, TIME, AND LOCATION, WERE YOU

11    ASLEEP?

12    A.    YES.

13    Q.    AND IS THIS A SINGLE FAMILY RESIDENCE?

14    A.    YES.

15    Q.    DID SOMETHING WAKE YOU UP?

16    A.    YES.

17    Q.    WHAT WAS THE FIRST THING THAT YOU REMEMBER

18    THAT WOKE YOU UP?

19    A.    MY WIFE.

20    Q.    OKAY.  WAS SHE SAYING SOMETHING?

21    A.    YES.

22    Q.    BASED ON WHAT YOUR WIFE WAS SAYING, DID YOU

23    LOOK SOMEPLACE IN THE HOUSE?

24    A.    YES.

25    Q.    WHERE DID YOU GO, IF ANYPLACE?

26    A.    TO THE KITCHEN.

27    Q.    AND DID SOMETHING HAPPEN WHILE YOU WERE IN

28    THE KITCHEN?

● **FILED**

Los Angeles Superior Court

AUG 0 3 2005

234

John A. Clarke, Executive Officer/Clerk

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES** , Deputy

| | CASE NUMBER | DEPARTMENT |
|---|---|---|
| The People of the State of California | BA279836 | 101 |
| Plaintiff, | | |
| vs. | | |
| 01- MORRIS, CONDALEE | **VERDICT (Guilty)** | |
| Defendant. | **(COUNT 2)** | |

We, the jury in the above-entitled action, find the Defendant, CONDALEE MORRIS, guilty of
the crime of HOME INVASION ROBBERY of KATHERINE RAYOS, in violation of Penal
Code Section 211, a Felony, as charged in Count Two of the Information and find it to be

Robbery of the _____First_____ Degree.

(Insert "First" or "Second")


We further find the allegation that the above offense was committed by the defendant who
voluntarily acted in concert and entered a structure within the meaning of Penal Code Section
213(a)(1)(A) to be _____TRUE_____.

(Insert "TRUE" or "NOT TRUE")


We further find the allegation that the Defendant CONDALEE MORRIS personally used a
firearm, to wit: a handgun, within the meaning of Penal Code Section 12022.53(b) to be

_____TRUE_____

(Insert "TRUE" or "NOT TRUE")


This _3_ day of _Aug._ 2005,

_____

**VERDICT (GUILTY)**

1   COMPLAINT, CONSTITUTIONAL AND STATUTORY RIGHTS.

2          MR. FISHER:  YES, YOUR HONOR.

3          THE COURT:  THANK YOU.  I NOTICE WITNESSES HAVE

4   BEEN EXCLUDED FROM THE COURTROOM.

5          MS. MILLER:  YES.

6          THE COURT:  PEOPLE CALL YOUR FIRST WITNESS.

7          MS. MILLER:  THANK YOU.  PEOPLE CALL KATHLEEN

8   RAYOS.

9          THE COURT:  THANK YOU.  PLEASE COME FORWARD,

10  MA'AM.

11         MS. MILLER:  I ASK MY INVESTIGATOR DETECTIVE

12  FRANCO REMAIN AS MY IO ON THE CASE.

13         THE COURT:  THANK YOU.  YOU ARE DESIGNATED

14  INVESTIGATING OFFICER FOR PRELIM ONLY.

15                 RAISE YOUR RIGHT HAND TO BE SWORN.

16

17                 KATHERINE RAYOS,

18  CALLED AS A WITNESS BY THE PEOPLE, WAS SWORN AND

19  TESTIFIED THROUGH THE SPANISH INTERPRETER AS FOLLOWS:

20         THE CLERK:  PLEASE RAISE YOUR RIGHT HAND TO BE

21  SWORN.

22          DO YOU SOLEMNLY STATE THAT THE TESTIMONY YOU

23  MAY GIVE IN THE CAUSE NOW PENDING BEFORE THIS COURT,

24  SHALL BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT

25  THE TRUTH, SO HELP YOU GOD?

26         THE WITNESS:  YES, I DO.

27         THE CLERK:  PLEASE TAKE THE WITNESS STAND.

28                 WILL YOU PLEASE STATE AND SPELL YOUR FULL

1    NAME FOR THE RECORD.

2        THE WITNESS:  KATHERINE RAYOS, K-A-T-H-E-R-I-N-E,

3    LAST NAME, R-A-Y-O-S.

4        THE COURT:  THANK YOU.  IF YOU WOULD PLEASE

5    PROCEED.

6        MS. MILLER:  THANK YOU.

7

8                    DIRECT EXAMINATION

9    BY MS. MILLER:

10       Q.   MISS RAYOS, I WANT TO TAKE YOU BACK TO MARCH

11   4, 2005 AT APPROXIMATELY 1:00 A.M.

12            WERE YOU LIVING AT 1806 WEST 42ND PLACE IN

13   THE CITY AND COUNTY OF LOS ANGELES?

14       A.   YES, MA'AM.

15       Q.   IS THAT A SINGLE FAMILY RESIDENCE?

16       A.   YES.

17       Q.   AND AT APPROXIMATELY THAT TIME ON THAT DATE,

18   DID SOMETHING OUT OF THE ORDINARY HAPPEN?

19       A.   YES, IT DID.

20       Q.   WHAT WAS THE FIRST THING OUT OF THE ORDINARY

21   THAT YOU NOTICED THAT HAD HAPPENED?

22       A.   THE FIRST THING OUT OF THE ORDINARY, I HEARD

23   A POUNDING NOISE, I THOUGHT MY GRANDSON HAD FALLEN OFF

24   THE BED.

25       Q.   WHERE WAS THAT POUNDING NOISE COMING FROM?

26       A.   FROM OUTSIDE THE BACK BEDROOM.

27       Q.   IS THERE A DOOR OUTSIDE THE BACK BEDROOM?

28       A.   YES, SIR -- YES, MA'AM.

246

```
                            MINUTE ORDER
            SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
```

DATE PRINTED: 08/22/05

---------------------------------------------------------------------

CASE NO. BA279836

THE PEOPLE OF THE STATE OF CALIFORNIA
                     VS.
DEFENDANT 01:  CONDALEE  MORRIS

---------------------------------------------------------------------

INFORMATION FILED ON 04/01/05.


COUNT 01: 211 PC FEL  - ROBBERY.
COUNT 02: 211 PC FEL  - ROBBERY.
COUNT 03: 487(D)(2) PC FEL  - GRAND THEFT FIREARM.
COUNT 04: 12021(C)(1) PC FEL  - POSS FIREARM W/ PRIOR CONVCTN.
COUNT 05: 12021(C)(1) PC FEL  - POSS FIREARM W/ PRIOR CONVCTN.
COUNT 06: 422 PC FEL  - MAKING A CRIMINAL THREAT.
COUNT 07: 245(A)(2) PC FEL  - ASSAULT WITH FIREARM ON PERSON.
COUNT 08: 12021(A)(1) PC FEL  - POSSES FIREARM-FELON OR ADDICT.
COUNT 09: 245(A)(2) PC FEL  - ASSAULT WITH FIREARM ON PERSON.
COUNT 10: 664-211 PC FEL  - ATTEMPT ROBBERY.


ON 08/17/05 AT  900 AM  IN CENTRAL DISTRICT DEPT 101

CASE CALLED FOR PROBATION AND SENTENCE HEARING

PARTIES: WILLIAM POUNDERS (JUDGE) ALBERTA P. JORDAN   (CLERK)
         JEANNE IANNONE  (REP)     BRADLEY LIEBERMAN  (DA)

DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY STEVEN F. FISHER DEPUTY
PUBLIC DEFENDER

DEFENDANT WAIVES ARRAIGNMENT FOR JUDGMENT AND STATES THERE IS NO LEGAL CAUSE
WHY SENTENCE SHOULD NOT BE PRONOUNCED. THE COURT ORDERED THE FOLLOWING
JUDGMENT:

IMPRISONED IN STATE PRISON FOR A TOTAL OF 35 YEARS

AS TO THE BASE COUNT  (01):

COURT ORDERS PROBATION DENIED.

SERVE 19 YEARS IN ANY STATE PRISON

COURT SELECTS THE UPPER TERM OF 9 YEARS AS TO THE BASE TERM COUNT 01.

PLUS 10 YEARS PURSUANT TO SECTION 12022.53(B)P.C.

COUNT (01): DISPOSITION: FOUND GUILTY - CONVICTED BY JURY

```
                                      PROBATION AND SENTENCE HEARING
                    PAGE NO.   1      HEARING DATE: 08/17/05
```

247

CASE NO. BA279836
DEF NO.  01                                  DATE PRINTED 08/22/05

DMV ABSTRACT NOT REQUIRED

NEXT SCHEDULED EVENT:
SENTENCING

AS TO COUNT  (02):

COURT ORDERS PROBATION DENIED.

SERVE 5 YEARS AND 4 MONTHS IN ANY STATE PRISON

COURT SELECTS ONE-THIRD THE MID-TERM OF 6 YEARS WHICH IS  2 YEARS.


PLUS 40 MONTHS PURSUANT TO SECTION SEE COMMENTS

COUNT TWO IS ENHANCED FOR AN ADDITIONAL 40 MONTHS (3.4 YEARS)
PURSUANT TO PENAL CODE SECTION 12022.53(B), WHICH IS ONE-THIRD
OF THE TEN YEARS TYPICAL FOR THIS ALLEGATION.
THE 5.4 YEARS FOR COUNT TWO IS TO BE SERVED CONSECUTIVE TO THE
SENTENCE IN COUNT ONE.

COUNT (02): DISPOSITION: FOUND GUILTY - CONVICTED BY JURY

DMV ABSTRACT NOT REQUIRED

NEXT SCHEDULED EVENT:
SENTENCING

AS TO COUNT  (06):

COURT ORDERS PROBATION DENIED.

SERVE 24 MONTHS IN ANY STATE PRISON


COURT SELECTS ONE-THIRD THE MID-TERM OF 24 MONTHS WHICH IS  8 MONTHS.

PLUS 16 MONTHS PURSUANT TO SECTION SEE COMMENTS

COUNT SIX IS ENHANCED FOR AN ADDITONAL 16 MONTHS (1.4 YEARS)
PURSUANT TO PENAL CODE SECTION 12022.5(A)(1), WHICH IS ONE-THIRD
THE MID-TERM OF 4 YEARS.
THE 2 YEARS FOR COUNT SIX IS TO BE SERVED CONSECUTIVE TO THE
SENTENCE IN COUNTS ONE AND TWO.

COUNT (06): DISPOSITION: FOUND GUILTY - CONVICTED BY JURY

DMV ABSTRACT NOT REQUIRED

NEXT SCHEDULED EVENT:
SENTENCING

AS TO COUNT  (07):

PAGE NO.   2      PROBATION AND SENTENCE HEARING
                  HEARING DATE: 08/17/05

248

CASE NO. BA279836
DEF NO.  01                                    DATE PRINTED 08/22/05

COURT ORDERS PROBATION DENIED.

SERVE 6 YEARS IN ANY STATE PRISON

COURT SELECTS THE MID TERM OF 2 YEARS AS TO COUNT 07.

PLUS 4 YEARS PURSUANT TO SECTION SEE COMMENTS

COUNT SEVEN IS ENHANCED FOR AN ADDITIONAL 4 YEARS PURSUANT TO
PENAL CODE SECTION 12022.5(A)(1).
THE COURT ORDERS THE SIX YEARS FOR COUNT SEVEN IMPOSED AND
STAYED PURSUANT TO PENAL CODE SECTION 654.

COUNT (07): DISPOSITION: FOUND GUILTY - CONVICTED BY JURY

DMV ABSTRACT NOT REQUIRED

NEXT SCHEDULED EVENT:
SENTENCING

AS TO COUNT  (08):

COURT ORDERS PROBATION DENIED.

SERVE 2 YEARS IN ANY STATE PRISON

COURT SELECTS THE MID TERM OF 2 YEARS AS TO COUNT 08.

THE COURT ORDERS THE TWO YEARS FOR COUNT EIGHT IMPOSED AND
STAYED PURSUANT TO PENAL CODE SECTION 654.

COUNT (08): DISPOSITION: FOUND GUILTY - CONVICTED BY JURY

DMV ABSTRACT NOT REQUIRED

NEXT SCHEDULED EVENT:
SENTENCING

AS TO COUNT  (09):

COURT ORDERS PROBATION DENIED.

SERVE 4 YEARS AND 4 MONTHS IN ANY STATE PRISON

COURT SELECTS ONE-THIRD THE MID-TERM OF 3 YEARS WHICH IS  1 YEARS.

PLUS 40 MONTHS PURSUANT TO SECTION SEE COMMENTS

COUNT NINE IS ENHANCED FOR AN ADDITIONAL 40 MONTHS (3.4 YEARS)
PURSUANT TO PENAL CODE SECTION 12022.5(A)(1), WHICH IS ONE-THIRD
OF THE TEN YEARS ALLOWED FOR THIS ALLEGATION.
THE 4.4 YEARS FOR COUNT NINE IS TO BE SERVED CONSECUTIVE TO THE
SENTENCE IN COUNTS ONE, TWO AND SIX.

                                        PROBATION AND SENTENCE HEARING
                   PAGE NO.   3        HEARING DATE: 08/17/05

249

CASE NO. BA279836
DEF NO.  01                                    DATE PRINTED 08/22/05

COUNT (09): DISPOSITION: FOUND GUILTY - CONVICTED BY JURY

DMV ABSTRACT NOT REQUIRED

NEXT SCHEDULED EVENT:
SENTENCING

AS TO COUNT  (10):

COURT ORDERS PROBATION DENIED.

SERVE 4 YEARS AND 4 MONTHS IN ANY STATE PRISON

COURT SELECTS ONE-THIRD THE MID-TERM OF 3 YEARS WHICH IS  1 YEARS.

PLUS 40 MONTHS PURSUANT TO SECTION SEE COMMENTS

 DEFENDANT GIVEN TOTAL CREDIT FOR 192 DAYS IN CUSTODY 167 DAYS ACTUAL CUSTODY
AND 25 DAYS GOOD TIME/WORK TIME

PLUS $20.00 COURT SECURITY ASSESSMENT (PURSUANT TO 1465.8(A)(1) P.C.)

TOTAL DUE: $20.00

IN ADDITION:

-MAKE RESTITUTION TO THE VICTIM, KATHERINE RAYOS, PURSUANT TO
PENAL CODE SECTION 1203.04 IN THE AMOUNT OF $3,400.00.

-THE DEFENDANT IS TO PAY A RESTITUTION FINE PURSUANT TO SECTION
1202.4(B) PENAL CODE IN THE AMOUNT OF $6,600.00.

-DEFENDANT IS TO PAY A PAROLE RESTITUTION FINE, PURSUANT TO PENAL

CODE SECTION 1202.45, IN THE AMOUNT OF $6,600.00.
SAID FINE IS STAYED AND THE STAY IS TO BECOME PERMANENT UPON
SUCCESSFUL COMPLETION OF PAROLE.

-THE COURT ADVISES THE DEFENDANT OF APPEAL RIGHTS.

-THE COURT ORDERS THAT THE DEFENDANT PROVIDE TWO SPECIMENS OF
BLOOD, A SALIVA SAMPLE, RIGHT THUMBPRINT, AND A FULL PALM PRINT
IMPRESSION OF EACH HAND FOR LAW ENFORCEMENT IDENTIFICATION
ANALYSIS.

COUNT TEN IS ENHANCED FOR AN ADDITIONAL 40 MONTHS (3.4 YEARS)
PURSUANT TO PENAL CODE SECTION 12022.53(B), WHICH IS ONE-THIRD
OF THE TEN YEARS TYPICAL FOR THIS ALLEGATION.
THE 4.4 YEARS FOR COUNT TEN IS TO BE SERVED CONSECUTIVE TO THE
SENTENCE IN COUNTS ONE, TWO, SIX AND NINE.

THE DEFENDANT IS REMANDED TO STATE PRISON, FORTHWITH.

                                    PROBATION AND SENTENCE HEARING
                  PAGE NO.   4      HEARING DATE: 08/17/05

1   PRESENT. CONTINUING THEN WITH THE INSTRUCTIONS, THE TOPIC

2   NOW BEING THE CRIMES CHARGED.

3                    (READING:)

4                        THE DEFENDANT IS

5   ACCUSED IN COUNTS 1 AND 2 OF HAVING

6   COMMITTED THE CRIME OF ROBBERY, A

7   VIOLATION OF SECTION 211 OF THE PENAL

8   CODE.

9                        EVERY PERSON WHO

10  TAKES PERSONAL PROPERTY IN THE

11  POSSESSION OF ANOTHER AGAINST THE

12  WILL AND FROM THE PERSON OR IMMEDIATE

13  PRESENCE OF THAT PERSON ACCOMPLISHED

14  BY MEANS OF FORCE OR FEAR AND WITH

15  THE SPECIFIC INTENT PERMANENTLY TO

16  DEPRIVE THAT PERSON OF THE PROPERTY

17  IS GUILTY OF THE CRIME OF ROBBERY, IN

18  VIOLATION OF PENAL CODE SECTION 211.

19                       THE WORDS "TAKES" OR

20  "TAKING" REQUIRE PROOF OF:

21                       ONE, TAKING

22  POSSESSION OF THE PERSONAL PROPERTY;

23                       AND, TWO, CARRYING IT

24  AWAY FOR SOME DISTANCE SLIGHT OR

25  OTHERWISE.

26                       "IMMEDIATE PRESENCE"

27  MEANS AN AREA WITHIN THE ALLEGED

28  VICTIM'S REACH, OBSERVATION OR

CONTROL SO THAT HE OR SHE COULD, IF NOT OVERCOME BY VIOLENCE OR PREVENTED BY FEAR, RETAIN POSSESSION OF THE SUBJECT PROPERTY.

"AGAINST THE WILL" MEANS WITHOUT CONSENT.

IN ORDER TO PROVE THIS CRIME, EACH OF THE FOLLOWING ELEMENTS MUST BE PROVED:

ONE, A PERSON HAD POSSESSION OF PROPERTY OF SOME VALUE, HOWEVER SLIGHT;

TWO, THE PROPERTY WAS TAKEN FROM THAT PERSON OR FROM HIS OR HER IMMEDIATE PRESENCE;

THREE, THE PROPERTY WAS TAKEN AGAINST THE WILL OF THAT PERSON;

FOUR, THE TAKING WAS ACCOMPLISHED EITHER BY FORCE OR FEAR;

AND, FIVE, THE PROPERTY WAS TAKEN WITH THE SPECIFIC INTENT PERMANENTLY TO DEPRIVE THAT PERSON OF THE PROPERTY.

FOR THE PURPOSES OF DETERMINING WHETHER A PERSON IS GUILTY AS AN AIDER AND ABETTOR TO ROBBERY, THE COMMISSION OF THE CRIME

OF ROBBERY IS NOT CONFINED TO A FIXED

PLACE OR A LIMITED PERIOD OF TIME AND

CONTINUES SO LONG AS THE STOLEN

PROPERTY IS BEING CARRIED AWAY TO A

PLACE OF TEMPORARY SAFETY.

THE ELEMENT OF FEAR

IN THE CRIME OF ROBBERY MAY BE

EITHER:

ONE, THE FEAR OF AN

UNLAWFUL INJURY TO THE PERSON OR

PROPERTY OF THE PERSON ROBBED OR TO

ANY OF HIS OR HER RELATIVES OR FAMILY

MEMBERS;

OR, TWO, THE FEAR OF

AN IMMEDIATE AND UNLAWFUL INJURY TO

THE PERSON OR PROPERTY OF ANYONE IN

THE COMPANY OF THE PERSON ROBBED AT

THE TIME OF THE ROBBERY.

THERE ARE TWO DEGREES

OF ROBBERY.  EVERY ROBBERY OF ANY

PERSON WHICH IS PERPETRATED IN AN

INHABITED DWELLING HOUSE IS ROBBERY

OF THE FIRST DEGREE.  ALL OTHER

ROBBERIES ARE OF THE SECOND DEGREE.

IF YOU FIND THE

DEFENDANT GUILTY OF ROBBERY OR

ATTEMPTED ROBBERY, YOU MUST DETERMINE

THE DEGREE THEREOF AND STATE THAT

DEGREE IN YOUR VERDICT.  IF YOU HAVE
A REASONABLE DOUBT WHETHER THE
ROBBERY IS OF THE FIRST OR SECOND
DEGREE, YOU MUST FIND IT TO BE OF THE
SECOND DEGREE.

EVERY PERSON WHO
VOLUNTARILY ACTING IN CONCERT WITH
TWO OR MORE OTHER PERSONS COMMITS
ROBBERY WITHIN AN INHABITED DWELLING
HOUSE IS GUILTY OF VIOLATING PENAL
CODE SECTION 213(A)(1)(A), A CRIME.

THE TERM "ACTING IN
CONCERT" MEANS TWO OR MORE PERSONS
ACTING TOGETHER IN A GROUP CRIME, AND
INCLUDES NOT ONLY THOSE WHO
PERSONALLY ENGAGE IN THE ACT OR ACTS
CONSTITUTING THE CRIME BUT ALSO THOSE
WHO AID AND ABET A PERSON IN
ACCOMPLISHING IT; HOWEVER, WHEN THE
CRIME CHARGED IS ROBBERY IN CONCERT,
THERE MUST BE AT LEAST THREE PERSONS,
INCLUDING ANY DEFENDANT ACTING IN
CONCERT.

TO ESTABLISH THAT A
DEFENDANT VOLUNTARILY ACTED IN
CONCERT WITH OTHER PERSONS, IT IS NOT
NECESSARY TO PROVE THAT THERE WAS ANY
PREARRANGED PLANNING OR SCHEME.

I'M SORRY.

PREARRANGEMENT,
PLANNING OR SCHEME.

IN ORDER TO PROVE
THIS CRIME, EACH OF THE FOLLOWING
ELEMENTS MUST BE PROVED:

ONE, A ROBBERY WAS
COMMITTED;

TWO, THE ROBBERY WAS
COMMITTED WITHIN AN INHABITED
DWELLING HOUSE;

AND, THREE, THE
DEFENDANT VOLUNTARILY ACTED IN
CONCERT WITH TWO OR MORE OTHER
PERSONS IN COMMITTING THE ROBBERY.

AN INHABITED DWELLING
HOUSE IS A STRUCTURE WHICH IS
CURRENTLY USED AS A DWELLING, WHETHER
OCCUPIED OR NOT.  IT IS INHABITED
ALTHOUGH THE OCCUPANTS ARE
TEMPORARILY ABSENT.

DEFENDANT IS ACCUSED
IN COUNT 10 OF HAVING COMMITTED THE
CRIME OF ATTEMPTED FIRST DEGREE
ROBBERY.  AN ATTEMPT TO COMMIT A
CRIME CONSISTS OF TWO ELEMENTS,
NAMELY A SPECIFIC INTENT TO COMMIT
THE CRIME AND A DIRECT, BUT

INEFFECTUAL, ACT DONE TOWARD ITS

COMMISSION.

IN DETERMINING

WHETHER THIS ACT WAS DONE, IT IS

NECESSARY TO DISTINGUISH BETWEEN MERE

PREPARATION ON THE ONE HAND AND THE

ACTUAL COMMENCEMENT OF THE DOING OF

THE CRIMINAL DEED ON THE OTHER.

MERE PREPARATION,

WHICH MAY CONSIST OF PLANNING THE

OFFENSE, OF DEVISING, OBTAINING OR

ARRANGING THE MEANS FOR ITS

COMMISSION IS NOT SUFFICIENT TO

CONSTITUTE AN ATTEMPT; HOWEVER, ACTS

OF A PERSON WHO INTENDS TO COMMIT A

CRIME WILL CONSTITUTE AN ATTEMPT

WHERE THOSE ACTS CLEARLY INDICATE A

CERTAIN UNAMBIGUOUS INTENT TO COMMIT

THIS SPECIFIC CRIME.

THOSE -- THESE ACTS

MUST BE AN IMMEDIATE STEP IN THE

PRESENT EXECUTION OF THE CRIMINAL

DESIGN, THE PROGRESS OF WHICH WOULD

BE COMPLETED UNLESS INTERRUPTED BY

SOME CIRCUMSTANCE NOT INTENDED IN THE

ORIGINAL DESIGN.

THE DEFENDANT IS

ACCUSED IN COUNT 3 OF HAVING

1   ANY VERDICT OR FINDING IS NOT YOURS, YOU WOULD INDICATE

2   THAT BY SAYING NO; IF THEY ARE ALL YOUR VERDICTS, YOU

3   WOULD SAY YES WHEN POLLED.

4              THE CLERK:  "TITLE OF COURT

5      AND CAUSE.

6               "COUNT 1.

7               "WE, THE JURY IN THE

8      ABOVE-ENTITLED ACTION, FIND THE

9      DEFENDANT, CONDALEE MORRIS, GUILTY OF

10     THE CRIME OF HOME INVASION ROBBERY OF

11     HELADIO RAYOS, IN VIOLATION OF PENAL

12     CODE SECTION 211, A FELONY, AS

13     CHARGED IN COUNT 1 OF THE

14     INFORMATION, AND FIND IT TO BE

15     ROBBERY OF THE FIRST DEGREE.

16             "WE FURTHER FIND THE

17     ALLEGATION THAT THE ABOVE OFFENSE WAS

18     COMMITTED BY THE DEFENDANT WHO

19     VOLUNTARILY ACTED IN CONCERT AND

20     ENTERED A STRUCTURE, WITHIN THE

21     MEANING OF PENAL CODE SECTION 213

22     SUBSECTION (A) SUBSECTION (1)

23     SUBSECTION (A) TO BE TRUE.

24            "WE FURTHER FIND THE

25     ALLEGATION THAT THE DEFENDANT,

26     CONDALEE MORRIS, PERSONALLY USED A

27     FIREARM, TO WIT, A HANDGUN, WITHIN

28     THE MEANING OF PENAL CODE SECTION

1    12022.53 SUBSECTION (B) TO BE TRUE.

2                    "THIS 3RD DAY OF

3    AUGUST, 2005.

4                    "SIGNED JUROR NO. 10,

5    FOREPERSON.

6                    "COUNT 2.

7                    "WE, THE JURY IN THE

8    ABOVE-ENTITLED ACTION, FIND THE

9    DEFENDANT, CONDALEE MORRIS, GUILTY OF

10   THE CRIME OF HOME INVASION ROBBERY OF

11   KATHERINE RAYOS, IN VIOLATION OF

12   PENAL CODE SECTION 211, A FELONY, AS

13   CHARGED IN COUNT 2 OF THE

14   INFORMATION, AND FIND IT TO BE

15   ROBBERY OF THE FIRST DEGREE.

16                   "WE FURTHER FIND THE

17   ALLEGATION THAT THE ABOVE OFFENSE WAS

18   COMMITTED BY THE DEFENDANT WHO

19   VOLUNTARILY ACTED IN CONCERT AND

20   ENTERED A STRUCTURE, WITHIN THE

21   MEANING OF PENAL CODE SECTION 213

22   SUBSECTION (A) SUBSECTION (1)

23   SUBSECTION (A) TO BE TRUE.

24                   "WE FURTHER FIND THE

25   ALLEGATION THAT THE DEFENDANT,

26   CONDALEE MORRIS, PERSONALLY USED A

27   FIREARM, TO WIT, A HANDGUN, WITHIN

28   THE MEANING OF PENAL CODE SECTION

947

1  PENAL CODE SECTION 1203.06 SUBSECTION

2  (A) SUBSECTION (1) AND 12022.5

3  SUBSECTION (A) SUBSECTION (1) TO BE

4  TRUE.

5          "THIS 3RD DAY OF

6  AUGUST, 2005.

7          "SIGNED JUROR NO. 10,

8  FOREPERSON.

9          "COUNT 10.

10          "WE, THE JURY IN THE

11  ABOVE-ENTITLED ACTION, FIND THE

12  DEFENDANT, CONDALEE MORRIS, GUILTY OF

13  THE CRIME OF ATTEMPTED FIRST DEGREE

14  ROBBERY OF DENISE RAYOS, IN VIOLATION

15  OF PENAL CODE SECTION 664/211, A

16  FELONY, AS CHARGED IN COUNT 10 OF THE

17  INFORMATION.

18          "WE FURTHER FIND THE

19  ALLEGATION THAT THE DEFENDANT,

20  CONDALEE MORRIS, PERSONALLY USED A

21  FIREARM, TO WIT, A HANDGUN, WITHIN

22  THE MEANING OF PENAL CODE SECTION

23  12022.53 SUBSECTION (B) TO BE TRUE.

24          "WE FURTHER FIND THE

25  ALLEGATION THAT THE ABOVE OFFENSE WAS

26  COMMITTED BY THE DEFENDANT WHO

27  VOLUNTARILY ACTED IN CONCERT AND

28  ENTERED A STRUCTURE, WITHIN THE

948

1            MEANING OF PENAL CODE SECTION 213

2            SUBSECTION (A) SUBSECTION (1)

3            SUBSECTION (A) TO BE TRUE.

4                    "THIS 3RD DAY OF

5            AUGUST, 2005.

6                    "SIGNED JUROR NO. 10,

7            FOREPERSON."

8                IS THIS YOUR VERDICT, SO SAY YOU ONE, SO

9  SAY YOU ALL.

10

11        (THE JURORS ANSWERED IN THE AFFIRMATIVE.)

12

13      THE COURT:  WOULD EITHER SIDE REQUEST POLLING OF

14  THE JURORS INDIVIDUALLY?

15      MR. FISHER:  YES, YOUR HONOR.

16      THE COURT:  WE WILL INDICATE BY YOUR SEAT LOCATION

17  AND DESIGNATE WHEN ASKED WHETHER THOSE ARE YOUR VERDICTS

18  ENTIRELY.  IF SO SAY YES, IF NOT, SAY NO.

19      THE CLERK:  JUROR NO. 1.

20      JUROR NO. 1:  YES.

21      THE CLERK:  JUROR NO. 2.

22      JUROR NO. 2:  YES.

23      THE CLERK:  JUROR NO. 3.

24      JUROR NO. 3:  YES.

25      THE CLERK:  JUROR NO. 4.

26      JUROR NO. 4:  YES.

27      THE CLERK:  JUROR NO. 5.

28      JUROR NO. 5:  YES.

# Legal Argument 2

Punishment for the robbery in count 4 and the attempted robbery in count 10 Violates Pen code section 654 and the Double Jeopardy Clause of the united states constitution

Appellant was convicted in count 4 of robbery (Mr. Heladio Rayos) and in Count 10 attempted robbery (Denise Rayos) The court imposed consecutive sentence for each offense. It should have stayed the attempted robbery in count 10 under Penal code section 654 because both offenese were part of a continuous transaction and ~~multiple offenses~~ ~~single robbery~~ arising from single Incident

Section 654, subdivision (a) states in relevant part: "An act or omission that is punishable in different way by different provisions of law shall be punished under the ~~provisions~~ provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more then one provision." The double jeopardy clause of the federal constitution also protects against multiple punishments for the same offense (Brown v ohio (1977) 432 US, 161, 165; North Carolina v Pearce (1969) 395 US 711, 717; People v Bradley (2003)

111 Cal App 4th 765, 769, CR3d 166, People v Danowski 74 Cal APP 4th 815 (88 Cal Rptr 2nd 471 (1999)

Section 654, precludes double punishment not only for a single act but also for an indivisible course of conduct motivated by a single intent or objective ( People v Latimer (1993) 5 Cal 1203, 1207, 1209.) The divisibility of a course of conduct depends upon the intent and objective of the actor, and if all the offenses are incident to one objective, the defendant may be punished for any one of them but not for more then one (Id at p 1208)

→ Sentencing issues —

(1) Defendant, contends the imposition of separate sentence for the robbery and the attempted robbery constituted multiple punishment in violation of 654, with the gun enhancements

For example, Section 654 precludes multiple punishment for a single act or omission, or an indivisible course of conduct (§ 654 People v Miller (1977) 18 Cal 3d 873, 885, ( 135 Cal Rptr 654, 558 P2d 522) If, for example, a defendant suffers two convictions punishment for one of which is precluded by section 654, that section require the

3.

sentence for one conviction to be imposed,
and the other imposed and then stayed
(People v Miller supr. 18 cal 3d at p 886.)
Section 654 does not allow any multiple
punishment including either concurrent or
Consecutive sentence (In re Wright (1967)
65 cal 2d 650, 652, 655 (56 cal Rptr. 110,
422 P2d 998.) (the Court erred in imposing
concurrent sentences for two conviction for
which Section 654 prohibited multiple punishment
(People v Miller, supra 18 Cal 3d at p 886
robbery of a victim at gunpoint has been
held to be an act of violence such as
to preclude application of section 654 in
the case of multiple conviction involving
multiple victims

        Court must impose the longest term,
and to determine which term is longest
the Court must take into account applicable
specific enhancement(s)

        for example (People v Kramer (2002)
29 c4th 720. 128. CR2d 407.) In kramer
the defendant was Convicted of pen code
Section 246 (seven - year maximum) and 245
(9) (four - year maximum) But with four
- year gun enhancement) The defendant

argued that the § 246 conviction was longer and that the § 245(a) count with the gun enhancement should be stayed. The court ruled that the enhancement(s) must be included in the calculation and ordered that the § 245 (a) sentence enhanced for the gun use be imposed.

For example, However brandishing of firearm in the presence of a police officer (Pen code § 417 (c) is subject to the limitation of 654, Brandishing a firearm in front of Multiple police officers may only be punished once.) People v Hall (2002) 83 Cd 546 101 CR2d 376.

Accordingly the court must stay the attempted robbery in count 10 and the gun enhancements, where a trial court erroneously fail to stay term subject to section 654, the court must stay sentence on the lesser offense while premitting execution of the greater offense Consistent with the intent of the sentencing court" People v Pena (1992) 7 Cal App 4th 1294 1312, People v Austin (1994) 23 Cal App 4th 1596 1614)

While the punishment for the home

1  invasion robbery in Count I is (9-years with
2  the 10-year gun enhancement.
3
4        While the punishment for the attempted
5  home invasion robbery in count 10 is (1-
6  year with the 3-year and 4 months gun
7  enhancements
8
9        Accordingly this court must modify
10  the sentence to stay imposition of the term
11  for the attempted home invasion robbery in
12  Count 10 together with the term for the
13  gun use enhancement (s) attached to the offense.
14
15        Appellant perfunctorily asserts in his
16  heading that multiple punishment (as to
17  Count (s) 1, 10 violates the federal double jeopardy
18  clause More over, if as to Count (s) 1 and 10
19  that said defendant (s), Candalee Morris
20  personally used a firearm, a handgun, with the
21  meaning of Penal Code Section 12022.53 (b)
22  Also current convictions arising from single
23  Incident. Moreover if both offense contain the same
24  elements that the other does, Then the offenses are
25  the same for the purpose of federal double
26  jeopardy Analysis,
27
28                    5

**FILED**

Los Angeles Superior Court

_233_

AUG 0 3 2005

John A. Clarke, Executive Officer/Clerk

By _____, Deputy

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | |
|---|---|
| The People of the State of California | **CASE NUMBER**    **DEPARTMENT** |
| Plaintiff, | BA279836    101 |
| vs. | |
| 01- MORRIS, CONDALEE | **VERDICT (Guilty)** |
| Defendant. | **(COUNT 1)** |

We, the jury in the above-entitled action, find the Defendant, CONDALEE MORRIS, guilty of the crime of HOME INVASION ROBBERY of HELADIO RAYOS, in violation of Penal Code Section 211, a Felony, as charged in Count One of the Information and find it to be Robbery of the _____First_____ Degree.

(Insert "First" or "Second")

We further find the allegation that the above offense was committed by the defendant who voluntarily acted in concert and entered a structure within the meaning of Penal Code Section 213(a)(1)(A) to be _____TRUE_____.

(Insert "TRUE" or "NOT TRUE")

We further find the allegation that the Defendant CONDALEE MORRIS personally used a firearm, to wit: a handgun, within the meaning of Penal Code Section 12022.53(b) to be _____TRUE._____.

(Insert "TRUE" or "NOT TRUE")

This _3_ day of _Aug_ 2005,

## VERDICT (GUILTY)

1  OKAY.

2  SIR, I WANT TO TAKE YOU BACK TO MARCH FOUR,

3  2004, AT APPROXIMATELY 1:00 IN THE MORNING.

4  WERE YOU AT 1806 WEST 42ND PLACE IN THE CITY

5  AND COUNTY OF LOS ANGELES?

6  A.   YES.

7  Q.   THAT IS 2005, JUST A COUPLE WEEKS AGO,

8  RIGHT?

9  A.   YES.

10  Q.   AT THAT DATE, TIME, AND LOCATION, WERE YOU

11  ASLEEP?

12  A.   YES.

13  Q.   AND IS THIS A SINGLE FAMILY RESIDENCE?

14  A.   YES.

15  Q.   DID SOMETHING WAKE YOU UP?

16  A.   YES.

17  Q.   WHAT WAS THE FIRST THING THAT YOU REMEMBER

18  THAT WOKE YOU UP?

19  A.   MY WIFE.

20  Q.   OKAY.  WAS SHE SAYING SOMETHING?

21  A.   YES.

22  Q.   BASED ON WHAT YOUR WIFE WAS SAYING, DID YOU

23  LOOK SOMEPLACE IN THE HOUSE?

24  A.   YES.

25  Q.   WHERE DID YOU GO, IF ANYPLACE?

26  A.   TO THE KITCHEN.

27  Q.   AND DID SOMETHING HAPPEN WHILE YOU WERE IN

28  THE KITCHEN?

1                    HELADIO RAYOS,

2    CALLED AS A WITNESS BY THE PEOPLE, WAS SWORN AND

3    TESTIFIED THROUGH THE SPANISH INTERPRETER AS FOLLOWS:

4         THE CLERK:  PLEASE RAISE YOUR RIGHT HAND TO BE

5    SWORN.

6              DO YOU SOLEMNLY STATE THAT THE TESTIMONY YOU

7    MAY GIVE IN THE CAUSE NOW PENDING BEFORE THIS COURT,

8    SHALL BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT

9    THE TRUTH, SO HELP YOU GOD?

10        THE WITNESS:  I DO.

11        THE CLERK:  PLEASE TAKE THE WITNESS STAND.

12             WOULD YOU PLEASE STATE AND SPELL YOUR FULL

13   NAME FOR THE RECORD.

14        THE WITNESS:  HELADIO RAYOS.

15        THE INTERPRETER:  INTERPRETER SPELLING, YOUR

16   HONOR?

17        THE COURT:  PLEASE.

18        THE INTERPRETER:  H-E-L-A-D-I-O, LAST NAME

19   R-A-Y-O-S.

20                  DIRECT EXAMINATION

21   BY MS. MILLER:

22        Q.   MR. RAYOS, YOU UNDERSTAND ENGLISH; IS THAT

23   CORRECT?

24        A.   A LITTLE BIT.

25        Q.   BEFORE YOU ANSWER THE QUESTIONS, I NEED TO

26   MAKE SURE YOU LET ME FINISH, LET THE INTERPRETER

27   INTERPRET COMPLETELY AND THEN RESPOND IN SPANISH SO THE

28   INTERPRETER CAN GO AHEAD AND TELL ME WHAT YOU SAID,

**FILED** 239
Los Angeles Superior Court

AUG 0 3 2005

John A. Clarke, Executive Officer/Clerk

By _____, Deputy

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

|  |  |
|---|---|
| The People of the State of California | **CASE NUMBER**  BA279836 |
| Plaintiff, | **DEPARTMENT**  101 |
| vs. |  |
| 01- MORRIS, CONDALEE | **VERDICT (Guilty)** |
| Defendant. | **(COUNT 10)** |

We, the jury in the above-entitled action, find the Defendant, CONDALEE MORRIS, guilty of the crime of ATTEMPTED FIRST DEGREE ROBBERY of DENISE RAYOS, in violation of Penal Code Section 664/211, a Felony,  as charged in Count Ten of the Information.

We further find the allegation that the Defendant CONDALEE MORRIS personally used a firearm, to wit: a handgun, within the meaning of Penal Code Section 12022.53(b) to be

_____TRUE_____.

(Insert "TRUE" or "NOT TRUE"

We further find the allegation that the above offense was committed by the defendant who voluntarily acted in concert and entered a structure within the meaning of Penal Code Section 213(a)(1)(A) to be _____TRUE_____.

(Insert "TRUE" or "NOT TRUE")

This 3 day of Aug 2005,

## VERDICT (GUILTY)

1    THE COURT:  LET'S TAKE A FIVE-MINUTE RECESS.

2            (RECESS.)

3

4    THE COURT:  BACK ON THE RECORD IN PEOPLE VERSUS

5    MORRIS.  DEFENDANT IS PRESENT, COUNSEL ARE PRESENT.

6            NEXT WITNESS.

7    MS. MILLER:  PEOPLE CALL DENISE RAYOS TO THE

8    STAND.

9    THE COURT:  THANK YOU.  PLEASE COME FORWARD,

10   MA'AM.  AND BEFORE TAKING YOUR SEAT IF YOU WOULD, RAISE

11   YOUR RIGHT HAND TO BE SWORN.

12

13            DENISE RAYOS,

14   CALLED AS A WITNESS BY THE PEOPLE, WAS SWORN AND

15   TESTIFIED AS FOLLOWS:

16   THE CLERK:  DO YOU SOLEMNLY STATE THAT THE

17   TESTIMONY YOU MAY GIVE IN THE CAUSE NOW PENDING BEFORE

18   THIS COURT, SHALL BE THE TRUTH, THE WHOLE TRUTH, AND

19   NOTHING BUT THE TRUTH, SO HELP YOU GOD?

20   THE WITNESS:  YES, SIR.

21   THE CLERK:  PLEASE TAKE THE WITNESS STAND.

22            WOULD YOU PLEASE STATE AND SPELL YOUR FULL

23   NAME FOR THE RECORD.

24   THE WITNESS:  D-E-N-I-S-E, R-A-Y-O-S.

25   THE COURT:  THANK YOU.

26            PLEASE PROCEED.

27

28

1

2                          DIRECT EXAMINATION

3    BY MS. MILLER:

4         Q.   MISS RAYOS, HOW OLD ARE YOU?

5         A.   22.

6         Q.   I WANT TO TAKE YOU BACK TO MAY FOUR, 2005 --

7    I MEAN MARCH FOUR, 2005, AT APPROXIMATELY ONE O'CLOCK

8    IN THE MORNING.

9              WERE YOU ASLEEP IN YOUR RESIDENCE AT 1806

10   WEST 42ND STREET IN THE CITY AND COUNTY OF LOS ANGELES?

11        A.   I DON'T LIVE THERE, BUT, YES.

12        Q.   IS IT YOUR PARENTS' RESIDENCE?

13        A.   IT'S MY PARENTS' RESIDENCE.

14        Q.   WERE YOU SLEEPING THERE THAT NIGHT?

15        A.   YES.

16        Q.   DID SOMETHING OUT OF THE ORDINARY HAPPEN

17   THAT MORNING?

18        A.   AT 1:00 IN THE MORNING.

19        Q.   YES?

20        A.   YES, IT DID.

21        Q.   DID SOME INDIVIDUALS COME INTO THE HOUSE?

22        A.   UMM, I WAS ASLEEP IN THE FRONT ROOM.  THERE

23   IS A DOOR THAT GOES THROUGH MY PARENTS' ROOM THAT

24   CONNECTS INTO MY SISTER'S ROOM AND I HEARD MY MOTHER

25   SCREAMING AND CRYING AND I HEARD MY SON CRYING.

26        Q.   WHO IS YOUR SON?

27        A.   AARON CARREON.  HE IS THE THREE YEAR OLD.  I

28   HEARD HIM CRYING AND IMMEDIATELY WHEN I HEARD HER, I

246

MINUTE ORDER
SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE PRINTED: 08/22/05

------------------------------------------------------------------------

CASE NO. BA279836

THE PEOPLE OF THE STATE OF CALIFORNIA
                          VS.
DEFENDANT 01:  CONDALEE  MORRIS

------------------------------------------------------------------------

INFORMATION FILED ON 04/01/05.


COUNT 01: 211 PC FEL  -  ROBBERY.
COUNT 02: 211 PC FEL  -  ROBBERY.
COUNT 03: 487(D)(2) PC FEL  -  GRAND THEFT FIREARM.
COUNT 04: 12021(C)(1) PC FEL  -  POSS FIREARM W/ PRIOR CONVCTN.
COUNT 05: 12021(C)(1) PC FEL  -  POSS FIREARM W/ PRIOR CONVCTN.
COUNT 06: 422 PC FEL  -  MAKING A CRIMINAL THREAT.
COUNT 07: 245(A)(2) PC FEL  -  ASSAULT WITH FIREARM ON PERSON.
COUNT 08: 12021(A)(1) PC FEL  -  POSSES FIREARM-FELON OR ADDICT.
COUNT 09: 245(A)(2) PC FEL  -  ASSAULT WITH FIREARM ON PERSON.
COUNT 10: 664-211 PC FEL  -  ATTEMPT ROBBERY.


ON 08/17/05 AT  900 AM  IN CENTRAL DISTRICT DEPT 101

CASE CALLED FOR PROBATION AND SENTENCE HEARING

PARTIES: WILLIAM POUNDERS (JUDGE) ALBERTA P. JORDAN   (CLERK)
         JEANNE IANNONE  (REP)     BRADLEY LIEBERMAN  (DA)

DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY STEVEN F. FISHER DEPUTY
PUBLIC DEFENDER

DEFENDANT WAIVES ARRAIGNMENT FOR JUDGMENT AND STATES THERE IS NO LEGAL CAUSE
WHY SENTENCE SHOULD NOT BE PRONOUNCED. THE COURT ORDERED THE FOLLOWING
JUDGMENT:

IMPRISONED IN STATE PRISON FOR A TOTAL OF 35 YEARS

AS TO THE BASE COUNT  (01):

COURT ORDERS PROBATION DENIED.

SERVE 19 YEARS IN ANY STATE PRISON

COURT SELECTS THE UPPER TERM OF 9 YEARS AS TO THE BASE TERM COUNT 01.

PLUS 10 YEARS PURSUANT TO SECTION 12022.53(B)P.C.

COUNT (01): DISPOSITION: FOUND GUILTY - CONVICTED BY JURY

                                        PROBATION AND SENTENCE HEARING
                      PAGE NO.   1      HEARING DATE: 08/17/05

247

CASE NO. BA279836
DEF NO.  01                                    DATE PRINTED 08/22/05

DMV ABSTRACT NOT REQUIRED

NEXT SCHEDULED EVENT:
SENTENCING

AS TO COUNT  (02):

COURT ORDERS PROBATION DENIED.

SERVE 5 YEARS AND 4 MONTHS IN ANY STATE PRISON

COURT SELECTS ONE-THIRD THE MID-TERM OF 6 YEARS WHICH IS  2 YEARS.


PLUS 40 MONTHS PURSUANT TO SECTION SEE COMMENTS

COUNT TWO IS ENHANCED FOR AN ADDITIONAL 40 MONTHS (3.4 YEARS)
PURSUANT TO PENAL CODE SECTION 12022.53(B), WHICH IS ONE-THIRD
OF THE TEN YEARS TYPICAL FOR THIS ALLEGATION.
THE 5.4 YEARS FOR COUNT TWO IS TO BE SERVED CONSECUTIVE TO THE
SENTENCE IN COUNT ONE.

COUNT (02): DISPOSITION: FOUND GUILTY - CONVICTED BY JURY

DMV ABSTRACT NOT REQUIRED

NEXT SCHEDULED EVENT:
SENTENCING

AS TO COUNT  (06):

COURT ORDERS PROBATION DENIED.

SERVE 24 MONTHS IN ANY STATE PRISON


COURT SELECTS ONE-THIRD THE MID-TERM OF 24 MONTHS WHICH IS  8 MONTHS.

PLUS 16 MONTHS PURSUANT TO SECTION SEE COMMENTS

COUNT SIX IS ENHANCED FOR AN ADDITONAL 16 MONTHS (1.4 YEARS)
PURSUANT TO PENAL CODE SECTION 12022.5(A)(1), WHICH IS ONE-THIRD
THE MID-TERM OF 4 YEARS.
THE 2 YEARS FOR COUNT SIX IS TO BE SERVED CONSECUTIVE TO THE
SENTENCE IN COUNTS ONE AND TWO.

COUNT (06): DISPOSITION: FOUND GUILTY - CONVICTED BY JURY

DMV ABSTRACT NOT REQUIRED

NEXT SCHEDULED EVENT:
SENTENCING

AS TO COUNT  (07):

                              PAGE NO.   2        PROBATION AND SENTENCE HEARING
                                                  HEARING DATE: 08/17/05

248

CASE NO. BA279836
DEF NO.  01                              DATE PRINTED 08/22/05

COURT ORDERS PROBATION DENIED.

SERVE 6 YEARS IN ANY STATE PRISON

COURT SELECTS THE MID TERM OF 2 YEARS AS TO COUNT 07.

PLUS 4 YEARS PURSUANT TO SECTION SEE COMMENTS

COUNT SEVEN IS ENHANCED FOR AN ADDITIONAL 4 YEARS PURSUANT TO
PENAL CODE SECTION 12022.5(A)(1).
THE COURT ORDERS THE SIX YEARS FOR COUNT SEVEN IMPOSED AND
STAYED PURSUANT TO PENAL CODE SECTION 654.

COUNT (07): DISPOSITION: FOUND GUILTY - CONVICTED BY JURY

DMV ABSTRACT NOT REQUIRED

NEXT SCHEDULED EVENT:
SENTENCING

AS TO COUNT  (08):

COURT ORDERS PROBATION DENIED.

SERVE 2 YEARS IN ANY STATE PRISON

COURT SELECTS THE MID TERM OF 2 YEARS AS TO COUNT 08.

THE COURT ORDERS THE TWO YEARS FOR COUNT EIGHT IMPOSED AND
STAYED PURSUANT TO PENAL CODE SECTION 654.

COUNT (08): DISPOSITION: FOUND GUILTY - CONVICTED BY JURY

DMV ABSTRACT NOT REQUIRED

NEXT SCHEDULED EVENT:
SENTENCING

AS TO COUNT  (09):

COURT ORDERS PROBATION DENIED.

SERVE 4 YEARS AND 4 MONTHS IN ANY STATE PRISON

COURT SELECTS ONE-THIRD THE MID-TERM OF 3 YEARS WHICH IS  1 YEARS.

PLUS 40 MONTHS PURSUANT TO SECTION SEE COMMENTS

COUNT NINE IS ENHANCED FOR AN ADDITIONAL 40 MONTHS (3.4 YEARS)
PURSUANT TO PENAL CODE SECTION 12022.5(A)(1), WHICH IS ONE-THIRD
OF THE TEN YEARS ALLOWED FOR THIS ALLEGATION.
THE 4.4 YEARS FOR COUNT NINE IS TO BE SERVED CONSECUTIVE TO THE
SENTENCE IN COUNTS ONE, TWO AND SIX.

                              PROBATION AND SENTENCE HEARING
              PAGE NO.    3      HEARING DATE: 08/17/05

249

CASE NO. BA279836
DEF NO.  01

DATE PRINTED 08/22/05

COUNT (09): DISPOSITION: FOUND GUILTY - CONVICTED BY JURY

DMV ABSTRACT NOT REQUIRED

NEXT SCHEDULED EVENT:
SENTENCING

AS TO COUNT  (10):

COURT ORDERS PROBATION DENIED.

SERVE 4 YEARS AND 4 MONTHS IN ANY STATE PRISON

COURT SELECTS ONE-THIRD THE MID-TERM OF 3 YEARS WHICH IS  1 YEARS.

PLUS 40 MONTHS PURSUANT TO SECTION SEE COMMENTS

DEFENDANT GIVEN TOTAL CREDIT FOR 192 DAYS IN CUSTODY 167 DAYS ACTUAL CUSTODY
AND 25 DAYS GOOD TIME/WORK TIME

PLUS $20.00 COURT SECURITY ASSESSMENT (PURSUANT TO 1465.8(A)(1) P.C.)

TOTAL DUE: $20.00

IN ADDITION:

-MAKE RESTITUTION TO THE VICTIM, KATHERINE RAYOS, PURSUANT TO
PENAL CODE SECTION 1203.04 IN THE AMOUNT OF $3,400.00.

-THE DEFENDANT IS TO PAY A RESTITUTION FINE PURSUANT TO SECTION
1202.4(B) PENAL CODE IN THE AMOUNT OF $6,600.00.

-DEFENDANT IS TO PAY A PAROLE RESTITUTION FINE, PURSUANT TO PENAL

CODE SECTION 1202.45, IN THE AMOUNT OF $6,600.00.
SAID FINE IS STAYED AND THE STAY IS TO BECOME PERMANENT UPON
SUCCESSFUL COMPLETION OF PAROLE.

-THE COURT ADVISES THE DEFENDANT OF APPEAL RIGHTS.

-THE COURT ORDERS THAT THE DEFENDANT PROVIDE TWO SPECIMENS OF
BLOOD, A SALIVA SAMPLE, RIGHT THUMBPRINT, AND A FULL PALM PRINT
IMPRESSION OF EACH HAND FOR LAW ENFORCEMENT IDENTIFICATION
ANALYSIS.

COUNT TEN IS ENHANCED FOR AN ADDITIONAL 40 MONTHS (3.4 YEARS)
PURSUANT TO PENAL CODE SECTION 12022.53(B), WHICH IS ONE-THIRD
OF THE TEN YEARS TYPICAL FOR THIS ALLEGATION.
THE 4.4 YEARS FOR COUNT TEN IS TO BE SERVED CONSECUTIVE TO THE
SENTENCE IN COUNTS ONE, TWO, SIX AND NINE.

THE DEFENDANT IS REMANDED TO STATE PRISON, FORTHWITH.

PAGE NO.    4

PROBATION AND SENTENCE HEARING
HEARING DATE: 08/17/05

8:90

1    PRESENT.   CONTINUING THEN WITH THE INSTRUCTIONS, THE TOPIC

2    NOW BEING THE CRIMES CHARGED.

3              (READING:)

4              THE DEFENDANT IS

5    ACCUSED IN COUNTS 1 AND 2 OF HAVING

6    COMMITTED THE CRIME OF ROBBERY, A

7    VIOLATION OF SECTION 211 OF THE PENAL

8    CODE.

9              EVERY PERSON WHO

10   TAKES PERSONAL PROPERTY IN THE

11   POSSESSION OF ANOTHER AGAINST THE

12   WILL AND FROM THE PERSON OR IMMEDIATE

13   PRESENCE OF THAT PERSON ACCOMPLISHED

14   BY MEANS OF FORCE OR FEAR AND WITH

15   THE SPECIFIC INTENT PERMANENTLY TO

16   DEPRIVE THAT PERSON OF THE PROPERTY

17   IS GUILTY OF THE CRIME OF ROBBERY, IN

18   VIOLATION OF PENAL CODE SECTION 211.

19              THE WORDS "TAKES" OR

20   "TAKING" REQUIRE PROOF OF:

21              ONE, TAKING

22   POSSESSION OF THE PERSONAL PROPERTY;

23              AND, TWO, CARRYING IT

24   AWAY FOR SOME DISTANCE SLIGHT OR

25   OTHERWISE.

26              "IMMEDIATE PRESENCE"

27   MEANS AN AREA WITHIN THE ALLEGED

28   VICTIM'S REACH, OBSERVATION OR

CONTROL SO THAT HE OR SHE COULD, IF NOT OVERCOME BY VIOLENCE OR PREVENTED BY FEAR, RETAIN POSSESSION OF THE SUBJECT PROPERTY.

"AGAINST THE WILL" MEANS WITHOUT CONSENT.

IN ORDER TO PROVE THIS CRIME, EACH OF THE FOLLOWING ELEMENTS MUST BE PROVED:

ONE, A PERSON HAD POSSESSION OF PROPERTY OF SOME VALUE, HOWEVER SLIGHT;

TWO, THE PROPERTY WAS TAKEN FROM THAT PERSON OR FROM HIS OR HER IMMEDIATE PRESENCE;

THREE, THE PROPERTY WAS TAKEN AGAINST THE WILL OF THAT PERSON;

FOUR, THE TAKING WAS ACCOMPLISHED EITHER BY FORCE OR FEAR;

AND, FIVE, THE PROPERTY WAS TAKEN WITH THE SPECIFIC INTENT PERMANENTLY TO DEPRIVE THAT PERSON OF THE PROPERTY.

FOR THE PURPOSES OF DETERMINING WHETHER A PERSON IS GUILTY AS AN AIDER AND ABETTOR TO ROBBERY, THE COMMISSION OF THE CRIME

892

OF ROBBERY IS NOT CONFINED TO A FIXED
PLACE OR A LIMITED PERIOD OF TIME AND
CONTINUES SO LONG AS THE STOLEN
PROPERTY IS BEING CARRIED AWAY TO A
PLACE OF TEMPORARY SAFETY.

THE ELEMENT OF FEAR
IN THE CRIME OF ROBBERY MAY BE
EITHER:

ONE, THE FEAR OF AN
UNLAWFUL INJURY TO THE PERSON OR
PROPERTY OF THE PERSON ROBBED OR TO
ANY OF HIS OR HER RELATIVES OR FAMILY
MEMBERS;

OR, TWO, THE FEAR OF
AN IMMEDIATE AND UNLAWFUL INJURY TO
THE PERSON OR PROPERTY OF ANYONE IN
THE COMPANY OF THE PERSON ROBBED AT
THE TIME OF THE ROBBERY.

THERE ARE TWO DEGREES
OF ROBBERY. EVERY ROBBERY OF ANY
PERSON WHICH IS PERPETRATED IN AN
INHABITED DWELLING HOUSE IS ROBBERY
OF THE FIRST DEGREE. ALL OTHER
ROBBERIES ARE OF THE SECOND DEGREE.

IF YOU FIND THE
DEFENDANT GUILTY OF ROBBERY OR
ATTEMPTED ROBBERY, YOU MUST DETERMINE
THE DEGREE THEREOF AND STATE THAT

893

DEGREE IN YOUR VERDICT.  IF YOU HAVE
A REASONABLE DOUBT WHETHER THE
ROBBERY IS OF THE FIRST OR SECOND
DEGREE, YOU MUST FIND IT TO BE OF THE
SECOND DEGREE.

EVERY PERSON WHO
VOLUNTARILY ACTING IN CONCERT WITH
TWO OR MORE OTHER PERSONS COMMITS
ROBBERY WITHIN AN INHABITED DWELLING
HOUSE IS GUILTY OF VIOLATING PENAL
CODE SECTION 213(A)(1)(A), A CRIME.

THE TERM "ACTING IN
CONCERT" MEANS TWO OR MORE PERSONS
ACTING TOGETHER IN A GROUP CRIME, AND
INCLUDES NOT ONLY THOSE WHO
PERSONALLY ENGAGE IN THE ACT OR ACTS
CONSTITUTING THE CRIME BUT ALSO THOSE
WHO AID AND ABET A PERSON IN
ACCOMPLISHING IT; HOWEVER, WHEN THE
CRIME CHARGED IS ROBBERY IN CONCERT,
THERE MUST BE AT LEAST THREE PERSONS,
INCLUDING ANY DEFENDANT ACTING IN
CONCERT.

TO ESTABLISH THAT A
DEFENDANT VOLUNTARILY ACTED IN
CONCERT WITH OTHER PERSONS, IT IS NOT
NECESSARY TO PROVE THAT THERE WAS ANY
PREARRANGED PLANNING OR SCHEME.

894

```
1                    I'M SORRY.
2                    PREARRANGEMENT,
3    PLANNING OR SCHEME.
4                    IN ORDER TO PROVE
5    THIS CRIME, EACH OF THE FOLLOWING
6    ELEMENTS MUST BE PROVED:
7                    ONE, A ROBBERY WAS
8    COMMITTED;
9                    TWO, THE ROBBERY WAS
10   COMMITTED WITHIN AN INHABITED
11   DWELLING HOUSE;
12                   AND, THREE, THE
13   DEFENDANT VOLUNTARILY ACTED IN
14   CONCERT WITH TWO OR MORE OTHER
15   PERSONS IN COMMITTING THE ROBBERY.
16                   AN INHABITED DWELLING
17   HOUSE IS A STRUCTURE WHICH IS
18   CURRENTLY USED AS A DWELLING, WHETHER
19   OCCUPIED OR NOT.  IT IS INHABITED
20   ALTHOUGH THE OCCUPANTS ARE
21   TEMPORARILY ABSENT.
22                   DEFENDANT IS ACCUSED
23   IN COUNT 10 OF HAVING COMMITTED THE
24   CRIME OF ATTEMPTED FIRST DEGREE
25   ROBBERY.  AN ATTEMPT TO COMMIT A
26   CRIME CONSISTS OF TWO ELEMENTS,
27   NAMELY A SPECIFIC INTENT TO COMMIT
28   THE CRIME AND A DIRECT, BUT
```

1  INEFFECTUAL, ACT DONE TOWARD ITS

2  COMMISSION.

3          IN DETERMINING

4  WHETHER THIS ACT WAS DONE, IT IS

5  NECESSARY TO DISTINGUISH BETWEEN MERE

6  PREPARATION ON THE ONE HAND AND THE

7  ACTUAL COMMENCEMENT OF THE DOING OF

8  THE CRIMINAL DEED ON THE OTHER.

9          MERE PREPARATION,

10  WHICH MAY CONSIST OF PLANNING THE

11  OFFENSE, OF DEVISING, OBTAINING OR

12  ARRANGING THE MEANS FOR ITS

13  COMMISSION IS NOT SUFFICIENT TO

14  CONSTITUTE AN ATTEMPT; HOWEVER, ACTS

15  OF A PERSON WHO INTENDS TO COMMIT A

16  CRIME WILL CONSTITUTE AN ATTEMPT

17  WHERE THOSE ACTS CLEARLY INDICATE A

18  CERTAIN UNAMBIGUOUS INTENT TO COMMIT

19  THIS SPECIFIC CRIME.

20          THOSE -- THESE ACTS

21  MUST BE AN IMMEDIATE STEP IN THE

22  PRESENT EXECUTION OF THE CRIMINAL

23  DESIGN, THE PROGRESS OF WHICH WOULD

24  BE COMPLETED UNLESS INTERRUPTED BY

25  SOME CIRCUMSTANCE NOT INTENDED IN THE

26  ORIGINAL DESIGN.

27          THE DEFENDANT IS

28  ACCUSED IN COUNT 3 OF HAVING

942

1    ANY VERDICT OR FINDING IS NOT YOURS, YOU WOULD INDICATE

2    THAT BY SAYING NO; IF THEY ARE ALL YOUR VERDICTS, YOU

3    WOULD SAY YES WHEN POLLED.

4                    THE CLERK:   "TITLE OF COURT

5            AND CAUSE.

6                        "COUNT 1.

7                        "WE, THE JURY IN THE

8            ABOVE-ENTITLED ACTION, FIND THE

9            DEFENDANT, CONDALEE MORRIS, GUILTY OF

10           THE CRIME OF HOME INVASION ROBBERY OF

11           HELADIO RAYOS, IN VIOLATION OF PENAL

12           CODE SECTION 211, A FELONY, AS

13           CHARGED IN COUNT 1 OF THE

14           INFORMATION, AND FIND IT TO BE

15           ROBBERY OF THE FIRST DEGREE.

16                        "WE FURTHER FIND THE

17           ALLEGATION THAT THE ABOVE OFFENSE WAS

18           COMMITTED BY THE DEFENDANT WHO

19           VOLUNTARILY ACTED IN CONCERT AND

20           ENTERED A STRUCTURE, WITHIN THE

21           MEANING OF PENAL CODE SECTION 213

22           SUBSECTION (A) SUBSECTION (1)

23           SUBSECTION (A) TO BE TRUE.

24                        "WE FURTHER FIND THE

25           ALLEGATION THAT THE DEFENDANT,

26           CONDALEE MORRIS, PERSONALLY USED A

27           FIREARM, TO WIT, A HANDGUN, WITHIN

28           THE MEANING OF PENAL CODE SECTION

1    12022.53 SUBSECTION (B) TO BE TRUE.

2              "THIS 3RD DAY OF

3    AUGUST, 2005.

4              "SIGNED JUROR NO. 10,

5    FOREPERSON.

6              "COUNT 2.

7              "WE, THE JURY IN THE

8    ABOVE-ENTITLED ACTION, FIND THE

9    DEFENDANT, CONDALEE MORRIS, GUILTY OF

10    THE CRIME OF HOME INVASION ROBBERY OF

11    KATHERINE RAYOS, IN VIOLATION OF

12    PENAL CODE SECTION 211, A FELONY, AS

13    CHARGED IN COUNT 2 OF THE

14    INFORMATION, AND FIND IT TO BE

15    ROBBERY OF THE FIRST DEGREE.

16              "WE FURTHER FIND THE

17    ALLEGATION THAT THE ABOVE OFFENSE WAS

18    COMMITTED BY THE DEFENDANT WHO

19    VOLUNTARILY ACTED IN CONCERT AND

20    ENTERED A STRUCTURE, WITHIN THE

21    MEANING OF PENAL CODE SECTION 213

22    SUBSECTION (A) SUBSECTION (1)

23    SUBSECTION (A) TO BE TRUE.

24              "WE FURTHER FIND THE

25    ALLEGATION THAT THE DEFENDANT,

26    CONDALEE MORRIS, PERSONALLY USED A

27    FIREARM, TO WIT, A HANDGUN, WITHIN

28    THE MEANING OF PENAL CODE SECTION

947

PENAL CODE SECTION 1203.06 SUBSECTION

(A) SUBSECTION (1) AND 12022.5

SUBSECTION (A) SUBSECTION (1) TO BE

TRUE.

"THIS 3RD DAY OF

AUGUST, 2005.

"SIGNED JUROR NO. 10,

FOREPERSON.

"COUNT 10.

"WE, THE JURY IN THE

ABOVE-ENTITLED ACTION, FIND THE

DEFENDANT, CONDALEE MORRIS, GUILTY OF

THE CRIME OF ATTEMPTED FIRST DEGREE

ROBBERY OF DENISE RAYOS, IN VIOLATION

OF PENAL CODE SECTION 664/211, A

FELONY, AS CHARGED IN COUNT 10 OF THE

INFORMATION.

"WE FURTHER FIND THE

ALLEGATION THAT THE DEFENDANT,

CONDALEE MORRIS, PERSONALLY USED A

FIREARM, TO WIT, A HANDGUN, WITHIN

THE MEANING OF PENAL CODE SECTION

12022.53 SUBSECTION (B) TO BE TRUE.

"WE FURTHER FIND THE

ALLEGATION THAT THE ABOVE OFFENSE WAS

COMMITTED BY THE DEFENDANT WHO

VOLUNTARILY ACTED IN CONCERT AND

ENTERED A STRUCTURE, WITHIN THE

948

1    MEANING OF PENAL CODE SECTION 213

2    SUBSECTION (A) SUBSECTION (1)

3    SUBSECTION (A) TO BE TRUE.

4         "THIS 3RD DAY OF

5    AUGUST, 2005.

6         "SIGNED JUROR NO. 10,

7    FOREPERSON."

8         IS THIS YOUR VERDICT, SO SAY YOU ONE, SO

9    SAY YOU ALL.

10

11    (THE JURORS ANSWERED IN THE AFFIRMATIVE.)

12

13    THE COURT:  WOULD EITHER SIDE REQUEST POLLING OF

14    THE JURORS INDIVIDUALLY?

15    MR. FISHER:  YES, YOUR HONOR.

16    THE COURT:  WE WILL INDICATE BY YOUR SEAT LOCATION

17    AND DESIGNATE WHEN ASKED WHETHER THOSE ARE YOUR VERDICTS

18    ENTIRELY.  IF SO SAY YES, IF NOT, SAY NO.

19    THE CLERK:  JUROR NO. 1.

20    JUROR NO. 1:  YES.

21    THE CLERK:  JUROR NO. 2.

22    JUROR NO. 2:  YES.

23    THE CLERK:  JUROR NO. 3.

24    JUROR NO. 3:  YES.

25    THE CLERK:  JUROR NO. 4.

26    JUROR NO. 4:  YES.

27    THE CLERK:  JUROR NO. 5.

28    JUROR NO. 5:  YES.

Argument 3

1   There was ample support for use of a properly
2   conducted show-up procedure in count 1 (Mr Heladio
3   Rayos. And (2) there was nothing in conduct of
4   show up procedure to support exclusion of Both
5   the eyewitness Testimony or the expert eyewitness
6   testimony

7
8       Supporting facts
9       Petitioner alleges that the people of the
10  state of California never proved or determined
11  whether the show-up procedure was impermissibly
12  suggestive in count 1 of (Mr Heladio Rayos)
13  To support his Identification of (Mr Morris)
14  as the Robbery suspect or the perpetrator

15
16      1) LAPD's practice and procedure
17  Manual Section 203.50 Identification
18  of Suspects in the field (see exhibit 22)

19
20      2) Addition, It's very easy to argue
21  that this "non exigent" show-up procedure
22  was not a product of any independant
23  recollection of the victim (Mr Heldio Rayos
24  in count 1, where the officer who conduct
25  this field confrontation told the victim
26  (Mr Heladio) that they had the suspect
27  that Burgiazed there house, Before (mr
28  Heladio went to make his Identification

1.

1   (Rt 374 Line 20-23) (Ct 86 Line 1-6) (exhibits 12-13)

2

3       3) The "non exigent" circumstance that

4   it didn't make it unreasonable for the

5   victims to be transported to the suspect.

6          What did LAPD's officer do after taking

7   Mr Morris into custody?

8       a) We conducted a follow-up to the

9   house, to the location (Rt 642 Line 11-27)

10      b) Well, what Happened was the

11  Defendant was pretty far down the street,

12  so we didn't have to walk them all the

13  way down there, The defendant was brought

14  oh, Probably Halfway Between 1806 and where

15  he was detained, so He was still away from

16  the Location, And each of the victims

17  were put in a police car and taken down to

18  where they were. They viewed and then

19  they were driven back (Rt 648 Line 21-28)

20  (exhibits 23-24)

21

22      4) When a suspect suspect Identified

23  or when a suspect not Identified in a "Show-

24  up" the teletype notification Card shall be

25  filled out (see exhibit 22)

26

27      5) None of these witnesses that called

28  911 or Reported this Robbery to the police

2

1 gave a description of the suspects see exhibits"
2 26B) (transcript of audio tape) (Letter 3, 2, 1)
3 (clerks transcript page 1 of 1) (see exhibits 1-4)

5     6) The cross racial or Ethic nature of
6 Identification a criminal Defense Lawyer or a
7 Lawyer have a little trouble with this because
8 you know people will Misinterpret what they
9 say. But you ever heard the expression, "They
10 all look alike?" we had a perfect example of
11 this in trial.

13     None of these witnesses could Distinguish the
14 faces, other than Height, weight, The perpetrators
15 other than Height and weight

17     There was a skinny one? Mr Morris
18 apparently was that one as well. If you get
19 down to it. He was just like five-seven,
20 five-eight; The ski mask one, the other
21 person, we had some testimony He looked
22 younger. (Rt 327 Line 13-20) (Rt 328 Line 25-28)
23 (Rt 329 Line 1) (Ct 105 Line 9-11) (Ct 106 Line 15-18)
24 (Ct 107 Line 1-32) (see exhibits 5-10)
25     But couldn't Distinguish other than
26 age, weight and Hieght also (Mr Heladro
27 Bayos) Testified, yeah, I Recognize him
28 because He was the taller of them all

3

1  (Rt 361 Line 16-21) (see exhibit 11)

3  IS He Identifying (mr Morris by his
4  face or is He Identifing him because
5  of his Height, weight or what ever?
6  Because we now Basically that all of them
7  look the same, with the exception of state
8  of physical CHaracteristic Height weight
9  whatever, except the shorter one, all right?

11  Now of course we know one of them
12  had a ski mask But that one, that had
13  the ski mask was Basically the same
14  PHysical Description as the others.

16  It's very easy to argue that this
17  "non exigent" show-up procedure was not
18  a product of any independant recollection
19  of the Victim (Mr Heladio Rayos) in Count 1
20  where the officer who conduct this
21  field Confrontation told the victim (Mr Heladio)
22  that they had the suspect that Bugraized
23  there house. Before (Mr Heladio) went to
24  Make his Identification (Rt 374 Line 20-23
25  (Ct 86 Line 1-6) (exhibit 12-13)

27  That's Pre suggestive that they have the
28  Person that did it, tainting any kind of

4

1  objectivity or Creating Bias from the witness
2  ( Mr Heladio ) Before Identification

4       The Counsel asked him before, He made
5  the Identification, were you glad that they
6  had gotten one of them? And He said well
7  Yeah, Remember what we went through
8  That? And is it fair to say you were real
9  upset ~~From~~ Traumatized because this was
10 probably one of the most Dramatic thing
11 that ever happened to you, Correct, yes
12 (Rt 361 Line 27-28.) (Rt 362 Line 1.) (Rt 374 Line 28)
13 (Rt 375 line 1-6.) ( see Exhibits 14 - 12 - 15 - 16.)

15      Now keep in mind He's the first one
16 that made the "non exigent Identification,
17 He was Driving up in a patrol car, all right?
18 And you have an African American suspect
19 there the only one, there, okay and Handcuffed
20 , He said surround by He doesn't even know
21 how many police officers, But uniformed
22 LAPD officers, And then they're parked
23 there, they shining there light on Mr
24 Morris ( Rt 374 Line 1-5) (Rt 374 Line 24-27).
25 (Rt 375 Line 7-11) (Rt 649 Line 3-5)(see exhibit
26 15 - 12 - 19 )
27      And my Counsel asked him how long
28 did it take you to make this Identification
                    -3-

of Mr Morris? Couple of Minutes (Rt 375 - 15 - 17)
(see Exhibit 15)

    And we already Discussed at the
beginning the Circumstance under which
( Mr Heladio Rayos ) made his Identification
A person that's been wrong like this would
have a disposition to point out this person.

    Now, that ( Mr Heladio Rayos ) was told
by the officials that they have the person,
Mr Lieberman got a police officer on the
witness stand And said," Did you read an
admonition to those witnesses?" But that's
not what happened with ( Mr Heladio Rayos ) okay?
keep in mind we had a police officer come
in trial that wasn't even present at the
Identification or in the car. He was in the
back ground and He's trying to say that
the witness ( Mr Heladio Rayos ) came
back and said Yeah I Positively Identified
Mr Morris, ( Rt 649 Line ~~28~~ 16 - 28) (Rt 650 Line
1 - 10) ( see exhibits 19 - 18 )

    And Counsel asked him," were you taking
notes. when you were interviewing these
witnesses, Did you take any notes? Yes I
did. Did you bring those notes to Court
today? no I didn't. How long after this

incident, where are these notes? I either discarded
them or I may have them somewhere,
You know you're supposed to keep the notes,
Don't you? At the time I didn't know, I
later found out that it probably would
have been a good idea to keep them.
How long after the interview was the
police report prepared by your parter.
When you say they made these statements?
Let's see, probably we got the call approximately
approximately 1:05 I would say that where
we started writting, actually writting the
report was Approximately 5:00 to maybe 6:00
in the morning, some where around there,
So How many hours after the statements
was made regarding the Identification,
that part of the report written? Well,
That would be around 5:00 to 6:00 hours,
And you remember you had some notes?
Yes. And do you know what you did with
those notes again? I don't remember
what I did with them (Rt 660 Line 21-28
(Rt 661 Line 1-23) (see Exhibits 20-21)

        This argument was offered regarding
the exclusion "Eyewitness testimony
of both. The expert witness and
the Identification testimony by (Mr Helodio)

— 2

1  the victim of the home invasion robbery

2

3        The LAPD officers held a suggestive
4  "non exigent show-up procedure in count 1
5  I'm going to use the LAPD's practice
6  and procedure Manual (see section 203.50
7  Identification of suspect in the field. To
8  prove my point (see Exhibit 22)

9

10        Like I said it was very easy to
11  argue that this non exigent show-up procedure
12  in count 1. was not a product of any
13  independant recollection of (Mr Heladio).
14  Because the officer that conducted this
15  field confrontation told (Mr Heladio Rayos) that
16  they had the suspect that robbed them.
17  Counsel asked him did the police officer tell
18  you that they had the suspect that Burgiarized
19  your house? And He said Yes. This happen
20  before be what to make his Identification
21  (Rt 374 Line 20-23) (Ct 86 Line 1-6) (Exhibits 13-
22  12.)
23        I'm going to show you where
24  the LAPD officer violated there own practice
25  and procedure Manual (see Exhibit 22)
26  At 203.50 Identification of the suspect
27  in the field.
28        And officer who intends to conduct

a field confrontation shall inform the
victim that (1) The person is in temporary
custody as a possible suspect "only."
And (2) The fact the person is in police
custody does not Indicate his "guilt"
or "innocence," And (3) The purpose of
the confrontation is either to "Eliminate"
or "Identify" the person as the perpetrator.

You ready, 1) where officer who intends
to conduct a field confrontation shall inform
the victim that the person is in temporary
custody as a possible suspect "only."
But in Mr Morris field show-up, The officer
who was conducting this field confrontation
told (Mr Heladio Rayos) that they had the
suspect who Robbed them. Counsel ask
(Mr Heladio) did the police tell you that they
had the suspect that Burglarized your house?
And he said yes He was told this before
he what to make his Identification of Mr Morris
And (2). The fact the person is in police
custody does not Indicate his "guilt" or
"innocence". The police made it clear to
(Mr Heladio) that Mr Morris was guilt of
the Crime. And (3) The purpose of the
confrontation is either to "Eliminate" or "Identify"
the person as the perpetrator. Before the

1  Confrontation the police told (Mr Heladio) that
2  Mr morris was the suspect that Burgurized
3  there house. So because of what the
4  LAPD officer told (Mr Heladio), Mr morris
5  was already Identify before the feld
6  Confrontation

7
8       The trial court should have suppressed
9  the eye witnesses testimony Apparently on
10 the Basis that the show-up procedure
11 was improper; As Non Exigent circumstance
12 required In this case for Identification in the
13 field

14      Again it was very easy to agree that
15 the Identification of suspect in the feild. A
16 suspect may be transported to a victim
17 or witness for the purpose of Identification
18 When; (see Exhibit 22) At (203.50)

19
20    1.) An officer is Conducting a preliminary investi
21 gation and a field confrontation is necessary
22 to determine if the susped is the perpertrator
23 of the offense; and (2) Probable cause exists
24 to arrest the suspect for the offense; or
25 (3) Exigent Circumstances exist that make it
26 unreasonable for the victim or witness to be
27 transported to the suspect; or (4) The officer
28 obtain the free and voluntary consent of the

1.0

1. suspect.

2.

3.

4.  1) An officer is conducting a preliminary investi

5. gation and a field Confrontation is necessary

6. to determine if the suspect is the perpetrator of

7. the offense. The office that conduct a preliminary

8. investigation and a field confrontation made it

9. Clear that Mr Morris was the suspect. When

10. Counsel asked (Mr Heladio) did the police officer

11. tell you that they had the suspect that Burgorized

12. you house? And He said 3 Yes that's happen before

13. he made his Identification (Ct 86-1-6 ) (Rt 374-20-23)

14. (exhibits 12-13 )

15.  And (2) Probable Cause exists to arrest

16. the suspect for the offense. As you could

17. see the police made it Clear that it was

18. probable Cause Exists to arrest Mr Morris

19. of the offense.

20.

21.  And 3) Exigent Circumstance ~~exist~~ exist that

22. make it unreasonable for the victim or

23. ~~~~ witness to be transported

24. to the suspect. Well if this Counts,

25.  Well, what happened was the Defendant

26. was pretty far down the street, so

27. we didn't have to walk them all the

28. way down there. The defendant was brought,

11

1  , OU, Probably Halfway Between 1806 and where He
2  was detained, So He was still away from the Location,
3  and each of the victims were put in a police car
4  and taken down to where they were. They viewed
5  and then they were driven back (648  Line 21-28)
6  (at 642 Line 11-27) Exhibits (23-24)
7    And (4) The officer obtains the free and
8  voluntary consent of the suspect, And the
9  officer how obtain Mr Morris did not
10 voluntary get consent from Mr Morris to
11 be place in a field confrontation, being without
12 peronally present with counsel

13

14 " The trial court should have suppressed the
15 eyewitness testimony apparently on the basis
16 that the show up procedure was improper
17 insofar as no exigent circumstance required
18 I" Booth, to be Handcuffed and taken
19 back to the bank 669 F2d at 1239

20

21   And show up procedure can be a
22 Sawtary police practice although a show-up
23 procedure is more Suggestive than a lineup
24 because the suspect is the only person
25 presented for Identification. Returning a
26 Suspect to the scene of a crime shortly
27 after it's commission to determine whether
28 our witness Identify/zhim as the perpetrator

Permits the witness to make the determination
while the image of the perpetrator is still fresh
in his mind, and may lead to the expedite
release of inocent suspect (citing US v williams
626 F2d 697 743 (9th cir cert denied, 499 US 1020,
101 sct 586, 66 Led .2d 482(1980)( U.S. v coades
549 F2d. 1303, 1305 ( 9th cir 1977)

      The notes in Question related to the
witnesses statement and identification. We
already know that they violated the police
procedure once. But they did it again by
throwing away the notes in question

      Accordingly the court must determine
whether in the totality of circumstances
that the show up procedure was so impermissibly
suggestive as to give rise to a
very substantial likelihood of irreparable
misidentification" 669 F2d at 1239) quoting
simmons v United States 391 US 377, 384
88 Sct, 967, 971, 19 Led 2d 1247 (1968) and
United States v Field 628 F2d 867 865
9th cir 1980) Accordingly the court should
order or Remand, the court to suppressed
the eye witness testimony and the
Government Filed this appeal Pursuant
to 18 USC section 3731. I contend the

13

1. Court order should be upheld.

2.

3.     Condalee Morris Advances three principal

4. arguement (s)

5.     First, Condalee Morris contends that his

6. display in handcuffs and taking back to the

7. Crime scene or back in handcuffs halfway.

8. And place in a "non exigent show-up was "improper"

9.

10.     Secondly, He contends that the police officer

11. told the victim (Mr Heladio Rayos) that

12. they had the suspect that Burgiarized your

13. house? Before we went to make the

14. Identification and that "PRe suggestive"

15.

16.     Third, He contends that the writen

17. statements about the identification was

18. throw Away and that was "inherently

19. Suggestive"

20.

21.

22.

23.

24.

25.

14

7

1  ~~THAT THE IDENTIFICATION WAS THROWN AWAY AND THAT WAS~~

2  ~~INHERENTLY SUGGESTIVE~~

3

4         PETITIONER CONTENDS THAT REVIEWAL IS REQUIRED

5  AND THERE WAS REASONABLE PROBABILITY THAT RESULT OF

6  TRIAL WOULD HAVE BEEN DIFFERENT SINCE THE SHOWUP

7  PROCEDURE IDENTIFICATION WAS PIVITOL EVIDENCE IN

8  THE CASE, NEVERTHELESS CONDALEE MORRIS COUNSEL DID

9  NOT MOVE TO SUPPRESS ANY EVIDENCE REGARDING THE

10 SHOWUP. IDENTIFICATION PROCEDURE NOR DID HE ARGUE

11 THAT ANY IN-COURT IDENTIFICATION THAT ( MR RAMOS )

12 MIGHT MAKE WOULD NECESSARILY BE TAINTED BY

13 ~~THE SUGGESTIVE of SHOWUP PROCEDURE~~, THE

14 DEFENDANT WAS DENIED DUE PROCESS of LAW

15 GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENT

16 OF THE UNITED STATE CONSTITUTION AND ARTICLE 1 §15

17 of THE CALIFORNIA CONSTITUTION

18

19         POINTS AND AUTHORITIES

20  - - - - - - - - - - - - - - - - - - - -

21         SHOWUP PROCEDURE ARE NOT OBJECTIONABLE UNLESS

22 PROCEDURE IS SO IMPERMISSIBLY SUGGESTIVE AS TO GIVE

23 RAISE TO VERY SUBSTANTIAL LIKELIHOOD OF IRREPARABLE MIS-

24 IDENTIFICATION ( UNITED STATES v. BOOTH 669 F2d AT 1239 )

25 CRIMINAL LAW. 339.8(5)

26         CHALLENGES THE IDENTIFICATION PROCEDURES MUST BE

27 RESOLVED ON A CASE TO CASE BASIS ( CRIMINAL LAW 339.6 )

28 MANSON v. BRAITHWAITE 432 U.S. 98, 114, 97 SCt 2243 -

8

1    2253 ; 53 Led 2d 104 (1977) NEIL V. BIGGER 409 US
2    188 , 199, 220 ; 93 Sct 375, 382, 383 ; 34 Led 2d 401
3    (1972) SIMMON V UNITED STATES 390 US 377, 384 ; 88 Sct
4    967, 971 ; 19 Led 2d 1247 (1968)

5         LATER DESCRIPTIONS BY EYE WITNESS OF ROBBERY
6    SUSPECT WERE DETAILED AND ACCURATE COULD NOT BE
7    USED TO SHOW IMPERMISSIBLE SUGGESTIVENESS IN THE SHOW-
8    UP SINCE ONE CENTRAL AND LEGITIMATE PURPOSE OF
9    SHOWUP PROCEDURE IS TO SHARPEN RECOLLECTION OF EYE-
10   WITNESS AND ENABLE THEM TO FOCUS ATTENTION ON
11   DETAILS THEY MAY OTHERWISE OVER LOOK ( CRIMINAL LAW)
12   399.8(5)) WARDEN V. HAYDEN 387 US 294 ; 87 Sct 1642
13   18 Led 2d 782 (1976)

14

15        EVIDENCE INDICATED THAT THERE HAD BEEN AMPLE SUPPORT
16   FOR USE OF PROPER CONDUCTED SHOWUP PROCEDURE IMMED-
17   IATELY AFTER THE ROBBERY ( CRIMINAL LAW 339.4(5))
18

19        WHILE IT IS BETTER PRACTICE NOT TO REFER TO SUBJECT
20   OF SHOW UP AS A " SUSPECT" IN VIEW OF DANGER OF
21   ADVERSE INFERENCES BEING DRAWN BY WITNESS,
22   REFERENCES BEING DRAWN BY WITNESS, REFERENCE BY
23   ITSELF IS NOT AN IMPERMISSIBLE SUGGESTION ( CRIMINAL
24   LAW 339.8(5))

25

26        USE OF HANDCUFFS OR OTHER INDICIA OF CUSTODY WILL NOT
27   INVALIDATE A SHOWUP AT LEAST WHERE PRESENTATION
28   OF SUSPECT CONSISTENT WITH PROTECTION OF OFFICERS

16

9

1   AND WITNESSES (CRIMINAL LAW 339.8(6)

2

3       THERE WAS NOTHING IN CONDUCT OF SHOW UP TO

4   SUPPORT EXCLUSION OF EYE WITNESS TESTIMONY AS AGENT

5   IN CHARGE HAD GIVEN A CAREFUL AND PROPER EXPLAIN-

6   ATION THAT NO INFERENCE WAS TO BE DRAWN FROM

7   FACT OF CUSTODY OR USE OF HANDCUFFS, THERE ARE

8   INDICATION IN THE RECORDS THAT OFFICERS ENCOURAGED

9   ALTHOUGH THERE WAS A LARGE NUMBER OF OFFICERS PRESENT

10  THAT WAS TO BE EXPECTED AFTER RECENT OCCUFFEN

11  OCCURRENCE OF MAJOR CRIME INVOLVING FIREARM

12  (CRIMINAL LAW 339.8(6))

13

14      WHERE SHOW UP PROCEDURE EMPLOYED DOES NOT

15  GIVE RISE TO A VERY SUBSTANTIAL LIKELIHOOD OF

16  IRREPARABLE MISIDENTIFICATION, IDENTIFICATION EVIDENCE

17  IS FOR THE JURY TO WEIGH (CRIMINAL LAW 339.8 (5))

18

19

20

21

22

23

24

25

26

27

28

17

# EXHIBIT



NOTICE TO APPELLANT:

In the event that a request for correction is filed, counsel should deliver this copy of this transcript to the court clerk at the time of the hearing so that it may be conformed.

# CLERK'S TRANSCRIPT

Superior Court of California
County of Los Angeles
APPEAL TRANSCRIPT
INDEX

Page 1 of 1

People of the State of California v. MORRIS, CONDALEE-1

Case number: BA279836-01

| Description | Date | Vol. | Page |
|---|---|---|---|
| EXHIBIT { # 26 B } TRANSCRIPT OF AUDIO TAPE | 07/28/05 | 1 | 1 |
| LETTER 32.1 | 12/01/05 | 1 | 4 |
| CERTIFICATION | 12/16/05 | 1 | 5 |

Exhibit (

DEFENDANT CONDALEE MORRIS CASE NUMBER BA279836

RECORDED BY LAPD MASTER

DATE OCCURRED MARCH 4, 2005 DATE OF TAPING MARCH 25, 2005

OPERATOR 1:      IT'S A TRANSFER I GOT 1806 WEST 42ND PLACE,
                 SAID SOMETHING ABOUT SOMEONE IS BREAKING
                 INTO HER HOUSE.

OPERATOR 2:      OKAY, 1806 WEST 42ND PLACE?

OPERATOR 1:      YEAH, I THINK SHE DROPPED THE PHONE BECAUSE
                 HER HUSBAND TOLD HER TO GET DOWN ON THE
                 FLOOR AND SHE COULDN'T GET TO THE PHONE ANY
                 MORE.

OPERATOR 2:      OKAY WHAT'S THE CALL BACK.

OPERATOR 1:      THE CALL BACK I'M GETTING IS IN 323-632-
                 1008.

OPERATOR 2:      1806 WEST 42ND PLACE?

OPERATOR 1:      NO 1806 WEST 42ND, YEAH.

OPERATOR 2:      OKAY, SO SHE SAID THAT SOMEONE WAS BREAKING
                 IN AND HER HUSBAND TOLD HER TO GET ON THE
                 GROUND.


TYPE OF HEARING
CASE NO. BA274338
PEOPLE EXT NO 26 B
ADMITTED IN EVIDENCE
DATE July 28 2005
JOHN A. CLARKE EXECUTIVE OFFICER/CLERK

Exhibit 2

- 1 -

| | |
|---|---|
| 1  OPERATOR 1: | SHE SAID THAT SOMEONE IS BREAKING IN I GOT |
| 2 | THE ADDRESS, I WAS TRYING TO GET HER PHONE |
| 3 | NUMBER AND ALL I HEARD HER SAY WAS LET ME |
| 4 | CHECK ON MY HUSBAND, HUSBAND SAID GET DOWN |
| 5 | ON THE GROUND, |
| 6  OPERATOR 2: | OKAY. |
| 7  OPERATOR 1: | AND I CAN'T GET HER BACK ON THE PHONE. |
| 8  OPERATOR 2: | SOUTHWEST UNITS (INAUDIBLE) 1806 WEST 42ND |
| 9 | PLACE 1-8-0-6 WEST 42ND PLACE.  CODE 3 |
| 10 | INCIDENT 245 IT WILL BE 095. |
| 11  HIGHWAY PATROL: | HI 542 HIGHWAY PATROL 4522 I HAVE A MOBILE |
| 12 | 911 TRANSFER. |
| 13  HIGHWAY PATROL: | MA'AM YOU'RE ON THE LINE WITH LAPD. |
| 14  OPERATOR: | 911 EMERGENCY OPERATOR 542. |
| 15  WITNESS: | HELLO HI I'M ON LOS ANGELES (INAUDIBLE) AND |
| 16 | WE'RE BEING ROBBED RIGHT NOW. |
| 17  OPERATOR: | WHAT IS THE ADDRESS? |
| 18  WITNESS: | 1806 WEST 42ND PLACE. |
| 19  OPERATOR: | 1806 WEST 42ND PLACE? |
| 20  WITNESS: | YES. |
| 21  OPERATOR: | IS THAT A HOUSE OR AN APARTMENT? |
| 22  WITNESS: | THIS IS A HOUSE. |
| 23  OPERATOR: | OKAY, I SEE YOUR PHONE NUMBER IS 323-623- |
| 24 | 1008. |

Exhibit 3

1  WITNESS:

2  OPERATOR:        YES THAT IS MY CELL PHONE.

3  WITNESS:         THAT'S YOUR CELL PHONE?

4  OPERATOR:        YES.

5

6                   OKAY, I SEE YOUR PHONE NUMBER IS 323-906-

7  WITNESS:         3988 IS THAT CORRECT?

8  OPERATOR:        NO MY NUMBER IS (INAUDIBLE)

9  WITNESS:         WHAT IS IT?

10 OPERATOR:        (INAUDIBLE)

11 WITNESS:         9440.  IS THAT 323?

12 OPERATOR:        YES.

13                  HELLO.

14

5

5

Exhibit 4

- 3

1     A.   LIKE I SAID, THEY WERE ALL IN MY FACE AT THE

2    SAME TIME.  WITH GUNS IN YOUR FACE, IT BLOCKS

3    EVERYTHING OF WHO IS WHO.

4     Q.   SO IT'S FAIR TO SAY YOU COULDN'T DISTINGUISH

5    BETWEEN MR. MORRIS AND THE TWO OTHER INDIVIDUALS?

6     A.   I COULD DISTINGUISH ONE RIGHT IN MY FACE AND

7    IT WAS MR. MORRIS AND ONE OTHER PERSON THAT LOOKED

8    SIMILAR TO HIM.

9     Q.   OKAY.  AND HOW TALL WAS MR. MORRIS?

10    A.   WELL, WHEN THE COPS ASKED ME I TOLD THEM

11   THEY WERE ABOUT FIVE-NINE -- FIVE-EIGHT, FIVE-NINE.

12    Q.   WHERE WAS MR. MORRIS DURING THE INCIDENT

13   WITH THE GUNS IN RELATION TO THE TWO OTHERS AND YOU,

14   WHERE WAS HE?

15    A.   WE WERE IN THE LIVING ROOM.

16    Q.   IN RELATION TO YOUR BODY, WAS HE IN BACK OF

17   YOU?

18    A.   NOBODY WAS IN BACK OF ME.  THEY WERE ALL IN

19   FRONT OF ME.

20    Q.   ALL THREE WERE IN FRONT OF YOU?

21    A.   ALL THREE WERE IN FRONT OF ME.

22    Q.   HOW MUCH OPPORTUNITY DID YOU HAVE TO SEE A

23   FRONT FACIAL VIEW OF MR. MORRIS?

24    A.   I HAD LOTS OF TIME.  MAYBE LIKE 10 MINUTES.

25    Q.   WHAT WAS THE LIGHTING LIKE IN THE LIVING

26   ROOM?

27    A.   UMM, THE KITCHEN LIGHT WAS ON, THE LIVING

28   ROOM LIGHT WAS ON.  I'M NOT GOING TO SAY IT WAS BRIGHT

Exhibit 5

1    BUT ENOUGH TO SEE THEIR FACES BECAUSE THE KITCHEN

2    LIGHTS ARE REALLY BRIGHT.  IT HAS A LIGHT JUST LIKE

3    THIS ONE UP HERE.

4         THE COURT:  POINTING TO THE FLORESCENT LIGHTS IN

5    THE COURTROOM.

6         THE WITNESS:  YES, MA'AM.  THEY WERE ALL THREE IN

7    MY FACE.  AND LIKE I SAID, AS THEY WERE RUNNING BACK

8    AND FORTH, I HAD PLENTY OF TIME TO SEE THEM WAITING AT

9    THE DOOR, LOOKING OUT THE WINDOW.

10        MR. FISHER:  THANK YOU.  I HAVE NOTHING FURTHER.

11        THE COURT:  ANY REDIRECT?

12

13                    REDIRECT EXAMINATION

14   BY MS. MILLER:

15        Q.  BY THE WAY, THIS OTHER INDIVIDUAL, YOU SAID

16   THERE WAS ANOTHER INDIVIDUAL THAT LOOKED LIKE THE

17   DEFENDANT AS WELL

18        A.  RIGHT.

19        Q.  WHEN YOU SAY LOOKED LIKE THE DEFENDANT, DID

20   IT LOOK LIKE HE COULD BE RELATED TO THE DEFENDANT.

21        A.  YES.  THAT IS WHY I ASKED IF HE HAD A

22   BROTHER.  MAYBE IN HIS TWENTIES, 23, 24.

23        Q.  SO THE OTHER INDIVIDUAL THAT LOOK LIKE THE

24   DEFENDANT LOOKED LIKE A YOUNGER VERSION OF THE

25   DEFENDANT?

26        A.  THEY WERE ALL YOUNG EXCEPT THE ONE IN THE

27   SKI MASK BECAUSE I COULD NOT SEE HIS FACE, BUT HE WAS

28   ABOUT FIVE-FIVE, FIVE-SIX.        Exhibit  6

1      Q.   THE ONE IN THE SKI MASK?

2      A.   THE SKI MASK.

3      Q.   WHAT ABOUT THE ONE THAT LOOK LIKE DEFENDANT

4 MORRIS, DID HE LOOK YOUNGER THAN HIM?

5      A.   YES.

6      Q.   SAME HEIGHT?

7      A.   I WOULD SAY SO, YES.

8      Q.   AND HOW MANY YEARS YOUNGER DO YOU THINK HE

9 IS THAN THE DEFENDANT?

10     A.   WELL, MR. MORRIS LOOKS 27, 28.

11     Q.   SO A FEW YEARS YOUNGER?

12     A.   23, 24, I WOULD SAY.

13     Q.   AND YOU ARE SAYING THE SAME HEIGHT, SAME

14 WEIGHT?

15     A.   YES.

16     MS. MILLER:  NOTHING FURTHER.

17     MR. FISHER:  NOTHING FURTHER.

18     THE COURT:  THANK YOU, MA'AM, YOU ARE EXCUSED.

19     MS. MILLER:  PEOPLE WOULD LIKE TO MARK A

20 CERTIFIED RAP SHEET IN THE NAME CONDALEE MORRIS.

21     THE COURT:  TA077363?

22     MS. MILLER:  THAT IS CORRECT.  AND ALSO THERE IS

23 THE -- IF I CAN JUST A MOMENT.

24        IN THAT CASE AS WELL THERE IS THE CONVICTION

25 FOR 12025(A)(2) AND SPECIFIC CONDITIONS WERE THE

26 FIREARM RESTRICTION.

27     THE COURT:  CAN I SEE THE PROBATION FROM THERE.

28 I CAN TAKE JUDICIAL NOTICE OF THAT.

Exhibit 7

1    SEMIAUTOMATICS AND GUNS?

2         A.    YES.

3         Q.    CAN YOU GIVE US A PHYSICAL DESCRIPTION OF

4    WHAT THE GUY IN THE SKI MASK LOOKED LIKE?

5               AND WHAT I MEAN IS HOW TALL AND -- THAT

6    PERSON WAS AND THAT PERSON'S APPROXIMATE WEIGHT?

7         A.    NO, I CAN'T.  EVERYTHING WAS VERY FAST.

8         Q.    AND THE OTHER TWO THAT HAD THE

9    SEMIAUTOMATIC HANDGUNS, CAN YOU GIVE ME A PHYSICAL

10   DESCRIPTION OF THEM?

11        A.    ONE WAS THE SHORT ONE WITH LIKE THIS, WITH-

12   LIKE THIS, HIS BEARD CUT THIS WAY AND HIS HAIR WOVEN UP.

13        Q.    OKAY.  I MISSED THAT.  LET'S GO TO THE

14   FIRST PART.

15             YOU SAID HE WAS SHORT.  HOW TALL?

16        A.    WELL, HE WAS LIKE THE SMALLEST ONE OF ALL

17   OF THEM.

18        Q.    OKAY.  APPROXIMATELY HOW TALL WAS HE?

19        A.    HE WOULD BE LIKE FIVE FOOT, SOMETHING LIKE

20   THAT.

21        Q.    OKAY.  AND YOU SAID SOMETHING ABOUT HIS

22   HAIRSTYLE.

23        A.    AND HE WORE IT LIKE THIS, THE WAY THEY DO

24   IT, KIND OF WOVEN.

25        Q.    LIKE CORN ROWS?

26        A.    YES, LITTLE BRAIDS.

27        Q.    AND DO YOU REMEMBER WHAT HE WAS WEARING?

28        A.    THEY ALL HAD ON A BLACK JACKET, A SWEATER.

Exhibit 8

1          THE INTERPRETER:  THE INTERPRETER NEEDS A

2  CLARIFICATION.

3          THE COURT:  YES.

4          THE INTERPRETER:  INTERPRETER WOULD LIKE TO

5  CLARIFY, A SWEAT JACKET.

6  BY MR. LIEBERMAN:

7          Q.          AND DID THAT PERSON HAVE FACIAL HAIR, THE

8  ONE WITH THE CORN ROWS?

9          A.          YES, LIKE THE ONES THAT CUT LIKE THIS

10  (INDICATING).

11          Q.          OKAY.  AND FOR THE RECORD, IT LOOKS LIKE

12  YOU TOOK BOTH OF YOUR INDEX FINGERS AND WENT DOWN EACH

13  CHEEK FROM ROUGHLY EAR LEVEL DOWN TOWARDS YOUR CHIN GOING

14  TOWARDS ALONG THE BEARD LINE.

15          IS THAT A FAIR DESCRIPTION, YOUR HONOR?

16          THE COURT:  YES.

17  BY MR. LIEBERMAN:

18          Q.          OKAY.  SO THEN THAT PERSON WITH THE CORN

19  ROWS THEN HAD SORT OF A BEARD?

20          A.          HE WAS -- HE WAS WELL SHAVEN ALL THE REST

21  OF IT, BUT HE KEPT THIS PART.  THEY CALL IT LIKE A GOATEE.

22          Q.          OKAY.  SO THE PERSON WITH THE CORN ROWS

23  HAD A GOATEE?

24          A.          YES.

25          Q.          OKAY.  NOW, I WANT TO TALK TO YOU ABOUT

26  THE OTHER PERSON WHO HAD THE SEMIAUTOMATIC HANDGUN.

27  PLEASE DESCRIBE THAT PERSON'S HEIGHT.

28          A.          HE WAS LIKE AROUND FIVE-SEVEN, AROUND

Exhibit a

329

1    THERE, AND HE WAS THIN.

2        Q.        DID HE HAVE ANY PARTICULAR HAIRSTYLE?

3        A.        THAT I DIDN'T NOTICE.

4        Q.        AND DID THAT PERSON HAVE ANY TYPE OF

5    FACIAL HAIR THAT YOU RECALL?

6        A.        NO.

7        Q.        AND DO YOU REMEMBER WHAT THAT PERSON WAS

8    WEARING, OTHER THAN THE BLACK SWEAT JACKET?

9        A.        NO.

10       Q.        OKAY.  SO JUST SO THAT WE'RE CLEAR, YOU'VE

11   DESCRIBED TWO PEOPLE WITH SEMIAUTOMATIC HANDGUNS, ONE OF

12   THEM BEING SHORT AND ONE OF THEM BEING THIN, CORRECT?

13       A.        YES.

14       Q.        OKAY.  AND I WANT TO BE ABLE TO KIND OF

15   GET THIS STRAIGHT, BECAUSE I'M GOING TO TALK ABOUT WHAT

16   EACH ONE DID.

17            SO THEN THERE WAS SOMEBODY WHO HAD THE SKI

18   MASK AND WHO HAD THE SHOTGUN, CORRECT?

19       A.        YES.

20       Q.        AND THEN THE DEFENDANT WHO HAD THE

21   REVOLVER; IS THAT CORRECT?

22       A.        YES.

23       Q.        OKAY.  I'M GOING TO BE REFERRING TO THEM

24   USING THOSE DESCRIPTIONS.

25            SO WHEN THE FOUR GENTLEMEN RAN THROUGH THE

26   KITCHEN AND APPROACHED YOU, WHAT DID THE DEFENDANT DO?

27       A.        HE GRABBED ME BY MY T-SHIRT, BECAUSE I WAS

28   WEARING A T-SHIRT, HE GRABBED ME LIKE THIS BY MY T-SHIRT

Exhibit 10

361

1  HIM AT THAT TIME?

2          A.      YES.

3          Q.      AND DID YOU TELL THE POLICE ANYTHING ABOUT

4  HIM, ABOUT WHETHER OR NOT THAT WAS ONE OF THE PEOPLE?

5          A.      YES.

6          Q.      WHAT DID YOU SAY?

7          A.      THAT HE WAS -- THAT I WAS SURE THAT HE WAS

8  ONE OF THEM.

9          Q.      AND WAS THAT A TRUTHFUL STATEMENT ON YOUR

10  PART?

11          A.      YES.

12          Q.      AND WAS THE INCIDENT STILL FRESH IN YOUR

13  MIND AT THAT POINT?

14          A.      WELL, YES.  IT WASN'T EVEN FIVE MINUTES

15  AFTER THAT HAPPENED.

16          Q.      WHAT DID YOU RECOGNIZE ABOUT THE DEFENDANT

17  WHEN YOU SAW HIM?

18          A.      THAT HE WAS THE TALLEST ONE AND SKINNY

19  AND . . .

20          Q.      OKAY.  SO HIS HEIGHT AND BUILD?

21          A.      YES.

22          Q.      DID YOU -- DID HIS FACE, DID YOU RECOGNIZE

23  HIS FACE?

24          MR. FISHER:  OBJECTION.  LEADING.

25          THE COURT:  SUSTAINED.

26  BY MR. LIEBERMAN:

27          Q.      WHEN YOU SAW HIS FACE, WHAT DID YOU THINK?

28          A.      I WAS HAPPY THAT THEY HAD GOTTEN ONE OF

Exhibit 11

374

1    Q.        AND HAD ANY MEMBERS OF YOUR FAMILY TALKED

2 TO YOU ABOUT ANY IDENTIFICATIONS THAT THEY MAY HAVE MADE

3 PRIOR TO YOU SEEING THE DEFENDANT?

4    A.        NO, BECAUSE I WAS THE FIRST ONE WHO WAS

5 TAKEN.

6    Q.        OKAY.  DID YOU FIND ANY BOX CUTTERS IN

7 YOUR HOUSE AFTER THE INCIDENT?

8    A.        NO.

9    Q.        DID YOU FIND ANY DUCT TAPE IN YOUR HOUSE?

10   A.        NO, NO.

11   MR. LIEBERMAN:   I HAVE NO MORE QUESTIONS, YOUR

12 HONOR, AT THIS TIME.

13   THE COURT:  ALL RIGHT.

14        MR. FISHER, YOU MAY CROSS-EXAMINE.

15   MR. FISHER:  THANK YOU, YOUR HONOR.

16

17             CROSS-EXAMINATION

18

19 BY MR. FISHER:

20   Q.        WHEN THE POLICE PUT YOU IN THE POLICE CAR

21 TO MAKE THE IDENTIFICATION, DID THEY TELL YOU THEY HAD ONE

22 OF THE SUSPECTS THAT -- THAT BURGLARIZED YOUR HOUSE?

23   A.        YES.

24   Q.        AND WHEN THEY TOOK YOU TO THIS PLACE TO

25 IDENTIFY THE SUSPECT, WAS MR. MORRIS HERE THE ONLY

26 AFRICAN-AMERICAN PERSON?

27   A.        YES.

28   Q.        AND IS IT FAIR TO SAY YOU WERE REAL UPSET,

Exhibit 12

1      Q.    I'M ALMOST FINISHED, I JUST WANT TO TALK
2    ABOUT YOUR IDENTIFICATION.
3           WERE YOU PUT IN A POLICE CAR AND TOLD THAT
4    THE POLICE HAD THE SUSPECT, ONE OF THE SUSPECTS THAT
5    BROKE INTO YOUR HOME?
6      A.    YES.
7      Q.    OKAY.   AND WERE YOU DRIVEN IN A POLICE CAR
8    TO TRY AND IDENTIFY THAT INDIVIDUAL?
9      A.    THAT'S RIGHT.
10     Q.    AND WHEN YOU SAW -- WHO WAS IN THE POLICE
11   CAR WHEN YOU MADE THE IDENTIFICATION?
12     A.    I WAS ALONE IN THE BACK.
13     Q.    DID THE POLICE OFFICERS TELL YOU THAT THAT
14   WAS THE PERSON THAT THEY THOUGHT ROBBED YOU?
15     A.    THEY DIDN'T SAY THAT.   THEY SAID THAT IF I
16   COULD FIGURE OUT IF THAT WAS THE PERSON THAT HAD COME
17   IN.
18     Q.    AND DID YOU IDENTIFY THAT PERSON?
19     A.    YES.   I TOLD HIM THAT I WAS 95 PERCENT SURE
20   THAT HE WAS ONE OF THEM.
21     Q.    AND WHEN YOU IDENTIFIED THAT PERSON, WAS
22   THAT PERSON HANDCUFFED?
23     A.    YES, HE WAS.
24     Q.    WERE UNIFORMED POLICE OFFICERS STANDING NEXT
25   TO HIM?
26     A.    YES.
27     Q.    HOW MANY?
28     A.    WELL, I DON'T REMEMBER.   AT LEAST ONE

Exhibit 13

361

1    HIM AT THAT TIME?

2         A.        YES.

3         Q.        AND DID YOU TELL THE POLICE ANYTHING ABOUT

4    HIM, ABOUT WHETHER OR NOT THAT WAS ONE OF THE PEOPLE?

5         A.        YES.

6         Q.        WHAT DID YOU SAY?

7         A.        THAT HE WAS -- THAT I WAS SURE THAT HE WAS

8    ONE OF THEM.

9         Q.        AND WAS THAT A TRUTHFUL STATEMENT ON YOUR

10   PART?

11        A.        YES.

12        Q.        AND WAS THE INCIDENT STILL FRESH IN YOUR

13   MIND AT THAT POINT?

14        A.        WELL, YES.  IT WASN'T EVEN FIVE MINUTES

15   AFTER THAT HAPPENED.

16        Q.        WHAT DID YOU RECOGNIZE ABOUT THE DEFENDANT

17   WHEN YOU SAW HIM?

18        A.        THAT HE WAS THE TALLEST ONE AND SKINNY

19   AND . . .

20        Q.        OKAY.  SO HIS HEIGHT AND BUILD?

21        A.        YES.

22        Q.        DID YOU -- DID HIS FACE, DID YOU RECOGNIZE

23   HIS FACE?

24        MR. FISHER:  OBJECTION.  LEADING.

25        THE COURT:  SUSTAINED.

26   BY MR. LIEBERMAN:

27        Q.        WHEN YOU SAW HIS FACE, WHAT DID YOU THINK?

28        A.        I WAS HAPPY THAT THEY HAD GOTTEN ONE OF

Exhibit 14

375

1    TRAUMATIZED BECAUSE THIS WAS A -- PROBABLY ONE OF THE MOST
2    DRAMATIC THINGS THAT'S EVER HAPPENED TO YOU, CORRECT?

3            A.        YES.

4            Q.        AND YOU WERE GLAD THE POLICE HAD ONE OF
5    THE SUSPECTS THAT BROKE INTO YOUR HOUSE, CORRECT?

6            A.        YES.

7            Q.        OKAY.  AND WHEN YOU FIRST SAW MR. MORRIS,
8    WERE THERE ANY UNIFORMED POLICE OFFICERS NEXT TO HIM?

9            A.        YES.

10           Q.        AND WAS MR. MORRIS HANDCUFFED?

11           A.        YES.

12           Q.        AND DID ANY OF THE POLICE OFFICERS HAVE
13    THEIR GUNS DRAWN, IF YOU KNOW?

14           A.        NO, I DIDN'T SEE THAT.

15           Q.        OKAY.  AND APPROXIMATELY HOW LONG DID IT
16    TAKE YOU TO MAKE THIS IDENTIFICATION OF MR. MORRIS?

17           A.        COUPLE OF MINUTES.

18           Q.        ALL RIGHT.  LET ME ASK YOU THIS:  HOW
19    POSITIVE ARE YOU THAT MR. MORRIS WAS ONE OF THESE PERSONS
20    THAT -- THAT INVADED YOUR HOME?

21           A.        BECAUSE I CAN'T FORGET A PERSON'S FACE IN
22    FIVE MINUTES.

23           Q.        WELL, GIVE ME A PERCENT.  ARE YOU A
24    HUNDRED PERCENT THAT THE PERSON -- THAT MR. MORRIS IS ONE
25    OF THE GUYS THAT INVADED YOUR HOME?

26           A.        FROM 90 TO 95 PERCENT, FROM 90 TO 99
27    PERCENT.

28           Q.        SO ABOUT A 10 PERCENT DOUBT, CORRECT?

Exhibit 15

375

1    TRAUMATIZED BECAUSE THIS WAS A -- PROBABLY ONE OF THE MOST

2    DRAMATIC THINGS THAT'S EVER HAPPENED TO YOU, CORRECT?

3         A.      YES.

4         Q.      AND YOU WERE GLAD THE POLICE HAD ONE OF

5    THE SUSPECTS THAT BROKE INTO YOUR HOUSE, CORRECT?

6         A.      YES.

7         Q.      OKAY.  AND WHEN YOU FIRST SAW MR. MORRIS,

8    WERE THERE ANY UNIFORMED POLICE OFFICERS NEXT TO HIM?

9         A.      YES.

10        Q.      AND WAS MR. MORRIS HANDCUFFED?

11        A.      YES.

12        Q.      AND DID ANY OF THE POLICE OFFICERS HAVE

13   THEIR GUNS DRAWN, IF YOU KNOW?

14        A.      NO, I DIDN'T SEE THAT.

15        Q.      OKAY.  AND APPROXIMATELY HOW LONG DID IT

16   TAKE YOU TO MAKE THIS IDENTIFICATION OF MR. MORRIS?

17        A.      COUPLE OF MINUTES.

18        Q.      ALL RIGHT.  LET ME ASK YOU THIS:  HOW

19   POSITIVE ARE YOU THAT MR. MORRIS WAS ONE OF THESE PERSONS

20   THAT -- THAT INVADED YOUR HOME?

21        A.      BECAUSE I CAN'T FORGET A PERSON'S FACE IN

22   FIVE MINUTES.

23        Q.      WELL, GIVE ME A PERCENT.  ARE YOU A

24   HUNDRED PERCENT THAT THE PERSON -- THAT MR. MORRIS IS ONE

25   OF THE GUYS THAT INVADED YOUR HOME?

26        A.      FROM 90 TO 95 PERCENT, FROM 90 TO 99

27   PERCENT.

28        Q.      SO ABOUT A 10 PERCENT DOUBT, CORRECT?

Exhibit 15

361

1   HIM AT THAT TIME?

2          A.        YES.

3          Q.        AND DID YOU TELL THE POLICE ANYTHING ABOUT

4   HIM, ABOUT WHETHER OR NOT THAT WAS ONE OF THE PEOPLE?

5          A.        YES.

6          Q.        WHAT DID YOU SAY?

7          A.        THAT HE WAS -- THAT I WAS SURE THAT HE WAS

8   ONE OF THEM.

9          Q.        AND WAS THAT A TRUTHFUL STATEMENT ON YOUR

10  PART?

11         A.        YES.

12         Q.        AND WAS THE INCIDENT STILL FRESH IN YOUR

13  MIND AT THAT POINT?

14         A.        WELL, YES.  IT WASN'T EVEN FIVE MINUTES

15  AFTER THAT HAPPENED.

16         Q.        WHAT DID YOU RECOGNIZE ABOUT THE DEFENDANT

17  WHEN YOU SAW HIM?

18         A.        THAT HE WAS THE TALLEST ONE AND SKINNY

19  AND . . .

20         Q.        OKAY.  SO HIS HEIGHT AND BUILD?

21         A.        YES.

22         Q.        DID YOU -- DID HIS FACE, DID YOU RECOGNIZE

23  HIS FACE?

24         MR. FISHER:  OBJECTION.  LEADING.

25         THE COURT:  SUSTAINED.

26  BY MR. LIEBERMAN:

27         Q.        WHEN YOU SAW HIS FACE, WHAT DID YOU THINK?

28         A.        I WAS HAPPY THAT THEY HAD GOTTEN ONE OF

Exhibit 4

362

1   THEM.

2       Q.      OKAY. WAS THAT THE SAME FACE THAT YOU HAD

3   SEEN INSIDE YOUR ROOM AND INSIDE YOUR WIFE'S ROOM?

4       A.      YES.

5       Q.      LATER ON OR AFTER THE INCIDENT, DID YOU

6   FIND ANY PROPERTY INSIDE YOUR HOUSE THAT WASN'T YOURS?

7       A.      YES.

8       Q.      WHAT DID YOU FIND?

9       A.      I FOUND A CROWBAR THAT THEY OPENED THE

10  DOOR WITH AND A BACKPACK.

11      MR. LIEBERMAN:  YOUR HONOR, I HAVE IN MY HAND WHAT

12  APPEARS TO BE A PHOTOGRAPH OF A BACKPACK, OR IT'S A

13  PHOTOGRAPH AND APPEARS TO BE A BACKPACK.

14          I'D LIKE IT MARKED AS PEOPLE'S NEXT IN

15  ORDER.

16      THE COURT:  EIGHT FOR IDENTIFICATION.

17

18      (MARKED FOR ID = PEO. 8, PHOTOGRAPH.)

19

20  BY MR. LIEBERMAN:

21      Q.      OKAY. MR. RAYOS, I'M SHOWING YOU WHAT'S

22  BEEN MARKED AS PEOPLE'S NO. 8 FOR IDENTIFICATION.

23          DO YOU RECOGNIZE WHAT THAT IS?

24      A.      YES.

25      Q.      WHAT IS THAT?

26      A.      A BACKPACK.

27      Q.      IS THAT THE BACKPACK THAT YOU FOUND?

28      A.      YES.

1    A.   NO.

2    Q.   COULD YOU SEE WHAT ANYBODY ELSE WAS DOING,

3  IF THEY WERE DOING ANYTHING TO YOUR SON OR YOUR

4  GRANDSON?

5    A.   NO.  I WAS LYING DOWN WITH A LOT OF PAIN.

6    Q.   AFTER YOUR WIFE WAS TAKEN OUT OF THE ROOM,

7  IS THAT WHEN YOU SHUT THE DOOR TO YOUR BEDROOM?

8    A.   YES.

9    Q.   SO YOU DON'T KNOW IF ANYONE DID ANYTHING TO

10  YOUR WIFE AT THAT POINT?

11    A.   I COULDN'T SEE ANYTHING ELSE.

12    Q.   HOW MANY MINUTES AFTER YOU HAD HEARD THE

13  INDIVIDUALS RUNNING AROUND THE HOUSE AND THE POLICE

14  CAME IN, HOW MANY MINUTES PASSED BETWEEN THAT TIME AND

15  THE TIME YOU WERE TAKEN IN THE POLICE CAR TO IDENTIFY

16  THE INDIVIDUAL?

17    A.   ABOUT -- I DON'T REMEMBER VERY WELL BUT WE

18  DIDN'T TAKE THAT LONG.

19    Q.   WHEN YOU SAY YOU DIDN'T TAKE THAT LONG, LESS

20  THAN 15 MINUTES?

21    A.   YES.

22    Q.   WAS THE HELICOPTER STILL OVERHEAD WHEN YOU

23  HAD GONE OUTSIDE TO GO MAKE IDENTIFICATION?

24    A.   NO, NOT ANYMORE.

25    Q.   YOU TALKED ABOUT BEING KICKED AND HIT IN THE

26  NECK REGION.  YOU SAID THE GUN.  CAN YOU TELL ME ABOUT

27  YOUR ACTUAL INJURIES, WAS THERE BRUISING OR ANYTHING TO

28  YOUR RIBS?

Exhibit 17

650

1  WAS ACTUALLY DOING THE VIEWING?

2      A.      NO, NOT -- NOT THE ACTUAL VIEWING.  WHEN

3  HE CAME BACK, BECAUSE I STAYED WITH THE REST OF THE

4  VICTIMS.

5      Q.      OKAY.  DID YOU SEE HOW THE VIEWING WAS

6  BEING CONDUCTED?

7      A.      I DID, YEAH, BECAUSE IT WASN'T TOO FAR, SO

8  I COULD SEE.

9      Q.      ALL RIGHT.  SO HE SAID, "THAT'S HIM"?

10     A.      YES.

11     Q.      WHAT WERE HIS EXACT WORDS?

12     A.      IF I CAN REVIEW MY REPORT?

13     Q.      DO YOU HAVE YOUR REPORT WITH YOU?

14     A.      YEAH, I DO.

15     Q.      IF THAT WOULD REFRESH YOUR RECOLLECTION,

16  PLEASE LOOK AT IT.  WHEN YOUR MEMORY IS REFRESHED, PLEASE

17  LOOK UP.

18             IS YOUR MEMORY REFRESHED?

19     A.      "THAT'S HIM.  THAT'S ONE OF THEM."

20     Q.      "THAT'S ONE OF THEM"?

21     A.      YES.

22     Q.      OKAY.  AND WHAT DID KATHERINE SAY?

23     A.      "YES, THAT'S HIM.  THAT'S ONE OF THE ONES

24  WHO CHOKED ME AND SOCKED ME IN THE FACE."

25     Q.      DID SHE SAY THAT'S ONE OF THE ONES OR

26  SOMETHING ELSE?

27     A.      "HE'S THE ONE WHO CHOKED AND SOCKED ME IN

28  THE FACE."              Exhibit 18

1    Q.    INDIVIDUALLY?

2    A.    INDIVIDUALLY.

3    Q.    AS PART OF THE VIEWING PROCESS, WAS THE

4    DEFENDANT LIT UP WITH ANY PARTICULAR LIGHTING SOURCE?

5    A.    YES.

6    Q.    DESCRIBE THAT.

7    A.    ON OUR POLICE VEHICLES WE HAVE SOME

8    OVERHEAD LIGHTS THAT ARE ON THE DRIVER'S SIDE AND THE

9    PASSENGER SIDE OF THE VEHICLE.  THOSE LIGHTS WERE TURNED

10   ON THE DEFENDANT FOR TWO REASONS.  ONE, TO ILLUMINATE HIM;

11   AND, TWO, SO THAT HE WOULD NOT -- HE OR SHE WOULD NOT BE

12   ABLE TO SEE BACK TO SEE WHO IS VIEWING HIM.

13   Q.    OKAY.

14   A.    SO THAT THERE ARE, YOU KNOW, THEIR

15   IDENTITY IS NOT SHOWN.

16   Q.    OKAY.  WHAT DID HELADIO SAY WHEN HE VIEWED

17   THE DEFENDANT?

18   A.    HE SAID, "THAT'S HIM," AND HE SAID THAT

19   WHEN HE CAME BACK.  HE WAS IN -- PUT IN A VEHICLE, TAKEN,

20   DRIVEN BACK.

21   Q.    SO HE DIDN'T SAY ANYTHING UNTIL HE GOT

22   BACK, OR DID HE SAY SOMETHING AT THE SCENE?

23   A.    WELL, HE WAS IN THE VEHICLE.  HE CAME --

24   AND I STAYED BACK.  THEN WHEN HE CAME BACK, THAT'S WHEN I

25   ASKED HIM.

26   Q.    OKAY.  SO WHO DROVE HIM OVER THERE?

27   A.    I DON'T RECALL WHO DROVE HIM OVER THERE.

28   Q.    SO YOU WEREN'T ACTUALLY PRESENT WHEN HE

660

1        Q.          SHOWING YOU PEOPLE'S 23.

2               DID YOU NOTICE ANY DAMAGE TO ANY OF THE

3  DOORS?

4        A.       THE -- THE REAR DOOR OF THE HOUSE WAS

5  DAMAGED.

6        Q.      OKAY.  DESCRIBE IT.

7        A.      I BELIEVE -- I CAN'T RECOLLECT.  I JUST

8  REMEMBER THAT IT BEING LIKE THE DOORJAMB APPEARED TO BE

9  LIKE IT WAS BUSTED OR KICKED IN.

10        Q.      OKAY.

11             I'M ALMOST DONE, YOUR HONOR.

12             I HAVE THREE SMALL ENVELOPES IN MY HAND.

13  THEY ALL THREE APPEAR TO CONTAIN OR ARE LABELED --

14  WITHDRAWN.

15             I HAVE NO MORE QUESTIONS, YOUR HONOR.

16      THE COURT:  CROSS-EXAMINE.

17

18               CROSS-EXAMINATION

19

20  BY MR. FISHER:

21        Q.      WHEN YOU WERE INTERVIEWING THESE

22  WITNESSES, DID YOU TAKE ANY NOTES?

23        A.      YES, I DID.

24        Q.      DID YOU BRING THOSE NOTES TO COURT TODAY?

25        A.      NO, I DIDN'T.

26        Q.      HOW LONG AFTER THIS INCIDENT -- WHERE ARE

27  THESE NOTES?

28        A.      I EITHER DISCARDED THEM OR I MAY HAVE THEM

661

1    SOMEWHERE.

2    Q.        YOU KNOW YOU'RE SUPPOSED TO KEEP THE

3    NOTES, DON'T YOU?

4    A.        AT THE TIME I DIDN'T KNOW.  I LATER FOUND

5    OUT THAT IT PROBABLY WOULD HAVE BEEN A GOOD IDEA TO KEEP

6    THEM.

7    Q.        HOW LONG AFTER THE INTERVIEW WAS THE

8    POLICE REPORT PREPARED BY YOUR PARTNER WHEN YOU SAY THEY

9    MADE THESE STATEMENTS?

10   A.        LET'S SEE, PROBABLY WE GOT THE CALL

11   APPROXIMATELY 1:05.  I WOULD SAY THAT WHERE WE STARTED

12   WRITING, ACTUALLY WRITING THE REPORT WAS APPROXIMATELY

13   5:00 TO MAYBE 6:00 IN THE MORNING, SOMEWHERE AROUND THERE.

14   Q.        SO HOW MANY HOURS AFTER THE STATEMENT WAS

15   MADE REGARDING THE IDENTIFICATION WAS THE --- THAT PART OF

16   THE REPORT WRITTEN?

17   A.        WELL, THAT WOULD BE AROUND FIVE TO SIX

18   HOURS.

19   Q.        AND YOU REMEMBER YOU HAD SOME NOTES?

20   A.        YES.

21   Q.        AND DO YOU KNOW WHAT YOU DID WITH THOSE

22   NOTES AGAIN?

23   A.        I DON'T REMEMBER WHAT I DID WITH THEM.

24   Q.        OKAY.  NOW, ARE YOU BROADCASTING ON DUPLEX

25   AT THE TIME YOU MAKE CONTACT WITH MR. MORRIS HERE?

26   A.        WHAT WE BELIEVE WE DID IS EITHER MY

27   PARTNER AND I, WE AT LEAST ON DUPLEX WE'D SAY WE'VE MADE

28   CONTACT WITH THE SUSPECT, BUT MOST OF IT WAS TALKING TO

Exhibit 21

- Crime with which suspect was identified;
- Name of person who made identification;
- DR number of report of crime with which suspect was identified;
- Name of the concerned law enforcement agency and the case number, when suspect identified with a crime committed in another jurisdiction;
- Names of victims and witnesses attending the "show-up;"
- Names of suspect's defense attorneys and deputy district attorneys attending the "show-up;"
- Name and serial number of the officer who selected the participants for the "show-up;"
- Unusual actions which the investigating officer requested the suspect to perform during the "show-up;" and,
- Name, serial number, and detail of officer conducting the "show-up."

**Suspect Not Identified.** When no suspects are identified in a "show-up," the teletype notification shall contain the following:

- NO SUSPECTS IDENTIFIED;
- (Names of victims and witnesses attending the "show-up"); and,
- (Name, serial number, and detail of officer conducting the "show-up".)

**203.50 IDENTIFICATION OF SUSPECTS IN THE FIELD.** A suspect may be transported to a victim or witness for the purpose of identification when:

- An officer is conducting a preliminary investigation and a field confrontation is necessary to determine if the suspect is the perpetrator of the offense; and,
- Probable cause exists to arrest the suspect for the offense; or,
- Exigent circumstances exist that make it unreasonable for the victim or witness to be transported to the suspect; or,
- The officer obtains the free and voluntary consent of the suspect.

An officer who intends to conduct a field confrontation shall inform the victim or witness that:

- The person is in temporary custody as a possible suspect only; and,
- The fact the person is in police custody does not indicate his/her guilt or innocence; and,
- The purpose of the confrontation is either to eliminate or identify the person as the perpetrator.

**735.05 SCHEDULING AND LOCATION OF FORMAL SHOW - UPS FOR ADULT SUSPECTS.** Formal show-ups for adult suspects shall be conducted in:

- The Auditorium, Room 100, Parker Center;
- The Auditorium of the Los Angeles County Central Jail; or,
- The designated facilities at Los Angeles County Jail.

Exhibit 2-2

2

1       Q.       OKAY.  IS THE PERSON YOU ARRESTED IN THE

2    COURTROOM RIGHT NOW?

3       A.       YES, HE IS.

4       Q.       CAN YOU PLEASE POINT HIM OUT AND DESCRIBE

5    WHAT HE'S WEARING.

6       A.       HE'S WEARING A WHITE LONG-SLEEVED SHIRT

7    SITTING NEXT TO COUNSEL.

8       THE COURT:  INDICATING DEFENDANT MORRIS FOR THE

9    RECORD.

10   BY MR. LIEBERMAN:

11      Q.       WHAT DID YOU DO AFTER TAKING HIM INTO

12   CUSTODY?

13      A.       WE CONDUCTED A FOLLOW-UP TO THE HOUSE, TO

14   THE LOCATION.

15      Q.       WHEN YOU DID THAT, WHERE WAS THE

16   DEFENDANT?

17      A.       HE -- MY PARTNER STAYED THERE WITH HIM.

18      Q.       OKAY.

19      A.       WE WALKED OVER THERE, OR I WALKED OVER

20   THERE.

21      Q.       SO THE DEFENDANT WAS IN A CAR OR WAS HE

22   JUST OUTSIDE?

23      A.       WE PUT HIM IN OUR POLICE VEHICLE.

24      Q.       OKAY.  SO THEN YOU WENT TO THE HOUSE?

25      A.       CORRECT.

26      Q.       1806?

27      A.       CORRECT.

28      Q.       AND WHAT DID YOU DO WHEN YOU GOT THERE?

1    A.    CORRECT.

2    MR. FISHER: OBJECTION. LEADING.

3    THE COURT: OVERRULED.

4    BY MR. LIEBERMAN:

5    Q.    OKAY. AND IS THAT HOW THIS IS ALWAYS

6    DONE?

7    A.    IT'S ALWAYS HOW I'VE DONE IT.

8    Q.    OKAY. IS THAT HOW YOU WERE TAUGHT TO DO

9    IT?

10    A.    YES, THAT'S HOW I WAS TRAINED.

11    Q.    OKAY. SO DID YOU READ THAT ADMONITION

12    FROM THE CARD WITH RESPECT TO EACH PERSON WHO

13    PARTICIPATED?

14    A.    CORRECT.

15    Q.    WHICH FAMILY MEMBERS PARTICIPATED IN THE

16    SHOWUP?

17    A.    KATHERINE, HELADIO AND DENISE, I BELIEVE.

18    Q.    DID THEY VIEW THE DEFENDANT?

19    A.    YES, THEY DID.

20    Q.    WHERE?

21    A.    WELL, WHAT HAPPENED WAS THE DEFENDANT WAS

22    PRETTY FAR DOWN THE STREET, SO -- SO WE DIDN'T HAVE TO

23    WALK THEM ALL THE WAY DOWN THERE, THE DEFENDANT WAS

24    BROUGHT, OH, PROBABLY HALFWAY BETWEEN 1806 AND WHERE HE

25    WAS DETAINED, SO HE WAS STILL AWAY FROM THE LOCATION, AND

26    EACH ONE WAS -- EACH OF THE VICTIMS WERE PUT IN A POLICE

27    CAR AND TAKEN DOWN TO WHERE THEY WERE. THEY VIEWED AND

28    THEN THEY WERE DRIVEN BACK.

Exhibit 24

## Legal Argument 5

1  THE APPELLATE WAS SUBJECTED TO A "NON-EXIGENT"
2  SHOW-UP BY THE LAPD AN WITHOUT BEING PERSONALLY
3  PRESENT B WITH COUNSEL
4      THE CALIFORNIA CONSTITUTION AFFORDS ITS CITIZENS
5  "NON-EXIGENT" PRESENCE OF COUNSEL AT ANY LAW
6  ENFORCEMENT INVESTIGATIVE PROCEEDING (SEE CLEAVER
7  V. SUPERIOR COURT 24 CAL. 3d 297)
8      IN ADDITION LAPD'S PRACTICE AND PROCEDURE
9  MANUAL SECTION 203.50. INSTRUCTS ITS POLICE OFFICERS
10 TO OBTAIN THE FREE, AND VOLUNTARY CONSENT OF THE
11 SUSPECT WHEN CONDUCTING IDENTIFICATIONS IN THE FIELD
12 (SEE EXHIBIT 1)
13
14     THE MOST RECENT DECISION ADDRESSING THIS ISSUE
15 WAS MADE IN PEOPLE V. COOK 40 CAL 4th 1334, THE COURT
16 BASED IT'S DECISION UPON SIXTH AMENDMENT CONSTITUTIONAL
17 REASONING ESTABLISHED IN KIRBY V. ILLINOIS (1972) 406
18 US 682 BREWER V WILLIAMS (1977) 430 US 387; PEOPLE V
19 JOHNSON (1992) 3 CAL 4th 1183.
20     HOWEVER THOSE DECISIONS ARE BASED ON THE
21 APPLICATION OF THE SIXTH AMENDMENT TO STATES BY WAY
22 OF THE FOURTEENTH AMENDMENT, THE SIXTH AMENDMENT
23 DECLARES IN PART. "TO HAVE THE ASSISTANCE OF COUNSEL
24 FOR HIS DEFENSE
25     THE CALIFORNIA CONSTITUTION BASICALLY HAS THE
26 SAME WORDING AS THE SIXTH AMENDMENT, BUT ADDS
27 ADDITIONAL LANGUAGE BY DECLARING;
28

1

TO HAVE THE ASSISTANCE OF COUNSEL FOR THE DEFENDANTS DEFENSE (TO BE PERSONALLY PRESENT WITH COUNSEL)

THIS IS WHAT GIVES THE APPELLANT STANDING FOR THIS APPELLATE COURT TO DETERMINE IF HIS SUBSTANTIAL STATE CONSTITUTIONAL RIGHTS HAVE BEEN VIOLATED

FURTHERMORE, ARTICLE I SECTION 24 DOES NOT PROHIBIT THE COURT FROM LITIGATING THIS ISSUE BY DECLARING

"THIS CONSTITUTION SHALL NOT BE CONSTRUED BY THE COURT TO AFFORD GREATER RIGHTS TO CRIMINAL DEFENDANTS THAN THOSE AFFORDED BY THE CONSTITUTION OF THE UNITED STATES"

A STATE IMMINENT MEASURE CANNOT ALTER, REDUCE OR CHANGE ANY RIGHTS SECURED BY ARTICLE I SECTION 15 WITHOUT THE CONSTITUTION BEING AMENDED PURSUANT TO ARTICLE XVIII SECTION 1

BE INFORMED I AM ASKING FOR A REVIEWAL OF THE FOLLOWING COUNTS 1, 2 9 10

- Crime with which suspect was identified;
- Name of person who made identification;
- DR number of report of crime with which suspect was identified;
- Name of the concerned law enforcement agency and the case number, when suspect identified with a crime committed in another jurisdiction;
- Names of victims and witnesses attending the "show-up;"
- Names of suspect's defense attorneys and deputy district attorneys attending the "show-up;"
- Name and serial number of the officer who selected the participants for the "show-up;"
- Unusual actions which the investigating officer requested the suspect to perform during the "show-up;" and,
- Name, serial number, and detail of officer conducting the "show-up."

**Suspect Not Identified.** When no suspects are identified in a "show-up," the teletype notification shall contain the following:

- NO SUSPECTS IDENTIFIED;
- (Names of victims and witnesses attending the "show-up"); and,
- (Name, serial number, and detail of officer conducting the "show-up".)

**203.50 IDENTIFICATION OF SUSPECTS IN THE FIELD.** A suspect may be transported to a victim or witness for the purpose of identification when:

- An officer is conducting a preliminary investigation and a field confrontation is necessary to determine if the suspect is the perpetrator of the offense; and,  ~~There was no~~
- Probable cause exists to arrest the suspect for the offense; or,
- ~~no~~ Exigent circumstances exist that make it unreasonable for the victim or witness to be transported to the suspect; or,
- The officer obtains the free and voluntary consent of the suspect.  And then did have that

An officer who intends to conduct a field confrontation shall inform the victim or witness that:

- The person is in temporary custody as a possible suspect only; and,
- The fact the person is in police custody does not indicate his/her guilt or innocence; and,
- The purpose of the confrontation is either to eliminate or identify the person as the perpetrator.

**735.05 SCHEDULING AND LOCATION OF FORMAL SHOW - UPS FOR ADULT SUSPECTS.** Formal show-ups for adult suspects shall be conducted in:

- The Auditorium, Room 100, Parker Center;
- The Auditorium of the Los Angeles County Central Jail; or,
- The designated facilities at Los Angeles County Jail.

Exhibit 1          2

Legal Argument

Mr Lieberman violated the due process clause of the fourteeth Amendment for failure to disclose "Material Evidence to the Defense" Under Brady v Maryland "Discovery"

Supporting facts

The only thing that the defense wasn't provided by (Mr Lieberman) that he should have been provided would be the reports themselvese with respect to the prints lifted off the items listed in the property report and the prints lifted in the interior of the residence by Earls (2) There is also a clear violation of the 30-day Discovery rule And (3) Also a fair comparison should had been made because of the Inadequacy of the prints in A.F.I.S computer and the Booking prints ( see the Exhibits 1 R.t

667   668   669   670   671   672   673   674
675   676   677   678   679   680   681   704
705   706   707   708   709   710   711   712
713   513   514   515   516   517   518   563
564   565   850   851   ~~851~~  852

Issues

1) Did Mr Lieberman failure to disclose

1

"Material Evidence to the defense that could have prove (Mr Morris) was Mistakenly Identified

2) Whether this is a clear violation of the 30-days Discovery rule

3) Whether a fair comparison should have been made because of the Inadequacy of the prints in A.F.I.S computer and the booking prints

The most compelling evidence is the finger prints in this case. Much better than the suggestive "non exigent" field show-up, Mr Morris was put in.
If Mr Lieberman would have provided the reports to the defense. A fair comparison could have been made. Then a innocence man would not be in prison today. I do believe if the reports was turnover to the defense.
Mr Lieberman could not prove this case beyond a reasonable doubt, I'm going to explain why Mr Lieberman intentionally didn't what the defense to get there hands on those reports. Because it would have prove (1) That Mr Morris was not the guy that ran out of the house with Katherine gun (2) It would also prove that the police

2

1  in the helicopter did lost sight of the suspect
2  the same suspect that made a tossing gesture
3  toward some bushes, where a officer
4  found katherine gun. I know this is were
5  the police in the Helicopter lost sight of
6  the suspect. Because of the trees on
7  Gramercy is like a umbrella it covers
8  the street from the air. The police
9  notice a black man in the same area
10  after they lost sight of the suspect
11  So they turn there light on Mr
11  Morris that was walking down the steet
12  on the north side of 42nd Place. Then two
13  officer's in a black and white detain
15  Mr Morris
16  Like the police officer in the helicopter
17  said if they lost sight of a suspect 9
18  times out of 10 he will be gone And
19  that's what happen in this case.
20  keep in mind, also that his helicopter
21  was egipped with video Camera. And
22  the officer's are trained to operate the
23  Camera and focus on the ground at the
24  same time. But this officer said
25  he can't do both. And that's hard to
26  believe. This is also hard to believe
27  that officer Dale Melton. The observer.
28  And this is his job, to respond to

3

1 radio call, talk with the officers on the
2 ground and report to the officer's on
3 what he see happening on the ground.
4         There is a Los Angeles Police
5 Department communitcations chrono log on
6 this Incident. when the 911 call
7 came in, when they were notified,
8 And when they arrive on the scene
9 of the crime, But there is no broad
10 cast or recording on what the helicopter
11 officer's seen after they arrive at the
12 scene.
13        when they seen this person exit
14 the front door when this man ran
15 down the street. when is mad man
16 made this gesture towards the bushes,
17 Or when this suspect ran to Gramercy
18 Or when they detained this innocent
19 man Mr Murris, keep in mind this
20 officer Dale Melton had the officer's to
21 switch to the frequence to "Simplex".
22        I'm going to tell you about Simplex,
23 On simplex the conversation arent recorded
24 down at the LAPD's Communication center.
25
26        " Let's talk about, when Mr Morris
27 was taken into custody, And than

4

1 put in a suggestive non exigent field show
2 up by the officers that detain him.
3

4    How the LAPD violated there own police
5 procedure to get a Identification ~~to commit~~
6    "see 203.50 Identification of suspect
7 in the field. And also see, when a
8 suspect identified or not Identified in a
9 " Show -up" the teletype notification card
10 should be filled out ( see exhibit 2 )
11

12    A suspect maybe transported to a
13 victim or witness for the purpose of
14 identification ~~a~~ when (1) An officer is
15 conducting a Preliminary investigation and a
16 field confrontation is necessary to determine
17 if the suspect is the Perpetrator of the
18 offense. The officer who conduct this
19 field confrontation Told the victim in
20 count 1.
21    Counsel asked him, did the police
22 officer tell you that they had the
23 suspect that Burgiarized your house?
24 Before you went to make your
25 Identification? and he said yes
26 (Rt 374 Line 20-23) (Ct 86 Line 1-6)
27 (see exhibit 3-4 )

5

1  Pre suggestive that they have the person
2  that did it tainting any kind of objectivity
3  or creating bias from the witness before
4  the Identification
5
6      2) Probable Cause exists to arrest the
7  suspect for the offense. The officer who
8  conducted this field Confrontation made it
9  clear that I was the perpetrator and, that
10 made it Probable Cause to arrest Mr Morris
11
12     3) Exigent circumstance exist that make
13 it unreasonable for the victim or witness to
14 be transported to the suspect; If this counts
15     well, what happend was the defendant
16 was pretty far down the street, So
17 we didn't have to walk them all the
18 way down there, The defendant was brought
19 on, Probably halfway between 1806 and where
20 He was detained, so He was still away
21 from the location, and each of the victims
22 were put in a police car and taken down
23 to where they were, They viewed
24 and then they were driven back (648 LINE
25 21-28) (Pt 642 Line 11-27) (Exhibits 5-6)
26
27     4) The officer obtain the free and

6

1. Voluntary consect of the suspect. And
2. you now that didn't happen.
3.

4.    They said the victims Identified Mr
5. Morris in the field show-up so where is
6. the telepe notification card, I know it
7. was discarded (Rt 660-21-28 )(Rt 661-1-23 )
8. (Xhibit 7-8)
9.    I would like to take you to the "follow
10. -up investigation" by Los Angele Police Department
11. And why to this day I still don't have
12. them reports themselvese with respect
13. to the prints lifted off the Items listed
14. in the property report and the prints lifted
15. in the interior of the residence by Earls
16. T# C8866
17.    Because the LAPD notified SID latent
18. prints section earls T# C8866 responded and
19. took prints of the crime scene and
20. evidence recovered by officers
21.
22.    Item (1-3) is the gun that was
23. recovered outside on the westside of the
24. house 1816. Item (6) is bag of cocaine
25. that was also found outside infront of
26. 1810 next door to 1806. "follow up investigation"
27. that morning: Item 14-15 was found
28. more bags of cocaine that was found in

7

1. front of 1806 on the sidewalk.

2.

3. Item 4 and 5 was recovered inside of
4. 1806 also 7, 8, 10 (see exhibit 9      )

5.

6. Also the prints in AFIS computer
7. and the booking prints that was
8. Inadequacy still not turnover to
9. me why is that is it because you
10. already now Mr Morris is innocent of
11. this crime.

12.

13. I dont see a futher problem in
14. making a comparison with all the evidence
15. in this case. And making a comparison
16. with all the prints in AFIS computer and
17. with the booking prints to see if there
18. anything wrong with those prints. If matches
19. were made also or at least comparison
20. made in this case. And no matches
21. established that would be Exonenting information
22. and it is Required under Brady

23.

24. Due process require the disclosure
25. to the defence of evidence
26. favorable

27.

8

to an accused" That is material
either to guilt or to punishment" Brady V
Maryland (1963) 373 US 83 87 10 Led 2d
215 83 S ct 1194, United States V
Bagley (1985) 473 US 667 676; 87
Led 2d 481; 105 S ct 3375, Brady
Disclosure is required even though it
is not included within Pen C. § 1054.1
because it is mandated by the united
states constitution Penal c. § 1054(e)
(Discovery required by united states
Constitution must be Disclosed) IZAZAGA
V Superior court (1991) 54 C3d 356, 378
285 CR 231. Evidence is favorable if it
either help the defendant or hurt the
prosecution. People V Santos (1994) 30
CA 4th 104, 35 CR2d 719; In addition
the "Brady" obligation can require disclosure
of reports and statements of experts
and witnesses. The prosecutor does
not intend to call at trial.(See penal
code section 1054.1 (f). "Brady also
place a duty on prosecutor to learn
of any favorable evidence known
to others action on the governments
behalf including the police and crime
LABS, (See Kyles V Whitley (1995)
514 US 419 131 Led 2d 490; 115 S ct

9 (☚)

1  (1155) In re Brown (1993) 17 C4th 873, 72 CR
2  2d 698. see people v little (1997) 59 CA 4th
3  426, 68 CR 2d 907

4

5       Evidence is Considered "Material"
6  only there is reasonable probability that had
7  it been Disclosed to the Defense the result
8  would have been different, Reasonable
9  Probability is Defined as a Probability
10 sufficent to undermine confidence in the
11 out come on the part of a Reviewing court
12 (In re sassounion (1995) 9 C4th 353, 544,
13 n6 36 CR 2d 466. (citting united states v
14 Bagley supra, see also Kyles v whitey (1995
15 514 US 419) 131 LEd 2d 490 115 s ct 1999.
16 united states v Aguis (1976) 427 US 97 108,
17 49 LEd 2d 342 352 96 sct 2392. The
18 failure of the prosecution to Disclose "Brady
19 Material certainly when intartional, But
20 even when negligent, can result in
21 (Reveral) Merrill v Superior Court
22 (1994) 27 CA 4th 1586, 33 CR 2d 515
23 and can even be viewed as prosecutorial
24 misconduct

25

26       Since the failure of the prosecution to
27 disclose "Brady Material" if it was intentional
28 or even if it was negligent (Reveral) is required.
   in all counts         (60)(

# EXHIBIT

Exhibit 1   Starts at page

667, 668 669 670 671 672 673
674 675 676 677 678 679 680 681
704 705 706 707 708 709 710 711
712 713  513 514 515 516 517 518
563 564 565 850 851 852

```
 1    CASE NUMBER:              BA279836

 2    CASE NAME:               PEOPLE VS. CONDALEE MORRIS

 3    LOS ANGELES, CALIFORNIA; THURSDAY, JULY 28, 2005

 4    DEPARTMENT NO. 101       HON. WILLIAM R. POUNDERS, JUDGE

 5    REPORTER:                JEANNE C. IANNONE, CSR NO. 3140

 6    TIME:                    9:39 A.M.

 7

 8              (APPEARANCES AS HERETOFORE NOTED.)

 9

10              (THE FOLLOWING PROCEEDINGS WERE

11               HELD IN OPEN COURT OUTSIDE THE

12               PRESENCE OF THE JURY:)

13

14        THE COURT:  OKAY.  WE DO HAVE MR. MORRIS AND BOTH

15    COUNSEL PRESENT.  THE JURORS I GUESS HAVE CHECKED IN SO I

16    THINK WE'RE READY TO GO.

17                   ANYTHING WE NEED TO TAKE UP?

18        MR. FISHER:  I JUST HAVE AN -- I HAVE AN OBJECTION,

19    YOUR HONOR.  COUNSEL IS PROPOSING TO HAVE THE SID LATENT

20    PRINT PERSON ROLL MY CLIENT'S FINGERPRINTS AND COMPARE

21    THEM WITH WHATEVER IS LIFTED AT THE -- AT THE CRIME SCENE,

22    APPARENTLY, ALL RIGHT.  AND MY PROBLEM WITH ALL OF THIS IS

23    THERE HAS BEEN A HUGE DISCOVERY VIOLATION.  THIS STUFF WAS

24    SUPPOSED TO BE TURNED OVER TO ME 30 DAYS BEFORE TRIAL, AND

25    I'VE BEEN ASKING MARNA MILLER FOR THIS INFORMATION, AND SO

26    WHAT WE HAVE NOW IS A SITUATION WHERE I'M -- I'M -- THE

27    REASON -- THE REASON GIVEN TO ME THIS MORNING FOR WANTING

28    TO ROLL THE DEFENDANT'S FINGERS AT THIS POINT IS BECAUSE
```

1  BOTH THE BOOKING FINGERPRINTS AND THE FINGERPRINTS THAT

2  ARE CONTAINED IN THE COMPUTER, OKAY, ACCORDING TO THE

3  LATENT PRINT EXPERT AREN'T SUFFICIENT, WHICH IS INCREDIBLE

4  AND VERY HARD TO BELIEVE, AND I'M HERE STUCK WITHOUT AN

5  EXPERT.

6        I DON'T HAVE THE FINGERPRINTS FROM THE

7  COMPUTER, I DON'T HAVE -- I HAVEN'T SEEN ANY FINGERPRINTS

8  AT ALL THAT WERE LIFTED FROM THE CRIME SCENE.  I DON'T

9  EVEN KNOW WHAT FINGERPRINTS ARE LIFTED AND YOU KNOW HOW IT

10  GOES.

11        I MEAN I'VE BEEN -- I'M HERE IN THE MIDDLE

12  OF TRIAL, I GOT THIS STUFF DUMPED ON ME.  I FIRST FOUND

13  OUT THAT THERE WERE SOME FINGERPRINTS I THINK THE SECOND

14  OR THIRD DAY IN -- THE SECOND DAY INTO THE TRIAL OR WHEN

15  THE I.O. SHOWED UP, I DON'T KNOW WHEN THAT WAS, MAYBE IT

16  WAS THE THIRD DAY, AND SO I'M OBJECTING TO ALL THIS..

17        SUBMIT IT.

18  THE COURT:  IT SEEMS TO ME THERE ARE TWO DIFFERENT

19  ISSUES.  ONE IS WHETHER A FAIR COMPARISON SHOULD BE MADE

20  NOW BECAUSE OF THE INADEQUACY OF THE PRINTS IN A.F.I.S.

21  AND THE BOOKING PRINTS, BUT THAT'S DIFFERENT FROM A

22  DISCOVERY VIOLATION, MEANING IF THE DISCOVERY ITEMS HAD

23  BEEN PROVIDED, I DON'T SEE A FURTHER PROBLEM IN MAKING A

24  COMPARISON NOW.

25        WHY THE DELAY OR WAS THERE A DELAY IN

26  PROVIDING THE INFORMATION TO MR. FISHER THE PRINTS?

27  MR. LIEBERMAN:  I THINK HE WAS AWARE THAT PRINTS

28  DID NOT MATCH, BUT -- OR -- I'M NOT GOING TO SAY -- I

1    DON'T KNOW WHAT MS. MILLER TOLD HIM EXACTLY, BUT IT WAS MY

2    IMPRESSION THAT COUNSEL IS AWARE THAT WE COULDN'T MATCH

3    PRINTS WITH THE DEFENDANT OR THE PRINTS THAT WE WERE

4    TRYING TO MATCH WERE INSUFFICIENT TO CREATE A MATCH.

5            HE DID GET THE REPORTS STATING THAT DURING

6    TRIAL, AND THAT --

7        THE COURT:  DURING THE TRIAL OR BEFORE TRIAL?  I

8    MEAN DISCOVERY, AS MR. FISHER HAS INDICATED, IS SUPPOSED

9    TO BE ACCOMPLISHED 30 DAYS PRIOR TO TRIAL SO THAT IF YOU

10   INTENDED TO USE THE FINGERPRINTS, THEY WOULD -- THEY

11   SHOULD BE MADE AVAILABLE AT LEAST FOR EXAMINATION, AND IF

12   MATCHES WERE MADE OR AT LEAST COMPARISONS MADE AND NO

13   MATCH ESTABLISHED, THAT MIGHT BE EXONERATING INFORMATION

14   AND REQUIRED UNDER BRADY.

15       MR. LIEBERMAN:  I KNOW THAT HE WAS TOLD THAT WE

16   DIDN'T MATCH UP THE DEFENDANT.

17       MR. FISHER:  NO.  EXCUSE ME.  I'D LIKE TO INTERJECT

18   HERE.

19       THE COURT:  OKAY.

20       MR. FISHER:  BASED ON MY EXPERIENCE OF 30 YEARS

21   DOING THIS, IF -- IF THEY DON'T MATCH -- IF THERE WAS A

22   MATCH, I WOULD HAVE THAT INFORMATION.  SO I JUST ASSUMED

23   THERE WASN'T A MATCH.

24           MARNA MILLER NEVER KNEW EITHER WAY, SHE

25   DIDN'T KNOW ANYTHING ABOUT THE FINGERPRINTS.  THE ONLY

26   THING MARNA MILLER, THE FORMER DISTRICT ATTORNEY, KNEW

27   THERE IS A LINE IN THERE SAYING AN EARL -- A

28   REPRESENTATIVE FROM SID CAME OUT AND -- LET ME FIND IT

1    HERE.

2         MR. LIEBERMAN:  MAY I JUST INTERJECT VERY BRIEFLY

3    JUST FOR A SECOND?

4         THE COURT:  WELL, LET HIM FINISH.

5         MR. FISHER:  NOTIFIED SID LATENT PRINT SECTION T.

6    EARLS, BADGE NUMBER, RESPONDED AND TOOK PRINTS OF THE

7    CRIME SCENE AND EVIDENCE RECOVERED BY OFFICERS.  NO --

8    MISS MILLER DIDN'T KNOW ANYTHING OTHER THAN THAT.

9         AND AS WE KNOW, IF IT WASN'T FOR ME BEING

10   SO PERSISTENT AT THE BEGINNING OF THE TRIAL AND ASKING THE

11   DISTRICT ATTORNEY TO GO INTO THIS T. EARLS' WORK PLACE AND

12   WHEREVER HIS FILES ARE, WE STILL WOULDN'T HAVE IT.

13        YOU KNOW, JUDGE, WE STILL DON'T HAVE -- WE

14   STILL DON'T HAVE IT, EVEN THOUGH THIS PRINT EXPERT IS

15   HERE, BECAUSE I LOOKED AT THE REPORTS, AND THERE'S NOTHING

16   IN THE REPORTS TO INDICATE, AT LEAST THE REPORTS I'VE BEEN

17   GIVEN, THAT THERE WAS ANY KIND OF COMPARISON MADE.

18        SO IT SOUNDS LIKE WHAT'S HAPPENING IS, AND

19   MAYBE I'M JUMPING THE GUN HERE, IS THAT THE COUNSEL IS

20   BRINGING THE LATENT EXPERT IN NOW TO DO THE WORK THAT

21   WASN'T DONE BY T. EARLS, WHO IS ON VACATION, WE KNOW, OR

22   TO TRY AND GET SOME SORT OF NEW EVIDENCE AND NEW READING

23   OF WHAT T. EARLS  HAS ALREADY DONE TO TRY AND SHOW THAT

24   MR. -- MR. -- THE DEFENDANT'S PRINTS WERE IN FACT THERE.

25        BUT IN ANY EVENT, I JUST -- I WOULD LIKE

26   TO HAVE AN EXPERT LOOK AT THE COMPUTER PRINTS AND THE --

27   AND THE BOOKING PRINTS AND ALL THIS NOW, IT'S A CLEAR

28   VIOLATION OF THE 30-DAY DISCOVERY RULE.

1    MR. LIEBERMAN: YOUR HONOR, WHEN I GOT THE CASE, I

2    WAS ADVISED THAT NO PRINT HAD BEEN -- THAT THERE WAS NO

3    POSITIVE MATCH. WE HAD NO INTENT TO CALL ANY PRINT

4    WITNESSES BECAUSE WE HAD NO REASON TO BELIEVE THAT ANY

5    PRINT WITNESS WOULD HELP US.

6        IN FACT, I THINK I EVEN SAID AT THE

7    BEGINNING OF THIS TRIAL THAT I WAS GOING TO CALL A PRINT

8    WITNESS TO TESTIFY TO THE LACK OF PRINTS ON THE GUN AND

9    THAT WAS IT. SO WE HAD NO INTENT TO CALL ANYBODY TO SHOW

10   ANY TYPE OF MATCH. THE ONLY THING THAT THE DEFENSE WASN'T

11   PROVIDED THAT HE SHOULD HAVE BEEN PROVIDED WOULD BE THE

12   REPORTS THEMSELVES WITH RESPECT TO THE PRINTS LIFTED IN

13   THE INTERIOR OF THE RESIDENCE BY EARLS, WHO IS ON

14   VACATION, SHOWING WHERE THE PRINTS WERE LIFTED, AND THE

15   ONLY RELEVANCE THAT HAS IS TO SHOW THAT THERE WERE PRINTS

16   FOUND THERE THAT DIDN'T COME UP WITH A MATCH. IT DIDN'T

17   CAUSE A MATCH.

18       SO THAT'S THE ONLY RELEVANCE THAT THAT

19   WOULD HAVE, AND THAT WAS THE ONLY THING HE WASN'T GIVEN

20   WAS THAT ACTUAL REPORT.

21       NOW, WHAT'S HAPPENING NOW IS BECAUSE

22   COUNSEL WANTED THOSE REPORTS, WE GOT THOSE REPORTS, AND

23   BECAUSE COUNSEL WANTED A WITNESS TO COME IN AND TESTIFY

24   REGARDING THOSE REPORTS, I CAUSED A WITNESS TO COME IN

25   HERE TO TESTIFY TO THAT.

26       THE ONLY THING THAT -- THAT'S NOW HAPPENED

27   THAT'S ANY DIFFERENT THAT COUNSEL DOESN'T LIKE IS THAT

28   THERE'S THE OPPORTUNITY NOW TO ROLL THE DEFENDANT AND GET

1     GOOD PRINTS TO MAKE A COMPARISON WITH THAT MAY OR MAY NOT

2     CAUSE A MATCH.  SO WE MAY BE ARGUING OVER NOTHING.

3               MR. SALONGA IS HERE.  HE ADVISED ME THIS

4     MORNING THAT THERE HAVE BEEN TWO COMPARISONS DONE ALREADY,

5     ONE WITH THE A.F.I.S. PRINT, WHICH THE COURT HAS ALREADY

6     LOOKED AT THAT ONE SHEET OF PAPER THAT SAID NO MATCH ON

7     A.F.I.S.

8         THE COURT:  RIGHT.

9         MR. LIEBERMAN:  BUT THAT WAS DONE, AND THERE WAS

10     ANOTHER ONE DONE WITH THE DEFENDANT'S BOOKING PRINTS LAST

11     NIGHT BY A DIFFERENT WITNESS, NOT MR. SALONGA, BUT HE WAS

12     ADVISED IT HAD BEEN DONE AND ALSO NO MATCH.

13               HE SAID THAT HE WANTS TO DO -- HE WANTS TO

14     ROLL THE DEFENDANT THIS MORNING FOR ONE REASON OR ACTUALLY

15     TWO REASONS.  FIRST IS THAT BOTH THE A.F.I.S. PRINTS IN

16     THE DATA BANK AND THE DEFENDANT'S BOOKING PRINTS ARE VERY

17     POOR QUALITY, AND THAT THAT MAY BE ONE REASON WHY THEY

18     CAN'T MAKE A MATCH.

19               NOW, OBVIOUSLY IT MAY NOT BE A MATCH

20     BECAUSE IT MAY BE -- TWO DIFFERENT PEOPLE MAY HAVE MADE

21     THOSE PRINTS AND THERE MAY BE -- AND THEY MAY EXONERATE

22     THE DEFENDANT WITH RESPECT TO THAT ISSUE.  NOT IN THE

23     CASE, I DON'T THINK, BUT IT MAY BE HELPFUL FOR THE

24     DEFENSE, LET'S SAY THAT.

25               SO WE WANT TO BE ABLE TO DO THAT, AND I

26     DON'T THINK THAT THE PEOPLE SHOULD BE PROHIBITED FROM

27     DOING THAT AT THIS POINT BASED UPON EVERYTHING THAT WE

28     KNOW.

1          THE SECOND THING IS THAT THERE IS NO PALM

2    PRINT BY THE DEFENDANT IN THE SYSTEM, EITHER IN A.F.I.S.

3    OR AT THE TIME OF BOOKING, AND THEY RECOVERED PALM PRINTS,

4    SO HE WOULD BE SEEKING TO GET THE PALM PRINT FROM THE

5    DEFENDANT TODAY TO DETERMINE WHETHER OR NOT THE PALM PRINT

6    MATCHES.

7          NOW, THAT'S THE ONLY REAL NEW EVIDENCE

8    THAT WE WOULD BE SEEKING TO DO OR ANY NEW INVESTIGATION, I

9    GUESS, WOULD BE GETTING THE PALM PRINT ITSELF, BUT

10   EVERYTHING ELSE IS JUST TRYING TO GET BETTER QUALITY

11   INFORMATION THAN WE ALREADY HAD, AND AGAIN IT COULD INURE

12   TO THE DEFENDANT'S BENEFIT IF THE BETTER PRINTS ARE DONE

13   AND THAT COMES BACK NEGATIVE.

14          SO WHAT I THINK IS HAPPENING HERE IS THAT

15   DEFENSE JUST DOESN'T WANT TO ROLL THE DICE AND FIND OUT.

16   IT COULD HELP HIM, IT COULD HURT HIM.

17          SO ANYWAY --

18        MR. FISHER:  NO, THAT'S NOT WHAT I'M CONCERNED

19   ABOUT.  I'M CONCERNED ABOUT WHAT I SAID IN MY OPENING

20   STATEMENT WITH RESPECT TO THE FINGERPRINTS, RELYING ON THE

21   FACT THAT THERE WAS NO MATCH AND, JUDGE, TO THIS MINUTE I

22   HAVE NOT SEEN ANY FINGERPRINTS.  IF I HAD FINGERPRINTS 30

23   DAYS BEFORE TRIAL, I WOULD HAVE GOTTEN A RETIRED SID

24   EXPERT FROM THE SHERIFF'S DEPARTMENT OR LAPD, WHICH WE

25   HAVE ON THE PANEL, TO LOOK AT THESE FINGERPRINTS, TO LOOK

26   AT THE RIDGES, TO SEE IF IN FACT THIS IS A GENUINE REASON

27   TO TRY AND REPRINT HIM BECAUSE THEY'RE NOT GOOD ENOUGH,

28   WHICH IS JUST SO HARD FOR ME TO BELIEVE THAT THEY WOULD

1   PUT FINGERPRINTS IN THIS A.F.I.S. OR THIS COMPUTER THAT

2   YOU COULDN'T READ AND NOW THE BOOKING FINGERPRINTS, IT --

3   BUT THE POINT IS I DON'T HAVE THIS INFORMATION, AND TO

4   THIS MINUTE I DON'T HAVE IT.

5           THE COURT:   YOU WOULD NOT NORMALLY HAVE THE PRINTS,

6   WOULD YOU?   YOU MIGHT HAVE ACCESS TO THEM, BUT YOU

7   WOULDN'T GET THE PRINTS.

8           MR. FISHER:   I WOULD HAVE KNOWN ABOUT THEM, I COULD

9   HAVE GOTTEN THE PRINTS AND I COULD HAVE GOTTEN AN EXPERT

10  TO LOOK AT THEM.

11          MR. LIEBERMAN:   WELL, THE PRINTS WERE LIFTED, AND

12  IT WAS MENTIONED IN THE REPORT THAT PRINTS WERE LIFTED.  I

13  UNDERSTAND COUNSEL'S ARGUMENT, BUT IT -- IF IN THE REPORT

14  IT SAID NO PRINTS WERE LIFTED AND NOW WE'RE SAYING YES,

15  PRINTS WERE LIFTED, I THINK HE HAS AN ARGUMENT, BUT I

16  THINK BASICALLY PRINTS WERE LIFTED, AND IT'S NOT LIKE

17  WE'RE GOING TO BE DISCOVERING OVER PRINTS --

18          MR. FISHER:   JUDGE, ALL I CAN DO IS MAKE THE

19  REPRESENTATION I'VE BEEN TRYING TO GET THIS STUFF FROM

20  MARNA MILLER.   SHE'S BUSY AND SHE HAD TROUBLE GETTING

21  THINGS THAT I WANTED, BUT SHE GOT MOST OF IT AND WHATEVER,

22  AND IT WASN'T TURNED OVER 30 DAYS BEFORE TRIAL AND HERE WE

23  ARE.

24          I'LL SUBMIT IT.

25          THE COURT:   I WILL SUSTAIN THE OBJECTION.   THE

26  PROBLEM THEN THOUGH IS WHAT TO DO ABOUT THE PRINTS AND

27  WHETHER THEY COME IN, WHETHER INFORMATION ABOUT THEM COMES

28  IN AT ALL, WHETHER THERE'S A -- THERE IS TESTIMONY ABOUT

1    THEM HAVING BEEN LIFTED AND COMPARED AND NO MATCH MADE.

2           MR. FISHER:  I DON'T REMEMBER THAT.

3           THE COURT:  NO.  I SAID WHETHER IT SHOULD COME IN

4    NOW.  I MEAN GIVEN THAT I'M SUSTAINING YOUR OBJECTION TO

5    THE DISCOVERY VIOLATION, I THINK IN A CASE, ESPECIALLY

6    INVOLVING A BURGLARY OR A ROBBERY OF A RESIDENCE WHERE

7    PRINTS HAVE BEEN FOUND AND THE DEFENSE COUNSEL GETS A

8    REPORT THAT THERE IS NO MATCH, THAT IT'S STORMING IN

9    THROUGH THE BACK DOOR TO SAY NOW WE'RE GOING TO FIND OUT

10   WHETHER THERE IS IN FACT A MATCH WITH THE DEFENDANT.

11           I DON'T THINK YOU CAN DO THAT, AND THAT'S

12   WHY THERE'S A DISCOVERY PROVISION.  SO I RECOGNIZE THAT

13   THERE IS A PROBLEM WHEN CASES ARE HANDED OFF AND THEY'RE

14   NOT PROPERLY PREPARED, BUT THAT'S THE RESPONSIBILITY OF

15   THE D.A.'S OFFICE, SO THE OBJECTION IS SUSTAINED.

16           WHAT WOULD EITHER SIDE WANT BROUGHT IN NOW

17   WITH REGARD TO WHETHER PRINTS WERE TAKEN?  I MEAN WE'VE

18   HAD TESTIMONY ABOUT THE GUN AND HOW IT WAS HANDLED AND IN

19   SOME CASES PRESERVED FOR PRINTS.  WE DON'T HAVE ANY

20   TESTIMONY YET THAT ANY PRINTS WERE ACTUALLY LIFTED FROM

21   THE GUN FOR COMPARISON OR FROM THE RESIDENCE, AS I RECALL.

22           SO WHAT IS BEING REQUESTED AT THIS POINT

23   FROM EITHER SIDE ABOUT PRINTS BEING LIFTED AND PRINTS

24   BEING COMPARED AND NO MATCH BEING MADE, ANY ONE OF THOSE

25   THREE?

26           MR. LIEBERMAN:  IT LOOKS LIKE -- ARE YOU A WITNESS,

27   MA'AM?

28           MR. FISHER:  EXCUSE ME.  THIS IS MISS BROWN.  I'M

1    SORRY.

2                MISS BROWN, WOULD YOU JUST WAIT OUTSIDE

3    FOR A MINUTE.  WE'LL GET TO YOU SHORTLY.  I'M SORRY.

4            THE COURT:  I THINK THE JURY IS TELLING US THAT

5    THEY'RE HERE, SO THEY ARE HERE AND WE KNOW IT.  OKAY.

6                SO WHAT'S THE FINAL THING?  I JUST NEED TO

7    KNOW WHAT'S GOING ON SO THAT BOTH SIDES ARE PREPARED TO

8    MEET WHATEVER EVIDENCE IS BEING OFFERED.

9                WHAT MORE WOULD BE OFFERED?  ANYTHING MORE

10   EITHER ONE OF YOU WANT?  ANYTHING MORE ABOUT PRINTS COMING

11   IN?

12           MR. LIEBERMAN:  WELL, I WAS JUST GOING TO CALL

13   MR. SALONGA TO TESTIFY THAT HE EXAMINED THE GUN, THAT

14   THERE WERE PARTIAL PRINTS LIFTED BUT THEY WERE INADEQUATE

15   OR INSUFFICIENT TO MATCH WITH ANYBODY, AND THAT'S NOT

16   UNCOMMON.  IT'S HARD TO GET PRINTS OFF OF A GUN.  THAT'S

17   WHAT I WANT TO CALL HIM TO TESTIFY REGARDING.

18               IT WAS MY UNDERSTANDING THAT THE DEFENSE

19   WANTED TO CALL HIM TO TESTIFY REGARDING WHAT EARLS DID,

20   AND I GUESS THE DEFENSE IS ENTITLED TO GO THROUGH THE

21   BUSINESS RECORD EXCEPTION AND HAVE HIM TESTIFY THAT EARLS

22   MADE A RECORD OF THE FACT THAT PRINTS WERE LIFTED FROM A

23   CERTAIN LOCATION, AND I GUESS IF HE WANTS TO GO ONE STEP

24   FARTHER AND SAY A MATCH WAS DONE AND -- OR THE COMPARISON

25   WAS DONE ONCE AND/OR TWICE, THEN I THINK HE OPENS THE DOOR

26   AT LEAST TO ALLOW ME TO ASK THE QUESTION OF THE WITNESS

27   ABOUT THE QUALITY OF THE PRINTS THAT WERE INVOLVED IN THE

28   COMPARISON AND WOULD BETTER QUALITY PRINTS GIVE YOU A

1  BETTER OPPORTUNITY TO MAKE A BETTER EVALUATION, AND WE CAN

2  LEAVE IT AT THAT, I GUESS, WITHOUT DOING ANY FURTHER

3  EVALUATION.

4            I THINK THAT WOULD BE --

5       THE COURT:  WHAT I WANTED FROM YOU IS WHAT YOU WANT

6  TO OFFER, AND RIGHT NOW YOU'RE TALKING ABOUT THE FACT THAT

7  PRINTS WERE LIFTED FROM THE GUN THAT WERE INSUFFICIENT FOR

8  COMPARISON, AND THAT'S NORMAL.

9       MR. LIEBERMAN:  YES.

10      THE COURT:  AND THAT'S ALL YOU WANT TO OFFER?

11      MR. LIEBERMAN:  YES.

12      THE COURT:  OKAY.  WHAT DOES THE DEFENSE WANT TO

13  OFFER ON THE ISSUE OF PRINTS?

14      MR. FISHER:  WELL, I THINK I'LL JUST LEAVE IT ALONE

15  AND JUST RELY ON THE STATE OF THE EVIDENCE THE WAY IT IS

16  RIGHT NOW.

17      THE COURT:  OKAY.  THAT'S FINE.  THAT MEANS I

18  SUSTAIN THE OBJECTION ABOUT DISCOVERY VIOLATION AND WOULD

19  NOT ALLOW CURRENT COMPARISONS TO BE MADE.  IT'S FAR TOO

20  LATE WITH EVIDENCE, SO CONVINCING AS FINGERPRINTS.

21            I MEAN THERE ARE CASES THAT -- APPELLATE

22  CASES THAT SAID THE MOST COMPELLING EVIDENCE IS

23  FINGERPRINTS, MUCH BETTER THAN EYEWITNESS IDENTIFICATIONS,

24  SO OKAY.  THAT'S -- I THINK THAT'S FAIR.

25      MR. LIEBERMAN:  OKAY.

26      MR. FISHER:  AND I HAVE MS. BROWN MY WITNESS HERE,

27  YOUR HONOR.

28      THE COURT:  OKAY.

1   MR. FISHER:  AND --

2   THE COURT:  DID YOU NEED TO TAKE HER OUT OF ORDER

3   OR WHERE ARE WE GOING NEXT WITH THE EVIDENCE?

4   MR. LIEBERMAN:  OKAY.  I JUST HAVE ONE QUESTION.

5   THE COURT:  OKAY.

6   MR. LIEBERMAN:  DURING CLOSING I DON'T THINK THERE

7   IS ANY EVIDENCE SO FAR IN THE RECORD THAT PRINTS WERE

8   COMPARED, JUST THAT PRINTS WERE LIFTED FROM -- THAT THEY

9   DUSTED FOR PRINTS.  IT'S MY UNDERSTANDING THAT'S THE STATE

10  OF THE EVIDENCE, THEY DUSTED FOR PRINTS IN THE INTERIOR OF

11  THE HOUSE, WHICH IS -- THAT'S MY UNDERSTANDING OF THE

12  STATE OF THE EVIDENCE.

13  THE COURT:  WHO TESTIFIED TO THAT?  I DON'T

14  REMEMBER.

15  MR. LIEBERMAN:  I THINK COUNSEL ASKED THE POLICE

16  OFFICERS OR THE -- I THINK HE ASKED THE CIVILIANS IF THEY

17  SAW PEOPLE GOING IN AND DUSTING FOR PRINTS.

18  MR. FISHER:  IT WAS THE LAST POLICE OFFICER, THE

19  ONE -- THE ONE THAT DETAINED.

20  MR. LIEBERMAN:  I THINK, YES, IT WAS A POLICE

21  OFFICER AND I THINK ALSO FAMILY MEMBERS, THAT PEOPLE WERE

22  GOING IN AND DUSTING, AND DUSTING WAS DONE OF CERTAIN

23  ARTICLES, AND I THINK THE POLICE OFFICER WAS SAYING THAT

24  CERTAIN ARTICLES WERE DUSTED AND THE FAMILY WAS SAYING

25  THAT THEY WENT IN TO DO SOME DUSTING.

26  I THINK THAT'S THE STATE OF THE EVIDENCE,

27  SO I JUST -- I DON'T THINK I'M WRONG ABOUT THAT, SO I

28  WOULD BE OBJECTING IF COUNSEL IS SAYING THERE WAS NO MATCH

1    BECAUSE THERE'S NO EVIDENCE OF THAT.

2        MR. FISHER:  WAIT A MINUTE, JUDGE.  I -- THEIR --

3    THEY HAVE THE BURDEN OF PROOF IN THIS CASE, AND I CAN

4    ARGUE ABSENT FINGERPRINTS, IF HE HAD FINGERPRINTS THAT

5    MATCHED MR. -- MR. MORRIS, HE WOULD HAVE THEM HERE TODAY,

6    AND I THINK I'M ENTITLED TO ARGUE THAT.

7        MR. LIEBERMAN:  BUT THAT'S -- BUT I THINK THAT

8    THAT'S -- THERE IS NO EVIDENCE THAT THERE WERE PRINTS THAT

9    WERE USABLE THAT WERE LIFTED, AND SO I THINK IF THERE --

10   IF THAT WAS THE CASE, THEN I THINK THE DEFENSE WOULD HAVE

11   THE OPPORTUNITY TO DO THAT.

12           RIGHT NOW THERE IS NO FOUNDATION

13   ESTABLISHED THAT THERE WERE PRINTS THAT WERE USABLE THAT

14   WERE LIFTED AND FOR A COMPARISON, AND I THINK THAT UNTIL

15   THERE'S--- UNTIL THAT IS ESTABLISHED, I DON'T THINK

16   DEFENSE CAN ARGUE THAT IF THE PEOPLE HAD GOOD PRINTS, THEY

17   COULD BRING THEM IN, OR IF THE PEOPLE HAD A MATCH, THEY

18   WOULD BE -- THEY WOULD BE PRESENTING IT.

19           I'LL SUBMIT.

20       THE COURT:  THE QUESTION I THINK IS WHETHER IT

21   SHOULD BE LEFT TO ARGUMENT THAT ON THE DEFENSE SIDE THAT

22   IF THE PROSECUTION HAD PRINT COMPARISON SHOWING THE

23   DEFENDANT WAS IN THE RESIDENCE, THEY WOULD OFFER THAT, AND

24   ON THE PROSECUTION'S SIDE THERE IS NO EVIDENCE THAT ANY

25   PRINTS WERE ACTUALLY RECEIVED OR PICKED UP THAT WERE

26   POSSIBLE OF COMPARISON, THAT WOULD ALLOW A COMPARISON.

27           IT MAY BE LEFT FOR ARGUMENT BECAUSE THAT

28   IS THE STATE OF THE CASE RIGHT NOW.  I DON'T RECALL THE

1 SUBJECT OF DUSTING FOR PRINTS AT THE TIME.

2   MR. FISHER:  WELL, THE POLICE OFFICER DID, I

3 RECALL.

4   THE COURT:  THAT'S FINE.  WHATEVER IS IN THE

5 RECORD.

6   MR. FISHER:  SO MR. LIEBERMAN CAN ARGUE HIS SIDE

7 AND I CAN ARGUE MINE.

8   THE COURT:  RIGHT.

9   MR. LIEBERMAN:  OKAY.

10   MR. FISHER:  IT'S FOR ARGUMENT.

11   THE COURT:  THE DEFENSE ARGUMENT IF THERE WAS A

12 POSITIVE MATCH, THE PROSECUTION WOULD HAVE BROUGHT THE

13 PRINTS IN.

14   MR. FISHER:  RIGHT.  AND MR. LIEBERMAN CAN SAY --

15   THE COURT:  AND THE PROSECUTION'S ARGUMENT IS THERE

16 IS NO EVIDENCE THAT THEY WERE GOOD ENOUGH FOR COMPARISON,

17 AND YOU CAN TALK ABOUT, WITH YOUR WITNESS ON THE GUN, WHAT

18 IT TAKES TO MAKE A SUFFICIENT PRINT FOR COMPARISON.

19   MR. LIEBERMAN:  OKAY.  AND I'M -- NOT TO BELABOR IT

20 BUT JUST TO FINISH, IS I THINK I WOULD BE ABLE TO ARGUE

21 THAT WITH RESPECT TO THE LIFTS, THAT THERE IS NO EVIDENCE

22 THAT THE LIFTS WERE SUFFICIENT TO BE COMPARED AND THERE IS

23 NO EVIDENCE THAT WHAT WE WERE COMPARING IT TO WAS

24 SUFFICIENT TO BE COMPARED WITH ANY LIFTS, THAT THE RECORD

25 IS SILENT ON THAT.

26   THE COURT:  THERE IS NO EVIDENCE ONE WAY OR THE

27 OTHER.

28   MR. LIEBERMAN:  YES.

1          THE COURT:  BUT THE MAIN THING IS TO SHOW THAT IT

2    DOES TAKE A CERTAIN NUMBER OF CHARACTERISTICS ON A PRINT

3    FOR A POSSIBLE COMPARISON.

4          MR. LIEBERMAN:  OKAY.  THAT'S FINE.

5          THE COURT:  YES.

6          MR. FISHER:  THAT'S FINE, YOUR HONOR.

7          THE COURT:  ARE WE READY TO GO WITH WHAT WITNESS?

8    YOUR PRINT EXPERT FIRST?

9          MR. LIEBERMAN:  GO AHEAD.

10          MR. FISHER:  DO YOU MIND IF WE TAKE MISS BROWN --

11          THE COURT:  SHE'D BE TESTIFYING TODAY ANYWAY.

12          MR. LIEBERMAN:  I WOULD MIND, ACTUALLY, BECAUSE I

13    HAVE A PILOT HERE OF THE HELICOPTER THAT I WOULD LIKE TO

14    CALL AND GET HIM OFF.

15          MR. FISHER:  THAT'S FINE.  CAN WE CALL MS. BROWN

16    OUT OF ORDER?

17          MR. LIEBERMAN:  WELL, FINE.  I DON'T THINK THE

18    FINGERPRINT WITNESS IS GOING TO TAKE VERY LONG, AND I'D

19    LIKE TO GET HIM OUT OF HERE.

20          MR. FISHER:  OKAY.  ALL RIGHT.

21          THE COURT:  OKAY.

22          MR. FISHER:  WE'LL JUST CALL MISS BROWN IN ORDER

23    THEN.

24          THE COURT:  OKAY.  LET'S --

25          MR. LIEBERMAN:  I'M NOT TRYING TO BE DIFFICULT.

26          MR. FISHER:  I KNOW, I KNOW.

27          MR. LIEBERMAN:  IT'S THEY ALL HAVE WORK TO DO AND I

28    DON'T KNOW WHAT MISS BROWN HAS TO DO TODAY.

```
1              THE WITNESS:  I DO.

2              THE CLERK:  THANK YOU.  PLEASE BE SEATED.

3                       PLEASE STATE AND SPELL YOUR NAME FOR THE

4     RECORD.

5              THE WITNESS:  MY NAME IS CONRADO, C-O-N-R-A-D-O,

6     SALONGA, S-A-L-O-N-G-A.

7              THE COURT:  THANK YOU.

8                       PEOPLE MAY INQUIRE.

9         MR. LIEBERMAN:  THANK YOU.

10

11                       DIRECT EXAMINATION

12

13    BY MR. LIEBERMAN:

14         Q.        SIR, WHAT DO YOU DO FOR A LIVING?

15         A.        I AM A FORENSIC PRINT SPECIALIST OF THE

16    LOS ANGELES POLICE DEPARTMENT SCIENTIFIC INVESTIGATION

17    DIVISION LATENT PRINT SECTION.

18         Q.        WHAT ARE YOUR JOB DUTIES?

19         A.        MY DUTIES ARE THE FOLLOWING:  I RESPOND TO

20    CRIME SCENE TO PROCESS THE SAID LOCATION FOR LATENT PRINT.

21    LATENT PRINT ARE PRINTS THAT ARE HIDDEN AND NEEDS TO BE

22    DEVELOPED AND ENHANCED.  I SOMETIMES CALL THIS CRIME SCENE

23    PRINTS.

24                   I ALSO COMPARE LATENT PRINT WITH A KNOWN

25    PRINT OF A POSSIBLE SUSPECT.  ALSO I INPUT LATENT PRINT ON

26    THE AUTOMATED FINGERPRINT IDENTIFICATION SYSTEM, AND I

27    TESTIFY IN COURT REGARDING MY FINDINGS.

28         Q.        HOW LONG HAVE YOU BEEN DOING THIS?
```

1       A.        I HAVE BEEN DOING THIS FOR MORE THAN 25

2   YEARS.

3       Q.        AND WHAT WAS YOUR TRAINING IN ORDER TO DO

4   THIS?

5       A.        I HAVE PREVIOUS TRAINING REGARDING

6   FINGERPRINT.  I'VE ATTENDED SEVERAL SEMINARS REGARDING

7   FINGERPRINT.  I HAVE A BACHELOR'S DEGREE IN CRIMINOLOGY,

8   AND I AM ALSO A CERTIFIED LATENT PRINT EXAMINER.

9       Q.        OKAY.  AT SOME POINT DID YOU EXAMINE A

10  SEMIAUTOMATIC COLT .380 CALIBER HANDGUN?

11      A.        YES.

12      Q.        AND WHAT WAS THE SERIAL NUMBER OF THAT --

13  OF THE HANDGUN THAT YOU EXAMINED?

14      A.        MAY I REVIEW MY RECORDS?

15      THE COURT:  YES.

16      THE WITNESS:  THE GUN THAT I EXAMINED HAS A SERIAL

17  NUMBER AS FOLLOWS:  M AS IN MARY, U AS IN UNION, 41546.

18  BY MR. LIEBERMAN:

19      Q.        OKAY.  I'M SHOWING YOU WHAT'S BEEN MARKED

20  AS PEOPLE'S NO. 15 FOR IDENTIFICATION.

21                DO YOU RECOGNIZE WHAT THIS IS?

22      A.        THAT'S THE -- THAT'S THE PICTURE OF THE

23  GUN THAT I EXAMINED.

24      Q.        OKAY.  IS THERE A SERIAL NUMBER ON THIS

25  GUN?

26      A.        YEAH.  IT'S A SERIAL NUMBER.

27      Q.        MU41546?

28      A.        THAT'S CORRECT.

1        Q.        AND WHAT DID YOU DO IN ORDER TO EXAMINE

2    THAT GUN?

3        A.        MAY YOU REPEAT THE QUESTION, PLEASE.

4        Q.        WHAT DID YOU DO WHEN YOU EXAMINED THAT

5    GUN?

6        A.        THE PROCESS OF EXAMINING GUNS ARE AS

7    FOLLOWS:  WE USE A CHEMICAL PROCESS CALLED GLUING.  WE USE

8    A REGULAR SUPER GLUE.  WE PUT IT IN THE CHAMBER, HIT IT OF

9    THE PERSPIRATION OF THE HAND AND IT WILL FORMALIZE THE

10   PRINT.  IT WILL MAKE THE PRINT PERMANENT ON THE ITEM.

11                 THEN AFTER THAT WE WILL EXAMINE THE GUN

12   FOR THE PRESENCE OF FINGERPRINT AFTER THAT PROCESS.  THEN

13   WE TRY TO ENHANCE THE FINGERPRINT THAT WE DEVELOP BY USING

14   RUBIDIUM, AND THEN WE USE THE ALTERNATE LIGHT SOURCE.  IF

15   THERE IS A GOOD PRINT THAT WE CAN -- THAT YOU CAN USE FOR

16   COMPARISON PURPOSES, THE LIGHT SOURCE WILL FLUORESCE THE

17   LATENT PRINT.

18       Q.        OKAY.  DID YOU DO THAT ON THIS GUN?

19       A.        YES, SIR.

20       Q.        WERE YOU ABLE TO DISCOVER OR FIND OR

21   LOCATE ANY PRINTS?

22       A.        YES, SIR.

23       Q.        DESCRIBE THE QUALITY OF THE PRINTS THAT

24   YOU WERE ABLE TO FIND.

25       A.        WHAT I DEVELOPED ON THE GUN WAS SMUDGES,

26   OVERLAPPING PRINTS, PRINTS THAT COULD NOT BE USED FOR

27   COMPARISON.  IT IS NOT COMPARABLE PRINTS.

28       Q.        YOU SAID YOU FOUND SMUDGES AND OVERLAPPING

1  PRINTS?

2         A.        YES, SIR.

3         Q.        AND WHY CAN'T THEY BE USED?

4         A.        BECAUSE OF THE POOR QUALITY OF THE PRINT.

5  WE HAVE CERTAIN THING THAT WE LOOK ON A LATENT PRINT THAT

6  WE DEVELOP, WHETHER WE DETERMINE -- FIRST WHETHER IT IS

7  COMPARABLE OR WITH A QUALITY PRINT, AND THE ONE THAT I

8  DEVELOPED ON THIS PARTICULAR GUN ARE NOT GOOD PRINTS.  IT

9  COULD NOT BE USED FOR COMPARISON PURPOSES.

10        Q.        HOW MANY PRINTS OR PARTIAL PRINTS OR

11 SMUDGES WERE YOU ABLE TO FIND?

12        A.        I CANNOT REMEMBER.

13        Q.        MORE THAN ONE?

14        A.        MORE THAN ONE.

15        Q.        IN ORDER TO MAKE A POSITIVE MATCH OF

16 PRINTS, WHAT IS REQUIRED?

17        A.        WHEN I DO A COMPARISON ON A CERTAIN

18 PORTION OR LATENT PRINT OR A CRIME SCENE PRINT, I AM

19 TRYING TO DETERMINE THE FOLLOWING:  THE DIRECTION AND FLOW

20 OF THE RIDGES FOLLOWING THE FINGERS AND PALM, THE GENERAL

21 PATTERN OF THE FINGERPRINT OR PALM, THE RIDGE, THE

22 PRESENCE OF THE RIDGE CHARACTERISTICS ON THAT SPECIFIC

23 PRINT, THE RELATIONSHIP OF THE RIDGE DETAILS, RIDGE

24 CHARACTERISTIC WITH EACH OTHER AND THE RIDGE INTERVENING

25 PRESENT BETWEEN TWO RIDGE DETAILS, AND, OF COURSE, THE

26 LAST ONE IS THE QUALITY AND THE CLARITY OF THE PRINT.

27        Q.        OKAY.  BEFORE YOU SAID QUALITY AND

28 CLARITY, YOU SAID SOMETHING, I DIDN'T UNDERSTAND.  IT WAS

1    AFTER YOU SAID THE RELATIONSHIP OF THE RIDGES, THE RIDGES

2    AND THEIR CHARACTERISTICS.

3              WHAT WAS THAT NEXT ONE THAT YOU SAID?

4              LET ME REPEAT.  YOU DISCUSSED THE

5    DIRECTION AND FLOW OF RIDGES, RIDGE CHARACTERISTICS, THE

6    RELATIONSHIP OF THE RIDGES TO EACH OTHER AND THE QUALITY

7    AND CLARITY OF THE RIDGES.

8        A.      YES.  AND THE -- AND THE NUMBER OF RIDGE

9    INTERVENING WITH TWO RIDGE DETAILS.

10        Q.      THE NUMBER OF RIDGES?

11        A.      INTERVENING.  INTERVENING.  THE NUMBER OF

12    RIDGE INTERVENING.

13        Q.      INTERVENING?

14        A.      YEAH, INTERVENING.  ONE RIDGE HERE AND

15    THEN ONE RIDGE HERE, AND THERE WILL BE THREE OR FOUR LINES

16    THAT WILL MAKE A GENERAL LINE.  THAT'S WHAT WE CALL THE

17    NUMBER OF RIDGE INTERVENING BETWEEN TWO RIDGE DETAIL OR

18    CHARACTERISTICS.

19        Q.      OKAY.  NOW, IN ORDER TO MAKE A POSITIVE

20    MATCH -- LET ME REPHRASE.

21              YOU WERE JUST TALKING ABOUT THE LATENT

22    PRINTS, THE PRINTS THAT ARE LIFTED FROM THE ARTICLE,

23    CORRECT?

24        A.      THAT'S CORRECT.

25        Q.      NOW, YOU HAVE TO MATCH THOSE LATENT PRINTS

26    OR THE LIFTED PRINTS WITH A KNOWN SAMPLE; IS THAT CORRECT?

27        A.      THAT'S CORRECT.

28        Q.      AND WHEN YOU'RE COMPARING THE LIFT THAT

1  ARE LATENT PRINTS WITH THE KNOWN SAMPLE, DOES THE QUALITY

2  OF THE KNOWN SAMPLE COME INTO PLAY IN ANY WAY?

3        A.        THAT IS VERY IMPORTANT.  THE PRINT, THE

4  STANDARD PRINT OR THE EXEMPLAR PRINT MUST BE CLEARLY

5  TAKEN.  SOMETIMES WE EXPERIENCE IN AN INEXPERIENCED JAILER

6  OR FINGERPRINT PERSON TOOK THE SET OF TEN PRINTS, THE

7  FINGERPRINT INMATE CARDS, SOMETIMES WE NEED SOME AREAS FOR

8  COMPARISON OR SOMETIMES IT BECOMES SMUDGY, THEY PUT TOO

9  MUCH INK ON THE PRINT.

10       MR. FISHER:  YOUR HONOR, MAY WE APPROACH, PLEASE?

11       THE COURT:  ALL RIGHT.

12

13          (THE FOLLOWING PROCEEDINGS WERE HELD

14           AT THE BENCH:)

15

16       MR. FISHER:  I THINK I HAVE AN IDEA WHERE THIS IS

17  GOING, THAT HE'S GOING TO TESTIFY THAT HE COULDN'T GET --

18  WELL, HE'S GOING TO PUT OUT BEFORE THE JURY THAT

19  MR. MORRIS' EXEMPLAR AND THE COMPUTER PRINTOUT --

20       THE COURT:  HE'S DOING JUST WHAT I SAID, THAT HE'S

21  EXPLAINING THAT YOU'VE GOT TO HAVE CERTAIN THINGS FOR

22  COMPARISON.

23       MR. LIEBERMAN:  I WASN'T GOING TO ASK HIM ANYTHING

24  IN PARTICULAR REGARDING THE QUALITY OF MR. MORRIS' PRINTS.

25       MR. FISHER:  OKAY.  I JUST -- OKAY.  THAT'S FINE.

26  ////

27  ////

28  ////

```
 1              (THE FOLLOWING PROCEEDINGS WERE

 2              HELD IN OPEN COURT IN THE PRESENCE

 3              OF THE JURY:)

 4

 5   BY MR. LIEBERMAN:

 6       Q.        OKAY.  I'M SORRY.  DID YOU FINISH YOUR

 7   RESPONSE?

 8       A.        COULD YOU REPEAT THE LAST QUESTION?

 9       THE COURT:  YOU WANT US TO READ IT BACK?

10       THE WITNESS:  COULD YOU, YOUR HONOR?  COULD YOU

11   REPEAT THE LAST QUESTION?

12       THE COURT:  OKAY.  THE FULL QUESTION IS, "WHEN

13   YOU'RE COMPARING THE LIFT THAT ARE LATENT PRINTS WITH THE

14   KNOWN SAMPLE, DOES THE QUALITY OF THE KNOWN SAMPLE COME

15   INTO PLAY IN ANY WAY?"

16       THE WITNESS:  OKAY.  YES, I WAS EXPLAINING EARLIER

17   ABOUT THE STANDARD OR EXEMPLAR PRINTS, THAT IT MUST BE AT

18   LEAST GOOD QUALITY FOR COMPARISON.  THERE MUST BE AN AREA

19   THAT WE ARE LOOKING FOR.  WHEN WE ROLL THE PERSON TO BE

20   FINGERPRINTED, IT MUST BE NAIL X TO NAIL X, AND THE

21   DISTRIBUTION OF THE INK MUST BE PROPERLY DISTRIBUTED.

22              SOMETIMES WHEN YOU ROLL IT, THERE IS A

23   TENDENCY THAT THE PERSON MAY PUT THE PRESSURE WHEN YOU'RE

24   TRYING TO ROLL IT ON THE IMPRINT AND THEN WHEN YOU ROLL

25   IT, IT'S GOING TO SMUDGE THE PRINTS.  SOMETIMES THOSE

26   THINGS ARE IN STORE IN OUR RECORDS, WHETHER POLICE RECORDS

27   OR CRIMINAL RECORDS, AND WHEN WE COME TO THE POINT THAT WE

28   NEED TO COMPARE THOSE STANDARD PRINTS WITH A QUESTIONED
```

1    PRINT, SOMETIMES WE HAVE A PROBLEM, NOT WITH THE CRIME

2    SCENE PRINT BUT WITH THE PRINTS THAT WAS MAINTAINED IN THE

3    DATA BASE.

4    BY MR. LIEBERMAN:

5         Q.       NOW, HAVE YOU EXAMINED, AS PART OF YOUR 25

6    YEARS OF EXPERIENCE IN THIS AREA, DO YOU REGULARLY EXAMINE

7    GUNS TRYING TO GET LATENT PRINTS FROM THEM?

8         A.       YES, SIR.

9         Q.       AND DO YOU -- IS IT UNCOMMON TO HAVE

10   TROUBLE GETTING USABLE PRINTS FROM HANDGUNS?

11        A.       YES.  IT'S NOT USUAL TO HAVE PRINTS ON A

12   GUN.

13        Q.       IT'S NOT WHAT?

14        A.       IT IS NOT USUAL TO HAVE PRINTS ON THE GUN.

15        Q.       IT'S NOT USUAL TO FIND PRINTS?

16        A.       YES, THAT'S RIGHT.

17        Q.       WHY IS THAT?

18        A.       BECAUSE THERE ARE SEVERAL FACTORS THAT A

19   PRINT COULD BE IMPRESSED ON A CERTAIN ITEMS OF EVIDENCE

20   LIKE SPECIFICALLY THE GUN.  IN A GUN OR A HANDGUN, THERE

21   IS ONLY SEVERAL SMOOTH SURFACES THAT YOU CAN LEAVE A GOOD

22   QUALITY PRINT, LIKE THE SLIDE OF THE GUN.

23              USUALLY THE HANDLE OF THE GUN ARE TEXTURED

24   SO THAT YOU WILL HAVE A GOOD GRIP, SO ON THE GRIP YOU

25   SELDOM GET PRINTS ON THE GRIP.  NOW, WHEN YOU HANDLE THE

26   SLIDE PORTION OF THE GUN, YOU MAY GET PRINTS, BUT WHEN YOU

27   TUCK THE GUN ON YOUR SIDE OR PUT THE GUN ON SOMETHING, IT

28   WILL RUB AND IT WILL OBLITERATE OR DESTROY OR AFFECT THE

712

1    QUALITY OF THE PRINT THAT YOU HAVE DEVELOPED.  THAT'S WHY

2    WE SELDOM GET GOOD COMPARABLE LATENT PRINT ON GUNS.

3        Q.        COULD A -- COULD PRINTS BE OBLITERATED IF

4    A GUN IS RUBBED AGAINST A PLANT?

5        A.        YES, SIR, SURELY.

6        Q.        IF A GUN IS FOUND IN A PLANTER AND IT RUBS

7    AGAINST THE LEAVES WHEN IT'S THROWN IN THERE?

8        A.        YES, THERE'S A BIG POSSIBILITY, SIR.

9        MR. LIEBERMAN:  I HAVE NO MORE QUESTIONS.

10       THE COURT:  CROSS-EXAMINE.

11

12                    CROSS-EXAMINATION

13

14   BY MR. FISHER:

15       Q.        WERE YOU THE -- THANK YOU, YOUR HONOR.

16                 WERE YOU THE SID LATENT PRINT SECTION

17   REPRESENTATIVE THAT WAS CALLED OUT ON MARCH 4TH, 2005, TO

18   1806 WEST 42ND STREET REGARDING THIS INCIDENT THAT WE'RE

19   HERE IN TRIAL ON?

20       A.        NO, SIR, I WAS NOT THE ONE.

21       Q.        AND WHEN DID YOU EXAMINE THIS GUN?

22       A.        THE GUN WAS EXAMINED LAST JULY 26 OF --

23   TWO DAYS AGO OF THIS YEAR.

24       Q.        HAD IT BEEN EXAMINED PRIOR TO THAT?

25       A.        TO MY KNOWLEDGE IT WAS NOT EXAMINED PRIOR

26   TO THAT.

27       MR. FISHER:  THANK YOU.

28                 I HAVE NOTHING FURTHER, YOUR HONOR.

1                    THE COURT:  REDIRECT.

2

3                             REDIRECT EXAMINATION

4

5    BY MR. LIEBERMAN:

6            Q.        WHEN YOU EXAMINED THE GUN, WHERE WAS --

7    HOW DID YOU GET TO YOUR -- LET ME REPHRASE.

8                      WAS THE GUN IN SOME PARTICULAR LOCATION

9    FOR IT TO BE EXAMINED?

10           A.        USUALLY IT'S IN OUR PROPERTY DIVISION.

11           Q.        HOW DID YOU GET THE GUN TO YOUR LAB?

12           A.        THROUGH REQUEST FROM THE PROPERTY OR

13   SOMETIMES IT IS HAND DELIVERED OR WALKED IN BY THE

14   DETECTIVE IN THE CASE.

15           Q.        OKAY.  IN THIS PARTICULAR CASE, DO YOU

16   KNOW WHETHER OR NOT HOW YOU GOT IT?

17           A.        I KNOW HOW I GOT IT.  IT WAS WALKED IN BY

18   A DETECTIVE FRANCO.

19           Q.        OKAY.  BUT THE GUN HAD BEEN BOOKED

20   PREVIOUS TO THAT?

21           A.        YES.  I AM AWARE THAT THE GUN WAS

22   PREVIOUSLY BOOKED.

23           MR. LIEBERMAN:  OKAY.  I HAVE NO MORE QUESTIONS.

24           MR. FISHER:  I DON'T HAVE ANY QUESTIONS, YOUR

25   HONOR.

26           THE COURT:  THANK YOU.  YOU MAY STEP DOWN.  YOU ARE

27   EXCUSED.

28           MR. LIEBERMAN:  YOUR HONOR, I HAVE I THINK JUST ONE

1          SO I WANT TO APOLOGIZE ON BEHALF OF OUR

2     OFFICE.   I'M VERY SORRY.

3          AGAIN IF THE COURT NEEDS TO EXCLUDE

4     CERTAIN THINGS, AGAIN I UNDERSTAND.   I THINK OTHER THAN

5     THAT -- LASTLY, THERE ARE TWO THINGS.

6          THERE ARE SOME FINGERPRINT ANALYSIS

7     REPORTS, AND COUNSEL AND I HAVE BEEN DISCUSSING THE

8     FINGERPRINT ISSUE SINCE THE TRIAL BEGAN, AND HE WANTED ME

9     TO JUST GET THE RESULTS OF THAT.   WE HAD TOLD HIM THAT

10    THERE WERE NO POSITIVE HITS WITH RESPECT TO THE DEFENDANT,

11    BUT I GOT TWO REPORTS, ONE OF THEM BASICALLY SAYING THAT

12    THERE WERE NO MAKES ON THE FINGERPRINTS, AND THOSE

13    FINGERPRINTS WERE LIFTED IN THE INTERIOR PORTION OF THE

14    HOUSE.   AND I'VE GIVEN HIM A COPY OF THAT, OR THERE IS A

15    COPY HE'S SEEN THAT I WILL PROVIDE.-- I'LL MAKE A PHOTOCOPY

16    FOR HIM.

17          MR. FISHER:   LET'S TALK ABOUT --

18          MR. LIEBERMAN:   LET ME FINISH THIS ONE LAST THING

19    ON THAT.

20          MR. FISHER:   YES.

21          MR. LIEBERMAN:   IS THAT IS THERE IS ONE MORE

22    FINGERPRINT REPORT, AND THAT IS BY SALONGA, S-A-L-O-N-G-A,

23    AND THAT IS BASICALLY A REPORT CONFIRMING THAT THERE WAS

24    NO LATENT PRINT OF VALUE DEVELOPED FROM THE FIREARM, AND

25    SO I'M PROVIDING DEFENSE COUNSEL WITH THAT.

26          I GOT THAT SECOND REPORT BY SALONGA THIS

27    MORNING, AND THE OTHER ONE I GOT YESTERDAY, AND SO I THINK

28    I'VE COVERED EVERYTHING.

1    THE COURT:  OKAY.  MR. FISHER.

2        MR. FISHER:  WELL, START WITH THE FINGERPRINTS.

3  THE PROPERTY REPORT INDICATES THAT A TECHNICIAN -- A

4  TECHNICIAN CAME OUT FROM SID AND -- AND FROM THE REPORT IT

5  LOOKS LIKE THE TECHNICIAN TOOK PRINTS OF THE CRIME SCENE

6  AND OTHER EVIDENCE, ITEMS LISTED IN THE PROPERTY REPORT.

7            THERE WAS A BAG OF COCAINE FOUND, THERE

8  WAS -- THERE WERE SEVERAL OTHER ITEMS SCATTERED AROUND,

9  AND MY CONCERN IS COUNSEL HAS JUST GIVEN ME THIS SHEET

10  THAT DOESN'T MAKE ANY REFERENCE TO WHAT -- IT DOESN'T MAKE

11  REFERENCE TO ANYTHING.  IT DOESN'T EVEN MAKE REFERENCE TO

12  FINGERPRINTS.

13            IT LOOKS LIKE IT HAS SOMETHING TO DO WITH

14  A STOLEN -- A STOLEN CAR.  IT SAYS A REQUEST FOR A.F.I.S.

15  FROM THE SCIENTIFIC INVESTIGATION DEPARTMENT, SO I

16  GUESS -- WHAT I THINK IS THAT THEY HAVEN'T GONE DOWN THERE

17  AND LOOKED FOR THE ANALYST'S FILE, AND WENT THROUGH AND --

18  THEY HAVEN'T GONE THROUGH IT BECAUSE THE ANALYST IS ON

19  VACATION.

20            I'VE BEEN TRYING TO GET THE ANALYST FOR

21  THE LAST FEW DAYS AND WE JUST FOUND OUT HE'S ON VACATION.

22  HE'S NOT GOING TO BE BACK UNTIL AUGUST, I BELIEVE IT WAS

23  THE 16TH, AND THIS IS OBVIOUS -- OBVIOUS FROM THE POLICE

24  REPORTS AND WHAT COUNSEL IS TELLING ME THAT THERE'S A

25  REPORT REGARDING RESULTS WHICHEVER WAY, AND WHAT WAS --

26  WHAT WAS PRINTED AND THE RESULT OF -- OF THE PRINTS, IF

27  ANY.  IT'S JUST OBVIOUS.

28            AND THIS ISN'T WHAT COUNSEL -- THIS

1  DOCUMENT CALLED, "LOS ANGELES POLICE DEPARTMENT SCIENTIFIC

2  INVESTIGATION DIVISION LATENT PRINT SECTION," IT SAYS

3  LATENT PRINT SECTION, BUT IT DOESN'T HAVE ANYTHING TO DO

4  WITH -- DOESN'T SAY ANYTHING ABOUT WHAT WAS PRINTED, WHAT

5  THEY COULDN'T MAKE.

6          IT JUST HAS A BOX, IT JUST HAS A BOX

7  THAT'S CHECKED, "NO MAKE," BECAUSE I SUSPECT THAT THEY

8  PRINTED THE DOOR, THEY PRINTED THE BAG OF COCAINE, THEY

9  PRINTED THE GUN, THEY PRINTED A LOT OF -- A LOT OF OTHER

10 ITEMS THAN JUST THE GUN THAT WE KNOW ABOUT.  WE DON'T KNOW

11 ANYTHING ELSE.

12          COUNSEL MADE --

13     THE COURT:  I'D LIKE TO SEE THAT, BECAUSE IT SHOULD

14 HAVE MORE --

15     MR. FISHER:  COUNSEL MADE REFERENCE TO FINGERPRINTS

16 ON THE WALL, BUT THERE'S NOTHING ABOUT THAT IN THIS

17 REPORT.

18     MR. LIEBERMAN:  I WAS JUST ADVISED THAT THAT'S WHAT

19 THE REPORT DEALT WITH.

20     MR. FISHER:  RIGHT, RIGHT.

21     MR. LIEBERMAN:  YOUR HONOR, I WAS TOLD BY DEFENSE

22 THAT THE TECHNICIAN WHO DID THE LIFTS, HE'S ON VACATION.

23 I WANTED THAT PERSON ADDED ON, AND I TRIED TO ADD THAT

24 PERSON ON MYSELF JUST TO TESTIFY THAT LATENT PRINTS WERE

25 TAKEN AND THAT THERE WERE NO MATCHES.

26          I CAN HAVE SOMEBODY AT THE FINGERPRINT LAB

27 GO TO THAT TECHNICIAN'S FILE AND GET MORE DETAILED REPORTS

28 REGARDING THIS, IF NECESSARY.  I DON'T KNOW IF THIS IS THE

1    MAIN ISSUE.  IT SEEMS TO ME THAT THE MAIN ISSUE WOULD BE

2    THE TAPES OF THE WITNESSES THAT WE JUST GOT, BUT THAT'S

3    JUST MY OPINION.

4        THE COURT:  WELL, GOING TO THE ISSUE OF THE TAPED

5    STATEMENTS, THEY CERTAINLY SHOULD HAVE BEEN PROVIDED, BUT

6    EACH OF THE WITNESSES SO FAR THAT'S TESTIFIED ALSO

7    TESTIFIED AT THE PRELIMINARY HEARING, SO THIS WAS NOT, IN

8    OTHER WORDS, A SITUATION WHICH AN OFFICER RELATED THEIR

9    STATEMENTS BUT THEY ACTUALLY WERE ABLE TO TESTIFY, AND

10   IT'S NOT, EVEN THOUGH THERE ARE THREE WITNESSES, IT'S NOT

11   A SHORT TRANSCRIPT, SO IT WILL BE INTERESTING TO SEE IF

12   THERE'S ANYTHING THAT'S DEVELOPED ON THAT TAPE THAT HASN'T

13   BEEN COVERED ALREADY BY THE TESTIMONY AT THE PRELIM AND

14   HERE, AND WE'LL TAKE A BREAK AND ALLOW YOU TO DO THAT.

15       THIS DOESN'T -- THIS SHEET IS CALLED A

16   REQUEST FOR A.F.I.S. RUN, IT'S DATED JULY 25, 2005, BY

17   INVESTIGATOR DETECTIVE FRANCO, AND IT LISTS THE VICTIM'S

18   NAME.  KATHERINE IS THE VICTIM THAT'S NAMED AND JUST SAYS,

19   "NO MAKE."  NO COMPARISON, I ASSUME.

20       THERE ARE THREE CHECK OFFS AS TO RESULTS,

21   NO PLACE ON IT TO ALLOW A LISTING OF WHAT WAS COMPARED,

22   BUT THE RESULTS OF THE COMPARISON WOULD BE UNABLE TO

23   SEARCH IN A.F.I.S.

24       THE SECOND IS IDENTIFIED AND THE THIRD IS

25   NO MAKE, SO IT SEEMS EVIDENT FROM THE WAY IT'S CHECKED OFF

26   THAT THE COMPARISON RESULTED IN NO MAKE, IF IT WAS

27   POSSIBLE TO MAKE A COMPARISON.  SO NO IDENTIFIABLE PRINTS

28   APPARENTLY TO WHOEVER WAS COMPARED.

1          LOGICALLY THERE SHOULD BE SOME INDICATION

2    OF WHETHER IT'S A COMPARISON WITH JUST ANYONE -- I GUESS

3    RUNNING IT AGAINST THE AUTOMATED FINGERPRINT

4    IDENTIFICATION SYSTEM, IT WOULD BE ANYBODY IN THE SYSTEM,

5    WHICH WOULD INCLUDE MR. MORRIS FROM HIS PRIOR CONVICTION.

6    SO NO -- NO MATCH TO HIM OR TO ANYONE ELSE IN THE SYSTEM.

7          OKAY.  SO YOU NEED SOME TIME TO GO FURTHER

8    INTO THESE THINGS.

9          WHAT DO YOU WANT TO DO WITH THE JURY?

10   THIS IS GREAT.  THEY FINALLY SHOW UP ON TIME AND NOW WE

11   CAN'T START.

12          HOW MUCH TIME DO YOU THINK YOU NEED?

13       MR. FISHER:  I DON'T KNOW, YOUR HONOR.  THIS LOOKS

14   LIKE A 60 MINUTE TAPE, BUT OFTEN TIMES IT'S NOT THE FULL

15   TAPE, SO IT LOOKS LIKE -- I DON'T KNOW, 60 MINUTES.  IT

16   MIGHT BE A 90 MINUTE TAPE.  I DON'T KNOW.

17       THE COURT:  OKAY.  WELL, WE'LL LET THE JURY TAKE A

18   BREAK TOO, TELL THEM WE RAN INTO A TECHNICAL PROBLEM AND

19   WE CAN'T START RIGHT AWAY, AND THEN WE'LL SEE WHERE WE ARE

20   AFTER YOU DO YOUR CHECKUP.

21          IS THERE ANYTHING ELSE YOU CAN DO AS FAR

22   AS THE PRINTS ARE CONCERNED?  BECAUSE SOMETHING IS

23   MISSING, I AGREE WITH MR. FISHER.  EVEN THOUGH THIS SAYS

24   THERE IS NO MAKE ON ANY OF THE PRINTS, IT WOULD BE NICE TO

25   KNOW WHERE THE PRINTS CAME FROM THAT WERE COMPARED, AND I

26   GUESS THAT'S ALL WE'RE GOING TO FIND OUT IS WHAT ITEMS

27   WERE USED TO PROCESS INTO THE A.F.I.S. SYSTEM.

28       MR. LIEBERMAN:  I WILL CALL AND DO THE BEST I CAN,

```
 1   AND THE I.O. WILL BE COMING BACK, SO BOTH MYSELF AND THE

 2   I.O. WILL TRY TO FIND OUT.

 3        MR. FISHER:  IT'S PROBABLY JUST IN HIS FILE IF

 4   THERE'S A PLACE WHERE HE KEEPS IT.  THEY DO THIS ALL THE

 5   TIME.

 6        THE COURT:  OKAY.

 7        MR. FISHER:  THERE'S GOING TO BE -- IT'S NOT GOING

 8   TO BE AN OFFICIAL REPORT, BUT IT'S THE COMPARISON, WHAT

 9   WAS COMPARED AND WHAT CAME BACK AND WHAT WAS PRINTED.

10        THE COURT:  SO WHAT, ABOUT AN HOUR, RESUME AT

11   11:00, AT LEAST TENTATIVELY?  IF YOU NEED MORE TIME, CALL

12   US AND LET US KNOW WHAT'S HAPPENED.

13        MR. FISHER:  OKAY.

14        THE COURT:  I'LL LET THE JURY GO FOR AN HOUR, TELL

15   THEM WE HAD A TECHNICAL PROBLEM, AND WE'LL DO THE BEST WE

16   CAN TO GET STARTED AGAIN.

17        MR. FISHER:  THANK YOU, YOUR HONOR.

18        THE COURT:  LET ME GIVE YOU THIS REPORT.

19

20             (RECESS.)

21

22        THE COURT:  OKAY.  WE DO HAVE MR. MORRIS, BOTH

23   COUNSEL PRESENT.

24             WHAT THEN IS THE SITUATION WITH REGARD TO

25   THE LATE DISCOVERY?

26        MR. FISHER:  WELL, I'VE LISTENED TO THE TAPES,

27   AND -- AND THAT'S FINE.  I'M SATISFIED.

28        THE COURT:  NOTHING NEW DISCOVERED ON THE TAPES
```

```
 1    THEN THAT YOU DIDN'T ALREADY KNOW?

 2          MR. FISHER:  NO.  THAT'S CORRECT.

 3          THE COURT:  DOUBLE NEGATIVE.

 4          MR. FISHER:  AND I JUST RECEIVED SOME FINGERPRINT

 5    DISCOVERY, BUT I HAVEN'T HAD AN OPPORTUNITY TO LOOK AT IT,

 6    BUT I CAN LOOK AT THAT AT THE NOONTIME, SO WE'RE READY,

 7    YOUR HONOR.

 8          THE COURT:  OKAY.

 9          MR. LIEBERMAN:  AND, YOUR HONOR, I JUST WANT THE

10    RECORD TO REFLECT THAT WE DID PROVIDE DEFENSE COUNSEL WITH

11    A COPY OF THE 911 TAPE WHICH SHOULD HAVE KATHERINE'S VOICE

12    ON THERE.

13               ADDITIONALLY, I JUST GOT A COPY OF WHAT

14    LOOKS LIKE THE POLICE LOG SHEET OR LOG SHEET THAT IS

15    ASSOCIATED WITH THIS, AND I'LL MAKE A PHOTOCOPY OF THAT

16    AND GIVE THAT TO DEFENSE AS SOON I CAN.

17               I'VE PROVIDED THE DEFENSE WITH THE

18    FINGERPRINT REPORT THAT HE WAS REFERRING TO OR REQUESTING.

19    IT'S FIVE PAGES.  HE SHOULD HAVE ALL FIVE PAGES.

20               AND ALSO I'VE GIVEN HIM A COPY OF THE --

21    THE REPORTS I DISCUSSED EARLIER, THE ONE BY SALONGA AND

22    THE ONE THAT THE COURT WAS DESCRIBING ON THE RECORD, HE

23    NOW HAS PHOTOCOPIES FOR HIS RECORDS AS WELL.

24               I THINK THAT WE'RE UP TO DATE FOR NOW, AND

25    HE'LL TELL US IF WE'RE NOT WHEN HE LOOKS AT THE STUFF

26    DURING LUNCH.

27               I WAS GOING TO MAKE ONE REQUEST, THAT I

28    CALL THE HELICOPTER OBSERVER OUT OF ORDER, IF THAT'S OKAY.
```

```
 1   CASE NUMBER:              B279836

 2   CASE NAME:                PEOPLE VS. CONDALEE MORRIS

 3   LOS ANGELES, CALIFORNIA; WEDNESDAY, JULY 27, 2005

 4   DEPARTMENT NO. 101        HON. WILLIAM R. POUNDERS, JUDGE

 5   REPORTER:                 JEANNE C. IANNONE, CSR NO. 3140

 6   TIME:                     1:34 P.M.

 7

 8            (APPEARANCES AS HERETOFORE NOTED.)

 9

10            (THE FOLLOWING PROCEEDINGS WERE

11             HELD IN OPEN COURT OUTSIDE THE

12             PRESENCE OF THE JURY:)

13

14        THE COURT:  WE DO HAVE MR. MORRIS AND BOTH COUNSEL

15   PRESENT.

16                   WHAT PROBLEMS AND SOLUTIONS HAVE WE GOT

17   NOW?  ANYTHING ELSE NEW?

18        MR. LIEBERMAN:  I THINK EVERYTHING IS BEING SOLVED,

19   YOUR HONOR.  I THINK WE HAVE A WITNESS THAT CAN TESTIFY,

20   IF DEFENSE WANTS -- I DON'T KNOW IF I'M GOING TO CALL THE

21   WITNESS, BUT IF I DON'T, DEFENSE CAN CALL THE WITNESS.

22   I'LL MAKE THE WITNESS AVAILABLE FROM SID TO TESTIFY TO

23   EXACTLY WHAT PRINTS WERE FOUND AND RESULTS OF THE

24   COMPARISON WITH A.F.I.S.; HOWEVER, I WAS TOLD THAT THEY

25   WOULD PREFER IF THEY COULD ROLL AND COMPARE THE DEFENDANT

26   TOMORROW, BECAUSE IT'S THEIR FEELING THAT PRINTS DON'T

27   NECESSARILY MATCH UP WITH A.F.I.S. BECAUSE SOMETIMES THE

28   PRINT, THE QUALITY OF THE PRINTS AND A.F.I.S. MAY NOT BE
```

1   VERY GOOD.

2               IF THEY WERE TO ROLL THE DEFENDANT, THEY

3   MAY GET A BETTER PRINT AND THEY MIGHT BE ABLE TO MATCH HIM

4   WITH THE NEW PRINT.

5               I DON'T KNOW IF THE DEFENDANT WAS WEARING

6   GLOVES OR NOT.  I DIDN'T INQUIRE OF EACH WITNESS, I SHOULD

7   HAVE DONE THAT BEFORE, BUT ASSUMING THAT HE WASN'T, THEN

8   HE MAY -- IT MAY BE A VERY INTERESTING DEVELOPMENT.

9           MR. FISHER:  I WOULD LIKE THE REPRESENTATIVE TO

10  COME AND -- AND TESTIFY WHAT THESE -- THIS BUSINESS RECORD

11  IS AND WHAT WAS DONE AND WHAT COMPARISON WAS MADE AND WHAT

12  RESULT, IF ANY, HAPPENED.  THAT'S WHAT I WOULD LIKE.

13          THE COURT:  OKAY.

14          MR. FISHER:  ABOUT ROLLING PRINTS, WE SHOULD JUST

15  BRING THEM IN THIS AFTERNOON OR TOMORROW MORNING WHEN WE

16  GET TO HIM AND JUST HAVE HIM INTERPRET WHAT THE RESULTS

17  ARE.

18          THE COURT:  OKAY.  SEEMS REASONABLE.

19              IS THAT WHAT YOU HAD PLANNED TO DO?

20          MR. LIEBERMAN:  YES.  I WOULD ASK THAT THE

21  DEFENDANT BE MADE AVAILABLE TO HAVE THEM COMPARED -- TO BE

22  ROLLED AND THEN THEY CAN MAKE THE COMPARISON.

23          MR. FISHER:  WELL, THEY HAVE HIS PRINTS WHEN HE WAS

24  BOOKED.

25          THE COURT:  BUT BASED ON THE OFFER THAT -- WELL,

26  THAT IS TRUE TOO, BUT THAT WOULDN'T BE PRESENT HERE IF

27  THEY WANT TO COMPARE FROM HERE.

28              IF THE CONCERN WAS COMPARING WHATEVER

1    IDENTIFIABLE PRINTS WERE SEIZED FROM THE SCENE OF THE

2    CRIME WITH A.F.I.S. PRINTS, THEN YOU DON'T GET AS GOOD A

3    COMPARISON IS WHAT THEY'RE SAYING.

4        MR. FISHER:  MY PROBLEM WITH THIS IS THERE'S A LOT

5    OF PROBLEM WITH THESE FINGERPRINT EXPERTS, EVEN SID, AND

6    THEY LOOK AT THESE RIDGES AND THEY INTERPRET THE RIDGES,

7    AND IF THERE'S SO MANY RIDGES, WHATEVER, YOU KNOW, ALL I

8    WANT IS WHAT HAPPENED WHEN THEY PUT IT IN THE COMPUTER.

9        THE COURT:  RIGHT.  BUT THAT DOESN'T MEAN THE

10   PROSECUTION IS NOT ENTITLED TO SEE IF A FRESH COMPARISON

11   OF PRINTS TAKEN HERE FROM YOUR CLIENT WOULD MATCH ANY OF

12   THE PRINTS LIFTED THAT WERE IDENTIFIABLE FROM THE SCENE.

13            I GUESS THE FIRST STEP WOULD BE TO FIND

14   OUT WHAT WAS IDENTIFIABLE, BUT THAT -- THE ONLY THING I

15   COULD DISCERN FROM THAT ONE REPORT WAS THAT THERE WERE

16   IDENTIFIABLE PRINTS THAT WERE SEIZED FROM THE SCENE THAT

17   DIDN'T RESULT IN A.F.I.S. MATCH.  THAT WOULD NOT

18   NECESSARILY MEAN THAT, FOR EXAMPLE, THEY WERE NOT THE

19   PRINTS OF THE PEOPLE THAT LIVE IN THE HOUSE, WHICH IS MOST

20   LOGICAL, UNLESS THEY HAD A CRIMINAL RECORD.

21            BUT, YEAH, MIGHT AS WELL PURSUE IT AND SEE

22   WHAT THE PRINTS WERE.

23       THE DEFENDANT:  LET'S GO.  I'M INNOCENT.  I AIN'T

24   GOT NOTHING TO HIDE.

25       THE COURT:  OKAY.

26       MR. FISHER:  SO WE'LL DO THAT THEN TOMORROW

27   MORNING?

28       THE COURT:  YEAH.

1    OVER AT THE BEGINNING, AND THAT'S WHEN THE WITNESSES HAD

2    PRIOR CONTACT WITH THE ALLEGED PERPETRATOR, BECAUSE IF

3    THESE WITNESSES HAD SEEN MR. MORRIS BEFORE AND -- AND SAW

4    HIM AGAIN IN THE HOUSE, THEN THERE WOULDN'T BE ANY

5    PROBLEM, YOU KNOW, LIKE YOU'VE SEEN THE PERSON, BUT THEY

6    HAD NEVER SEEN MR. MORRIS BEFORE.

7              SO THOSE ARE TWO OTHER FACTORS YOU

8    SHOULD -- YOU SHOULD CONSIDER.

9              THE LAST THING I'D LIKE TO TALK ABOUT IS

10   THIS -- ANOTHER GLOSSING OVER THE -- THE EVIDENCE WITH

11   RESPECT TO THE SID REPRESENTATIVE.  WE KNOW THAT A

12   REPRESENTATIVE CAME OUT AND DUSTED THIS PLACE.  WE KNOW

13   SPECIFICALLY WHAT WAS DUSTED, SOME ITEMS.  THE OFFICER

14   TESTIFIED THAT THIS CROWBAR WAS DUSTED AND -- AND THIS --

15   THIS ROLL OF TAPE.

16             LADIES AND GENTLEMEN, YOU HEARD HIM

17   TESTIFY ABOUT HOW YOU HARDLY SELDOM EVER GET -- GET

18   FINGERPRINTS OFF A GUN BECAUSE IT'S -- IT'S ROUGH, IT'S A

19   ROUGH SURFACE AND YOU CAN'T GET PRINTS.

20             WELL, I SUBMIT TO YOU THAT YOU HOLD THIS

21   CROWBAR LIKE THIS COLD STEAL, THERE IS NO PROBLEM.  YOU

22   CAN GET A PRINT, THE RIDGES CAN BE READ, AND YOU CAN

23   COMPARE THAT WITH MR. MORRIS', AND SEE WHETHER OR NOT IT'S

24   A MATCH.  MAKE NO MISTAKE.

25             THE SAME THING WITH TAPE.  YOU HOLD THE

26   TAPE, AND MR. MORRIS IS THE MASTERMIND OF THIS, RIGHT?

27   HE'S PROBABLY THE ONE THAT WENT OUT -- COUNSEL WANTS YOU

28   TO BELIEVE HE'S PROBABLY THE ONE THAT WENT OUT AND BOUGHT

1    ALL THESE ITEMS.  YOU HOLD A TAPE LIKE THIS, DUST IT,

2    YOU'RE GOING TO GET PRINTS, AND -- AND -- AND YOU'RE GOING

3    TO BE ABLE TO MAKE A COMPARISON.

4                 THIS IS PLASTIC.  IT'S LIKE A DOPE CASE.

5    SOMEONE IS CARRYING A BAGGIE OF COCAINE.  YOU PUT -- YOU

6    CAN EVEN SEE YOUR FINGERPRINT IF YOU -- ON CERTAIN PLASTIC

7    BAGS LIKE THIS.

8                 SO WHEN COUNSEL GETS UP HERE AND SAYS THE

9    ONLY EVIDENCE IN THIS CASE BEFORE YOU WAS THE GUN, HE HAD

10   A PERFECT OPPORTUNITY AND TIME TO -- AT THAT TIME TO ASK

11   THE EXPERT, WELL, WHAT WAS DUSTED AND -- AND WHAT WAS

12   COMPARED AND WHAT CAME BACK.

13        MR. LIEBERMAN:  OBJECTION.

14        THE COURT:  SUSTAINED.

15        MR. FISHER:  OKAY.

16                 DON'T BUY INTO THIS ARGUMENT, WELL,

17   MR. FISHER HAS A RIGHT TO CALL WITNESSES ON BEHALF OF THE

18   DEFENDANT.  HE HAS THE SUBPOENA POWER.  HE COULD HAVE

19   ASKED THE QUESTIONS OF THE FORENSIC EXPERT.

20                 YOU JUST REMIND YOURSELF THAT MR. FISHER,

21   THE DEFENSE IN THIS CASE DOESN'T HAVE TO DO ANYTHING.  THE

22   BURDEN OF PROOF IS ON THE PROSECUTION, AND IF SOMETHING

23   CAME BACK THAT -- THAT CONCLUDED OR -- OR -- OR POINTED TO

24   DEFENDANT, MR. MORRIS' GUILT, YOU WOULD HAVE HEARD ABOUT

25   IT WITH RESPECT TO THE SCIENTIFIC --

26        MR. LIEBERMAN:  OBJECTION, YOUR HONOR.  MAY I BE

27   HEARD AT SIDE BAR?

28             THE COURT:  YES.

```
1              (THE FOLLOWING PROCEEDINGS WERE HELD

2                AT THE BENCH:)

3

4       MR. LIEBERMAN:  COUNSEL IS TRYING TO GIVE THE

5   IMPRESSION THAT I THINK IS UNFAIR IN THIS PARTICULAR CASE.

6   HE MADE A DECISION IN THE CASE, AND THE STATE OF THE

7   EVIDENCE IS THAT THINGS WERE DUSTED, WE DO NOT KNOW WHAT

8   WAS DUSTED, AND THERE IS A REASON WHY WE DON'T KNOW,

9   BECAUSE DEFENSE COUNSEL CHOSE TO LEAVE THAT AS THE STATE

10  OF THE EVIDENCE AND NOT HAVE HIS CLIENT RE-FINGERPRINTED.

11              I THINK THE INFERENCE THAT COUNSEL IS

12  TRYING TO DRAW IS UNFAIR, AND I THINK HE SHOULD NOT BE

13  PERMITTED TO CONTINUE ON THIS LINE OF ARGUMENT.

14      THE COURT:  THIS ARGUMENT IS BASICALLY WHAT I SAID

15  I WOULD PERMIT, THAT THE EVIDENCE IS THAT DUSTING WAS

16  DONE, NO PRINTS WERE PICKED UP, NO PRINTS WERE COMPARED,

17  AND HE'S JUST SAYING IF THERE HAD BEEN ANYTHING POSITIVE,

18  YOU'D BEEN ABLE TO BRING IT FORWARD, SO THAT'S THE

19  ARGUMENT I PERMITTED.

20              OBJECTION IS OVERRULED.

21

22              (THE FOLLOWING PROCEEDINGS WERE

23                HELD IN OPEN COURT IN THE PRESENCE

24                OF THE JURY:)

25

26      MR. FISHER:  NOW, I'M ALMOST DONE.  I JUST WANT TO

27  TALK A LITTLE BIT ABOUT REASONABLE DOUBT, BUT I WANT TO

28  CHECK MY NOTES BECAUSE I KNOW THERE WAS SO MUCH -- SO MUCH
```

Police Procedure

- Crime with which suspect was identified;
- Name of person who made identification;
- DR number of report of crime with which suspect was identified;
- Name of the concerned law enforcement agency and the case number, when suspect identified with a crime committed in another jurisdiction;
- Names of victims and witnesses attending the "show-up;"
- Names of suspect's defense attorneys and deputy district attorneys attending the "show-up;"
- Name and serial number of the officer who selected the participants for the "show-up;"
- Unusual actions which the investigating officer requested the suspect to perform during the "show-up;" and,
- Name, serial number, and detail of officer conducting the "show-up."

**Suspect Not Identified.** When no suspects are identified in a "show-up," the teletype notification shall contain the following:

- NO SUSPECTS IDENTIFIED;
- (Names of victims and witnesses attending the "show-up"); and,
- (Name, serial number, and detail of officer conducting the "show-up".)

**203.50 IDENTIFICATION OF SUSPECTS IN THE FIELD.** A suspect may be transported to a victim or witness for the purpose of identification when:

- An officer is conducting a preliminary investigation and a field confrontation is necessary to determine if the suspect is the perpetrator of the offense; and,
- Probable cause exists to arrest the suspect for the offense; or,
- Exigent circumstances exist that make it unreasonable for the victim or witness to be transported to the suspect; or,
- The officer obtains the free and voluntary consent of the suspect.

An officer who intends to conduct a field confrontation shall inform the victim or witness that:

- The person is in temporary custody as a possible suspect only; and,
- The fact the person is in police custody does not indicate his/her guilt or innocence; and,
- The purpose of the confrontation is either to eliminate or identify the person as the perpetrator.

**735.05 SCHEDULING AND LOCATION OF FORMAL SHOW - UPS FOR ADULT SUSPECTS.** Formal show-ups for adult suspects shall be conducted in:

- The Auditorium, Room 100, Parker Center;
- The Auditorium of the Los Angeles County Central Jail; or,
- The designated facilities at Los Angeles County Jail.

Exhibit 2   2

```
 1        Q.    I'M ALMOST FINISHED, I JUST WANT TO TALK
 2   ABOUT YOUR IDENTIFICATION.
 3              WERE YOU PUT IN A POLICE CAR AND TOLD THAT
 4   THE POLICE HAD THE SUSPECT, ONE OF THE SUSPECTS THAT
 5   BROKE INTO YOUR HOME?
 6        A.    YES.
 7        Q.    OKAY.  AND WERE YOU DRIVEN IN A POLICE CAR
 8   TO TRY AND IDENTIFY THAT INDIVIDUAL?
 9        A.    THAT'S RIGHT.
10        Q.    AND WHEN YOU SAW -- WHO WAS IN THE POLICE
11   CAR WHEN YOU MADE THE IDENTIFICATION?
12        A.    I WAS ALONE IN THE BACK.
13        Q.    DID THE POLICE OFFICERS TELL YOU THAT THAT
14   WAS THE PERSON THAT THEY THOUGHT ROBBED YOU?
15        A.    THEY DIDN'T SAY THAT.  THEY SAID THAT IF I
16   COULD FIGURE OUT IF THAT WAS THE PERSON THAT HAD COME
17   IN.
18        Q.    AND DID YOU IDENTIFY THAT PERSON?
19        A.    YES.  I TOLD HIM THAT I WAS 95 PERCENT SURE
20   THAT HE WAS ONE OF THEM.
21        Q.    AND WHEN YOU IDENTIFIED THAT PERSON, WAS
22   THAT PERSON HANDCUFFED?
23        A.    YES, HE WAS.
24        Q.    WERE UNIFORMED POLICE OFFICERS STANDING NEXT
25   TO HIM?
26        A.    YES.
27        Q.    HOW MANY?
28        A.    WELL, I DON'T REMEMBER.  AT LEAST ONE
```

EXHIBIT 3

1    Q.        AND HAD ANY MEMBERS OF YOUR FAMILY TALKED

2  TO YOU ABOUT ANY IDENTIFICATIONS THAT THEY MAY HAVE MADE

3  PRIOR TO YOU SEEING THE DEFENDANT?

4    A.        NO, BECAUSE I WAS THE FIRST ONE WHO WAS

5  TAKEN.

6    Q.        OKAY.  DID YOU FIND ANY BOX CUTTERS IN

7  YOUR HOUSE AFTER THE INCIDENT?

8    A.        NO.

9    Q.        DID YOU FIND ANY DUCT TAPE IN YOUR HOUSE?

10   A.        NO, NO.

11   MR. LIEBERMAN:  I HAVE NO MORE QUESTIONS, YOUR

12  HONOR, AT THIS TIME.

13   THE COURT:  ALL RIGHT.

14      MR. FISHER, YOU MAY CROSS-EXAMINE.

15   MR. FISHER:  THANK YOU, YOUR HONOR.

16

17              CROSS-EXAMINATION

18

19  BY MR. FISHER:

20   Q.        WHEN THE POLICE PUT YOU IN THE POLICE CAR

21  TO MAKE THE IDENTIFICATION, DID THEY TELL YOU THEY HAD ONE

22  OF THE SUSPECTS THAT -- THAT BURGLARIZED YOUR HOUSE?

23   A.        YES.

24   Q.        AND WHEN THEY TOOK YOU TO THIS PLACE TO

25  IDENTIFY THE SUSPECT, WAS MR. MORRIS HERE THE ONLY

26  AFRICAN-AMERICAN PERSON?

27   A.        YES.

28   Q.        AND IS IT FAIR TO SAY YOU WERE REAL UPSET,

Exhibit 4

660

Q.      SHOWING YOU PEOPLE'S 23.

DID YOU NOTICE ANY DAMAGE TO ANY OF THE

DOORS?

A.      THE -- THE REAR DOOR OF THE HOUSE WAS

DAMAGED.

Q.      OKAY.  DESCRIBE IT.

A.      I BELIEVE -- I CAN'T RECOLLECT.  I JUST

REMEMBER THAT IT BEING LIKE THE DOORJAMB APPEARED TO BE

LIKE IT WAS BUSTED OR KICKED IN.

Q.      OKAY.

I'M ALMOST DONE, YOUR HONOR.

I HAVE THREE SMALL ENVELOPES IN MY HAND.

THEY ALL THREE APPEAR TO CONTAIN OR ARE LABELED --

WITHDRAWN.

I HAVE NO MORE QUESTIONS, YOUR HONOR.

THE COURT:  CROSS-EXAMINE.


CROSS-EXAMINATION


BY MR. FISHER:

Q.      WHEN YOU WERE INTERVIEWING THESE

WITNESSES, DID YOU TAKE ANY NOTES?

A.      YES, I DID.

Q.      DID YOU BRING THOSE NOTES TO COURT TODAY?

A.      NO, I DIDN'T.

Q.      HOW LONG AFTER THIS INCIDENT -- WHERE ARE

THESE NOTES?

A.      I EITHER DISCARDED THEM OR I MAY HAVE THEM

exhibit 7

661

SOMEWHERE.

Q.         YOU KNOW YOU'RE SUPPOSED TO KEEP THE

NOTES, DON'T YOU?

A.         AT THE TIME I DIDN'T KNOW.  I LATER FOUND

OUT THAT IT PROBABLY WOULD HAVE BEEN A GOOD IDEA TO KEEP

THEM.

Q.         HOW LONG AFTER THE INTERVIEW WAS THE

POLICE REPORT PREPARED BY YOUR PARTNER WHEN YOU SAY THEY

MADE THESE STATEMENTS?

A.         LET'S SEE, PROBABLY WE GOT THE CALL

APPROXIMATELY 1:05.  I WOULD SAY THAT WHERE WE STARTED

WRITING, ACTUALLY WRITING THE REPORT WAS APPROXIMATELY

5:00 TO MAYBE 6:00 IN THE MORNING, SOMEWHERE AROUND THERE.

Q.         SO HOW MANY HOURS AFTER THE STATEMENT WAS

MADE REGARDING THE IDENTIFICATION WAS THE -- THAT PART OF

THE REPORT WRITTEN?

A.         WELL, THAT WOULD BE AROUND FIVE TO SIX

HOURS.

Q.         AND YOU REMEMBER YOU HAD SOME NOTES?

A.         YES.

Q.         AND DO YOU KNOW WHAT YOU DID WITH THOSE

NOTES AGAIN?

A.         I DON'T REMEMBER WHAT I DID WITH THEM.

Q.         OKAY.  NOW, ARE YOU BROADCASTING ON DUPLEX

AT THE TIME YOU MAKE CONTACT WITH MR. MORRIS HERE?

A.         WHAT WE BELIEVE WE DID IS EITHER MY

PARTNER AND I, WE AT LEAST ON DUPLEX WE'D SAY WE'VE MADE

CONTACT WITH THE SUSPECT, BUT MOST OF IT WAS TALKING TO

Exhibit 8

Exhibit # 9

To

Legal Argument 6

follow up investigation

| MULTIPLE | |
|---|---|

LOS ANGELES POLICE DEPARTMENT
**FOLLOW-UP INVESTIGATION**

| DATE THIS REPORT | DATE ORIGINAL RPT. | SPECIFIC TYPE ORIGINAL RPT. (ADW, TFV, EVID., ARREST/BURG., ETC.) | R.D. 395 | DR 050309786 |
|---|---|---|---|---|
| 5/27/05 | 3/4/05 | **ROBBERY** | | |

| VICTIM/BOOKED TO/ARRESTEE (as on original report) | IF RECLASSIFYING TO HOMICIDE SEX/DEC/SUIT/ACE VIC'Y'S: | BKG. NO. (Suppl. to Arrest) | WORK FOLDER PERIOD ORIG RPT/INDEX NO. 3RR-11 |
|---|---|---|---|
| Rayos, Heladio | | | |

| CASE STATUS | ☐ CLEARED BY ARREST | ☐ CLEARED OTHER | ☐ REPORT UNFOUNDED | ☒ INVESTIGATION CONTINUED | INV. DIV. CHANGE TO |
|---|---|---|---|---|---|

| | CHANGE TO - ON OR BETWEEN MO DAY YEAR TIME | CHANGE TO - ON OR BETWEEN MO DAY YEAR TIME | TYPE ORIG RPT - CHANGE TO | RD- CHG TO | DR CHANGE TO |
|---|---|---|---|---|---|
| DATE OCCURRED | | | | | |

| PROPERTY VALUE | ADDITIONAL LOSS | PARTIAL RECOVERY | TOTAL RECOVERY | DELETE FROM ORIG. RPT. | DESCRIPTION CHANGE | ITEM NOS. RECOVERED/DELETED (ON MULTI. RPTS. USE NARRATIVE) |
|---|---|---|---|---|---|---|

| | SEX | DESC | HAIR | EYES | HEIGHT | WEIGHT | DOB | AGE | NAME & ADDRESS (or name & charge, if arrested) | LA OR BKG. NO. |
|---|---|---|---|---|---|---|---|---|---|---|
| S-1 | M | BLK | BLK | BRO | 509 | 170 | 05/09/76 | 28 | Morris, Condalee 1503 S 127th Compton   ACTION TAKEN   DDA Merrick - (2)211 (1)487 PC (1)12021 (3)422 | 8480652 |
| S-2 | | | | | | | | | NAME & ADDRESS (or name & charge, if arrested) ACTION TAKEN | |
| S-3 | | | | | | | | | NAME & ADDRESS (or name & charge, if arrested) ACTION TAKEN | |

| NARRATIVE (USE BELOW COLUMNS FOR MULTIPLE REPORTS ONLY) | | VICTIM'S NAME | DATE ORIG. RPT. | VALUE |
|---|---|---|---|---|
| P/T/D | MULTIPLE RPT: DR NOS. | TYPE OF CRIME | RD | | | |

**Incident No. 5063000245**

**Additional:**

I/O spoke with Air Support and inquired whether they took video of the incident. They did not. I/O was advised the air units are equipped with recording equipment, but they do not record on a routine basis. Video footage is taken upon request.

The gun recovered from the victim's bushes is not registered. Katherine Rayos stated the gun found in the bushes was the gun taken from her house, however, the gun is not registered to her. Rayos insisted the gun she owned was registered. I/O has searched Department resources and cannot find any guns registered to Katherine Rayos.

Roy Olivares is the cousin of Heladio Rayos. On 03/21/05, Melvin Ellis, was arrested in Compton in possession of a firearm. The gun was registered to Roy Olivares, ▓▓▓▓ Olivares was notified about the recovery of his gun. Olivares stated he left his gun at his cousin's house and apparently it was taken during the home invasion robbery. I/O asked Katherine Rayos why she did not report the second gun stolen. Rayos stated she was not aware Olivares left his gun at their house and never saw the suspects take it. Rayos' husband, Haladio, said the gun was in the closet and he did not know the suspects took it. Olivares' gun was also a Colt, simi-auto (70S02122) I/O pulled Ellis' booking photo and completed a photographic line-up containing his photo. None of the victim's could identify Ellis as a suspect.

Witness Treva Brown is the neighbor of the Rayos family. Brown lives at ▓▓▓▓▓ Brown advised police at approximately 0010 hours on 03/01/05, she observed a small two door Black vehicle stopped facing eastbound ▓▓▓▓▓ vehicle was stopped at the stop sign for approximately two minutes. On 03/02/05, at approximately 0045 hours, she observed the same vehicle stopped at the stop sign for approximately two minutes. On 03/04/05, at approximately 0045 hours, she saw two vehicles park on St. Andrews Place. She described vehicle one as a white small compact (possible Camry) parked on St. Andrews Place, facing northbound. Vehicle two (Black station wagon) was parked on St. Andrews facing southbound. Treva then heard the police helicopter overhead and also heard her dog barking. The vehicles then fled the area.

| WAS PROPERTY BOOKED IN CONJUNCTION WITH THIS REPORT OR INCIDENT? ☐ NO ☒ YES | IF YES, HAS 10.6 BEEN COMPLETED? ☐ NO ☒ YES | REPORTING OFFICER(S) J. FRANCO | SERIAL NO. 30632 | DIVISION SOUTHWEST |
|---|---|---|---|---|
| SUPERVISOR APPROVING D111 | SERIAL NO. | REPORTING OFFICER(S) | SERIAL NO. | DIVISION |
| DATE & TIME REPRODUCED | DIVISION | CLERK | | |



# LAW OFFICES
## LOS ANGELES COUNTY PUBLIC DEFENDER
19-513 CLARA SHORTRIDGE FOLTZ CRIMINAL JUSTICE CENTER
210 WEST TEMPLE ST, 19TH FLOOR
LOS ANGELES, CALIFORNIA 90012
(213) 974-2811
TDD # (800) 801-5551

**MICHAEL P. JUDGE**
PUBLIC DEFENDER

February 28, 2007

Condalee Morris #V96203
B-4 220
Calipatria State Prison
P. O. Box 5005
Calipatria, CA 92233

Re: People v. Condalee Morris
Case No. BA279836

Dear Mr. Morris:

This letter is in response to your request for copies of missing pages of the police report in your case. Enclosed are the remaining pages of the police report that you requested with the exception of pages 6 and 7, which are not in the file. Additionally, copies of the photos that were inadvertently missed previously are enclosed as well.

Sincerely,

MARK LESSEM
Head Deputy

ML:sjf

Encls.

*"To Enrich Lives Through Effective and Caring Service"*

| S POLICE DEPARTMENT INVESTIGATION | | | | | | SPECIFIC TYPE ORIGINAL RPT. | | | | | | | MULTIPLE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | DATE ORIGINAL RPT. 3/4/05 | | | | | ROBBERY | | | | 395 | | | 050309786 |
| D/ARRESTEE (as on original report) Rayos, Heladio | | | | | | IF RECLASSIFYING TO HOMICIDE SEX/DESCENT/AGE VICT'S | | | | BKG. NO. (Suppl. to Arrest) | | WORK FOLDER PERIOD ORIG RPT / INDEX NO. 3R4-19 | |

| CASE STATUS | ☐ CLEARED BY ARREST | ☐ CLEARED OTHER | ☐ REPORT UNFOUNDED | ☒ INVESTIGATION CONTINUED | INV. DIV. CHANGE TO |
|---|---|---|---|---|---|

Use this section only to add or correct info - do not repeat info from previous reports. Exception: Complete entire suspect info if making final disposition.

| DATE OCCURRED | CHANGE TO - ON OR BETWEEN MO DAY YEAR TIME | R | CHANGE TO - ON OR BETWEEN MO DAY YEAR TIME | TYPE ORIG RPT - CHANGE TO | RD - CHG. TO | DR CHANGE TO | |
|---|---|---|---|---|---|---|---|
| PROPERTY VALUE: | ADDITIONAL LOSS | PARTIAL RECOVERY | TOTAL RECOVERY | DELETE FROM ORIG. RPT. | DESCRIPTION CHANGE | ITEM NOS. RECOVERED/DELETED (ON MULTI. RPTS. USE NARRATIVE) | |

| | SEX | DESC | HAIR | EYES | HEIGHT | WEIGHT | DOB | AGE | NAME & ADDRESS (or name & charge, if arrested) | LA OR BKG. NO. |
|---|---|---|---|---|---|---|---|---|---|---|
| S-1 | M | BLK | BLK | BRO | 509 | 170 | 05/09/76 | 28 | Morris, Condalee 1503 S 127th Compton ACTION TAKEN Investigation Continued | 8480652 |
| S-2 | SEX | DESC | HAIR | EYES | HEIGHT | WEIGHT | DOB | | NAME & ADDRESS (or name & charge, if arrested) ACTION TAKEN | LA OR BKG. NO. |
| S-3 | SEX | DESC | HAIR | EYES | HEIGHT | WEIGHT | DOB | AGE | NAME & ADDRESS (or name & charge, if arrested) ACTION TAKEN | LA OR BKG. NO. |

| NARRATIVE (USE BELOW COLUMNS FOR MULTIPLE REPORTS ONLY) | | | | | | |
|---|---|---|---|---|---|---|
| P/T/O | MULTIPLE RPT: DR NOS. | TYPE OF CRIME | RD | VICTIM'S NAME | DATE ORIG. RPT. | VALUE |

Incident No. 5063000245

Crime Summary:
Suspects gained entry into the residence by prying open the back door. Suspects beat victims and demanded money at gunpoint. Suspects took victim's cash and fled the location.

Investigation:
Suspects 2, 3, and 4 were able to flee from the location. Suspect 1 (Morris) was seen leaving through the front door by the LAPD airship and taken into custody by responding officers. Morris was positively identified by the victims as one of the suspects involved in the robbery. Officers recovered a handgun from the bushes. The gun was not the weapon was taken from the residence and found in the same area the airship observed Morris near. The gun was not registered, Katherine Rayos said it was hers and she has had it for years.

I/O spoke with victim Katherine Rayos. Rayos stated she was recently awarded a large settlement, which was related to a severe work injury. Rayos said the settlement was in the millions, but she has yet to receive any money. Rayos commented the suspects kept saying, "We know you have a lot of money. Where is the safe?" Victim Katherine Rayos said Morris seemed to be the one in charge during the robbery and he was the suspect who hit her in the face.

Morris has a lengthy arrest history and is on formal probation for a weapons charge. Morris was admonished, but refused to provide a statement.

| WAS PROPERTY BOOKED IN CONJUNCTION WITH THIS REPORT OR INCIDENT? | ☐ NO ☒ YES ...... | IF YES, HAS 10.6 BEEN COMPLETED? | | ☐ NO ☒ YES | |
|---|---|---|---|---|---|
| SUPERVISOR APPROVING | SERIAL NO. | REPORTING OFFICER(S) J. FRANCO | SERIAL NO. 30632 | DIVISION SOUTHWEST | |
| DATE & TIME REPRODUCED | DIVISION | CLERK | REPORTING OFFICER(S) | SERIAL NO. | DIVISION |

LAPD 03.14.0 (3/85) - DH (0/0/00)

FOLLOW-UP INVESTIGATION

| BOOKING NO. | U.D. | LOC. BKD. | | DR. I.D. NO. | STATE | MT | | DR | | LA |
|---|---|---|---|---|---|---|---|---|---|---|
| P480652 | | 4273 | | A1013021 | CA | N | | 050309786 | | |

ADMONITION OF RIGHTS (WHEN APPLICABLE)

THE ADMONITION OF RIGHTS WAS READ VERBATIM PER FORM 15.03 BY:

| ARRESTEE'S LAST NAME | FIRST | MIDDLE | |
|---|---|---|---|
| MORRIS | CONDALEE | | |

ADDRESS: 1503 S 127TH.  APT. NO.

CITY: COMPTON  STATE CA

| SEX | DESCENT | HAIR | EYES | HEIGHT | WEIGHT | BIRTHDATE | AGE |
|---|---|---|---|---|---|---|---|
| M | B | BLK | BRO | 509 | 170 | 050976 | 28 |

| VEH. LIC. NO. | STATE | R.D. | AKA: LAST- FIRST- OR NICKNAME |
|---|---|---|---|
| | | 0395 | |

| BIRTHPLACE | PROD. INV. UNIT | JUV. DETAINED AT | AD. CHG |
|---|---|---|---|
| COMPTON CA | | | Y |
| LA | US 03 | | |

| DIVISION AND | DETAIL ARRESTING | DATE ARRESTED | TIME ARR. | TIME BKD. |
|---|---|---|---|---|
| 4203 | A | 030405 | 0110 | 0927 |

| LOCATION OF ARREST | | BAIL | 100000 |
|---|---|---|---|
| 1806 S 42ND ST | | TOTAL BAIL | 150000 |

| TYP. | CHARGE & CODE | DEFINITION |
|---|---|---|
| F | 211PC | ROBBERY |

WARRANT NO. ☆

J: 0166531    A1093I857
MAIN: 04398798    276647CR3

R GORDON 24262
SEE PG 4 OF RPT

| NAME | SERIAL NO. |
|---|---|

SOCIAL SECURITY NO.
616070825

ADDITIONAL CHARGES (ON ADDL. WANTS, LIST NO., COURT, AND BAIL, INCL. P.A.)
COMTA07736301  12025(A)PC  50000

| ARRAIGN. DATE | TIME | COURT | LOCATION CRIME COMMITTED | R.D. | RESIDENCE PHONE NO. |
|---|---|---|---|---|---|
| | | | SAA | 0395 | NONE |

EMPLOYER / SCHOOL

| OCCUPATION / GRADE | UNEMPLOYED | PHY. COD. | N/V |
|---|---|---|---|

| CLOTHING WORN | PLAID/SHT.BLU/PNTS | EXACT LOCATION / DISPOSITION ARRESTEE'S VEHICLE | PED | HOLD FOR: |
|---|---|---|---|---|

| LIST CONNECTING RPTS BY TYPE & IDENTIFYING NOS | VEHICLE USED (YEAR, MAKE, MODEL, TYPE, COLORS, LIC. NO., ID MARKS) | PASSENGERS M F |
|---|---|---|
| P/R 211 SAME DR. | | |

| COMPLAINTS / EVID OF ILLNESS / INJ-BY WHOM TREATED | DRIVING VEH. (DIRECTIONS & NAME OF STREET) AT OR BETWEEN STREETS | RETAINED $ NONE | CASH DEPOSITED $ NONE |
|---|---|---|---|

INVOLVED PERSONS  Code: V: VICTIM  W: WITNESS  P/A: ARRESTING PRIVATE PERS.  TO: TRUE OWNER  R: PERSON RPTG.  459: S - PERSON SECURING  D - PERSON DISCOVERING  JUV: P - BOTH PARENTS  G - GUARDIAN

| NAME | V & W/8 | SEX | DESC. | D.O.B. | ADDRESS | CITY | ZIP | PHONE | DAY X |
|---|---|---|---|---|---|---|---|---|---|
| V1 Rayos, Heladio | | M | H | | | | | | |
| V2 Rayos, Katherine | | F | H | | | | | | |
| V3 Rayos, Matthew | | | | | | | | | |

| COMBINED CRIME REPORT | IF MULTI. ARRESTEES THIS SECTION & ABOVE CRIME RPT. CHECK BOX IS COMPLETED ON ONLY ONE FACE SHEET. | TYPE OFFENSE | | VICT'S OCCUPATION |
|---|---|---|---|---|

| DATE AND TIME CRIME OCCURRED | TYPE PROPERTY | TOTAL | EST. DAMAGE | TYPE PREMISES |
|---|---|---|---|---|

| 459 / BFV ONLY-POINT AND METHOD OF ENTRY | WEAPON / FORCE / INSTRUMENT USED | TFV / BFV ONLY-VICT'S. VEH. (YR, MAKE, TYPE, LIC.) |
|---|---|---|

MO (UNIQUE ACTIONS)

C-P.I.R. FACE
SHEET

| | | MOTIVATED BY HATRED / PREJUDICE | DOMESTIC VIOLENCE |
|---|---|---|---|

| COMBINED EVID. RPT. | USE THIS SECTION IN LIEU OF PROPERTY REPORT IF ONLY ONE ARRESTEE, NO GUN, AND NO MORE THAN 8 ITEMS OF EVID. | LOC. EVID. BKD. | SOW | 10.10 GIVEN? N | Preliminary Drug Test | SUPV. / INV. OFCR. TESTING | SER. NO. WITNESS OFCR. | SER. NO. |
|---|---|---|---|---|---|---|---|---|

| ITEM | QUAN. | ARTICLE | SERIAL NO. / TYPE TEST OF DRUG | BRAND / DRUG WEIGHT UNITS | MODEL NO. / DRUG TEST RESULT | MISC. |
|---|---|---|---|---|---|---|
| | | SEE | PROP | RPT | | |

| APPROVAL / REPORTING OFFICERS | SUPERVISOR APPROVING PRINT DET II RUDD | SERIAL NO. GR 24262 | RAP SHEET ATTACHED | REPORTING OFFICER(S) LAURA-UA | SERIAL NO. 36703 | DIV. & DETAIL SGW | VACATION Sept. |
|---|---|---|---|---|---|---|---|
| | DATE & TIME REPRODUCED 3/5/05 0700 | DIV. CLERK 3V8 | YES ☒ NO | P. ARREST-OTHER RVS. EVID. IF LISTED ON THIS PAGE. PONCE 56042 | SAIS | | PASS |

| JUVENILE DISPO. Petition Request: ☐ DETAINED  ☐ RELEASED  ☐ NON-BOOK | ☐ NON-BOOK & WARR. | INVEST OFCR. FRANCO | SERIAL NO. 30632 | DIV SW |
|---|---|---|---|---|
| CHARGE, IF DIFFERENT THAN ORIGINAL CODE & DEFINITION: | IF REFERRED, AGENCY & PERSON ACCEPTING REFERRAL | PROPERTY BOOKED  Y  N  IF YES, 10.8 COMPLETED?  Y  N | SUPERVISOR APPROVING | SERIAL NO. |
| | | | JUV. COORD. REVIEWING | SERIAL NO. |

| DISP. RSLT. | 13 ☐ EXON.-INNOCENT | 04 ☐ CYA | 10 ☐ JUV. TRAF. MISD. | 16 ☐ DCS | DATE / TIME DISPO. REPROD. | DIV. / CLERK |
|---|---|---|---|---|---|---|
| | 12 ☐ REL-INSUF. EVID. | 05 ☐ PROBATION | 07 ☐ FIRE DEPT. | ☐ OTHER: | | |
| | 03 ☐ COMMUNITY SERVICE | 06 ☐ OTH. LAW ENF. AGENCY | 11 ☐ DEPT. MENTAL HEALTH | | | |

7-95

**ARREST REPORT**
506300C245

Los Angeles Police Department

| PAGE NO. 2 | TYPE OF REPORT Crime and Arrest | | | | BOOKING NO. 8480652 | DR NO. 0503-09786 |
|---|---|---|---|---|---|---|
| ITEM NO. | QU AN | ARTICLE | SERIAL NO | BRAND | MODEL NO. | MISC DESCRIPTION (EG. COLOR, SIZE, INSCRIPTIONS, CALIBER, REVOLVER, ETC) | DOLLAR VALUE |

Victim 4:    Rayos, Aaron       DOB: 03-11-02
Victim 5:    Rayos, Denise      DOB: 09-15-82
Witness:     Cortez, Kimberly   DOB: 08-14-86

Suspect 2:   M/H 505/130-140  19-23 yrs  blk ski mask, blk hoody, blk pants (handgun)
Suspect 3:   M/B 508-511/150-170  19-25 yrs  blk hoody, blk pants (rifle or shotgun)
Suspect 4:   M/B 504-505/130-140  20-25 yrs  bald head, buck teeth, blk hoody, blk pants (handgun)

**Source of Activity**
On 03-04-05 at approximately 0105 hours my partner (Ofcr B Zavala #36703) and I (Ofcr B Ponce #36692) were on uniform patrol, in a marked black and white police vehicle assigned unit 3A15. We received a radio call of a burglary in progress at 1806 W 42nd Place. The comments of the radio call stated, "Person reporting stated person was attempting to break in, PR's husband instructed to get on the ground..." Incident #5063000245

**Investigation**
Upon arrival police helicopter AIR 3 (Ofcr Melton #32783 and Bolanos #26192) were above 1806 W 42nd Place, while the suspects were still inside. Ofcr Melton observed suspect Morris exit through the front door from 1806 W 42nd Place and run eastbound 42nd Place. Ofcr Melton observed suspect Morris tossing unknown objects from his person. Ofcr Melton then observed Morris walk on the west side of 1816 W 42nd Place and attempt to conceal an unknown object. The suspect continued to run westbound 42nd Place. AIR 3 directed us to the Morris' location and was taken into custody in front of 2003 W 42nd Place.

Approximately 2-3 minutes later Officer Melton directed additional officers next to 1816 W 42nd Place where he observed the suspect attempt to conceal an object. Officer Elsdon was able to recover the victim's handgun (item 1). Ofcr Melton did not observe anyone within that location other than officers.

Heladio Rayos stated that on 03-04-05 at approximately 0100 hours he was asleep in his room by himself. He heard loud banging and noises to the rear of the house. Heladio got up to investigate the noise. Four male black suspects, dressed in all black clothing, armed with guns then confronted Heladio. Suspect 1 pointed a large silver revolver at Heladio's head and ordered him to the ground. Heladio stated the suspect's demanded money and guns. While Heladio laid on the kitchen floor, the suspects kicked him several times causing Heladio to lose his breath and he was unable to talk. Suspect 1 continued to demand money. Heladio directed suspect 1 to his pants where he had approximately $500 cash. Suspect 1 grabbed Heladio's pants and removed his money. Suspect 2 and 3 entered victim Katherine's room and also demanded money. Suspect 3 pointed either a rifle or shotgun at Katherine's head and also demanded money. Katherine, who was sleeping with her grandchildren (Aaron-3 yrs old and Mathew-8 yrs old), was ordered to victim Heladio's room and held against their will at gunpoint. Heladio observed suspect 2 grab Aaron and point a gun to his head, while holding him in a chokehold.

RS

**CONTINUATION SHEET**

Los Angeles Police Department

| PAGE NO. | TYPE OF REPORT | | | | BOOKING NO. | DR NO. |
|---|---|---|---|---|---|---|
| 3 | Crime and Arrest | | | | 8480652 | 0503-09786 |

| ITEM NO. | QU AN | ARTICLE | SERIAL NO | BRAND | MODEL NO. | MISC DESCRIPTION (EG. COLOR, SIZE, INSCRIPTIONS, CALIBER, REVOLVER, ETC) | DOLLAR VALUE |
|---|---|---|---|---|---|---|---|

Heladio could hear his wife, Katherine, plead with the suspects not to kill anyone and that she had more money in her purse. Heladio then observed his daughter (victim Denise) walk out of her room. Suspect 4, who pointed a handgun to her head, immediately confronted Denise. Heladio heard the police helicopter overhead and the suspects began to panic. That is when the suspects fled the location through the front and rear doors.

Heladio stated he complied with the suspect's demands because he feared for him and his family's life.

**Katherine Rayos** stated that on 03-04-05 at approximately 0100 hours she was sleeping in her room with her grandchildren (Aaron-3 yrs old and Mathew-8 yrs old). She heard a loud pounding noise and did not know where it was coming from. Katherine got up to investigate and walked to the kitchen area. She could hear someone pounding on the rear door, attempting to break in. Katherine backed away from the windows fearing someone would see and hurt her. She ran to her husband's room, Heladio, and alerted him that someone was attempting to break in. She then ran back to her room and closed the door. Katherine called 911. While on the phone, she heard a suspect coming to her door. She threw the phone under her bed as suspect 2 gained entry, armed with a rifle or shotgun. Suspect 2 instructed Katherine to get on her knees. Suspect 2 pointed his gun to her head and asked who she had called. Katherine told suspect 2 she had called her mother. Suspect 2 stated, "If you called the cops, I'm gonna kill you right now!" Katherine replied, "No. 1 didn't. I didn't call the cops." Suspect 2 then drug her to her husband's room. Katherine told suspect 2 not to leave her kids in the room by themselves. Suspect 3 grabbed Aaron (3 yrs old) with his left arm around his neck and pointed a gun to his head. Suspect 3 stated, "If you don't tell us where the money's at and the guns were gonna shoot him!" Katherine stated, "We don't have any money. We have one gun." Suspect 3 instructed her to get the gun and give it to him.

Katherine further stated that when she was forced to her husband's bedroom, suspect 1 approached her. Suspect 1 asked her where the safe was. She told him they didn't have one. Suspect 1 then choked and punched her in the face and pointed a gun to her head.

Katherine was able to observe suspects 2, 3, and 4 kick and punch her husband while he lay on the floor. She begged the suspects to stop beating her husband and not to kill him. Katherine, in fear for her family's life, offered the suspects a $600 workers comp check she had received.

Katherine described suspect 2; M/H  505/130-140  19-23 years old  wearing a black ski mask, black hooded sweater, and black pants. She believed the suspect was a Hispanic because she observed his skin color around his eyes and tone of voice.

Katherine is disabled and needs a wheel chair to get around. She also uses a cane to assist her to walk. Suspect Morris punched Katherine in her mouth causing her to fall to the ground.

**Denise Rayos** stated that on 03-04-05 at approximately 0100 hours she was sleeping in her bedroom with her sister (witness Kimberly). She heard loud pounding and later heard her parents yelling. Denise heard a loud commotion and unfamiliar voices telling her parents what to do. She locked her door and instructed her pregnant sister to call 911. Denise then stepped out of her room to find her child, Aaron. She observed her mother, Katherine, begging the suspects to leave and not to hurt anyone.

RG

CONTINUATION SHEET

Los Angeles Police Department

| PAGE NO. | TYPE OF REPORT | | | | BOOKING NO. | DR NO. |
|---|---|---|---|---|---|---|
| 4 | Crime and Arrest | | | | 8480652 | 0503-09786 |

| ITEM NO. | QU AN | ARTICLE | SERIAL NO | BRAND | MODEL NO. | MISC DESCRIPTION (EG. COLOR, SIZE, INSCRIPTIONS, CALIBER, REVOLVER, ETC) | DOLLAR VALUE |
|---|---|---|---|---|---|---|---|

Denise heard a suspect say, "Shut up or I'll kill you!" Denise then observed three suspects beating her father up in the hallway. Denise then told the suspects not to hurt her family. Suspect 1 and 4 approached Denise, pointed their guns to her head, and told to "shut up". She observed one suspect using his cell phone talking to an unknown person. Denise then heard the police helicopter above and saw that the suspects began to panic. Denise opened the front door and took cover, allowing the suspects to leave the residence.

Kimberly Cortez stated she was asleep in her bedroom when she heard a loud commotion inside her house. She heard the suspects asking her mother, Katherine, if anyone else was inside the house. Katherine replied, "Yes. My daughters and she's pregnant and my kids." Kimberly then heard the suspect demanding money. She could also hear her mother pleading with the suspects not to hurt the children. Kimberly heard the suspects saying, "Tell me where the money's at or I'll kill you!"

Kimberly stated she never saw the suspects but their voices sounded like they were black males.

Ofer Zavala conducted a field show up admonition with Heladio, Katherine, and Denise. Each of the victims viewed suspect Morris separately.

Heladio stated, "That's him. That's one of them."
Katherine stated, "Yes. That's him. He's the one who choked and socked me in my face."
Denise stated, "Yeah, that's him. I'm positive that's him."

I searched suspect Morris and recovered $525 from his front right pocket. The money recovered was consistent with Heladio's statement and observation of what suspect Morris removed from his pants pocket. I counted, photographed, and returned the victim's property.

## Arrest
Suspect Morris was arrested for 211 PC- 1st degree robbery and transported to Southwest Station.

## Booking
The suspect was booked for 211 PC Robbery, and felony warrant COMTA07736301 for carrying a concealed firearm, $50,000.00 bail, at Jail Division. We received booking approval from Det III Richards #16633. Officer Zavala recovered an additional $55.00 from Morris and it was booked as evidence at Southwest Station.

## Statements
Detective Gordon #24262, Southwest Area Homicide, admonished Morris of his Miranda Rights. Morris waived his rights and denied any involvement in the robbery. *See videotape.*

## Injury/Medical
We observed approximately 8" of abrasions on Heladio's left side of neck. Also a 2" scratch on the left side of his neck, a 9" foot print on the left side of his torso, several small scratches on left side of face, and 1" scratch on right side of neck.

We observed a bruise on Katherine's upper lip. She also complained of pain throughout her body.

RG

147

Los Angeles Police Department

## CONTINUATION SHEET

| PAGE NO. 5 | TYPE OF REPORT | | | | Crime and Arrest | | BOOKING NO. 8480652 | DR NO. 0503-09786 |
|---|---|---|---|---|---|---|---|---|
| ITEM NO. | QU AN | ARTICLE | SERIAL NO | BRAND | MODEL NO. | | MISC DESCRIPTION (EG. COLOR, SIZE, INSCRIPTIONS, CALIBER, REVOLVER, ETC) | DOLLAR VALUE |

Both victims stated they would seek their own medical treatment.

**Photographs**
SID Photographer G. Brod #N1328 photographed the crime scene and the evidence recovered. (C#278302)

Officer Zavala took digital photos of the injuries sustained by victims Heladio and Katherine Rayos.

**Evidence**
Officer Elsdon #36810 recovered items 1-3 on the west side of 1816 W 42nd Place, inside a planter.

Officer Zavala recovered items 4 and 5 inside 1806 W 42nd Place.

Officer Zavala recovered item 6 in front of 1810 W 42nd Place, on the sidewalk.

Officer Zavala recovered item 7 inside Heladio's bedroom.

Officer Zavala recovered items 8-10 in the kitchen area.

Officer Ponce recovered items 11-13 from the suspect at Southwest Station.

*See property report for more details.*

**Additional**
We notified SID, latent prints section Earls, T #C8866 responded and took prints of the crime scene and evidence recovered by officers.

RHD and night watch detectives were also notified.

I spoke with witness 2 (Treva) who resides at 1800 W 42nd Place. She stated that on 03-01-05 at approximately 0010 she came home from work and observed a suspicious vehicle (small 2dr black compact vehicle) stopped facing eastbound 42nd Place at St Andrews Pl. The vehicle was stopped at the stop sign for approximately two minutes.

On 03-02-05 at approximately 0015 hours she again observed the same vehicle stopped at the stop sign for approximately 10 minutes.

On 03-04-05 at approximately 0045 hours she heard two vehicles park on St Andrews Pl south of 42nd Place. She described vehicle 1 (white small compact veh poss Toyota Camry) parked on St Andrews Pl facing northbound. Vehicle 2 (black stationwagon) parked on St Andrews facing southbound. Treva then heard the police helicopter overhead and her dog barking. Treva observed veh 1 go northbound St Andrews Pl then eastbound 42nd Pl. Vehicle 2 went southbound St Andrews Pl to unknown direction.

RG

**CONTINUATION SHEET**

Los Angeles Police Department

| PAGE NO. 6 | TYPE OF REPORT | Crime and Arrest | | | | BOOKING NO. 8480652 | DR NO. 0503-09786 |
|---|---|---|---|---|---|---|---|
| ITEM NO. | QU AN | ARTICLE | SERIAL NO | BRAND | MODEL NO. | MISC DESCRIPTION (EG, COLOR, SIZE, INSCRIPTIONS, CALIBER, REVOLVER, ETC) | DOLLAR VALUE |

**Court Information**
Ofcr Ponce interviewed victims and witness.
Ofcr Zavala/Elsdon/Ponce recovered evidence.
Ofcr Zavala took photos of victim's injuries.
Ofcr Ponce completed arrest report.
Detective Gordon admonished the suspect his Miranda rights.
Ofcr Melton/Bonalos observed the suspect leave crime scene.

**PROPERTY REPORT**

| DATE AND TIME OF THIS REPORT | DATE PROPERTY BKD. | | CHARGE BKD. DR BKG. # | 8480652 |
|---|---|---|---|---|
| 3-4-05  0610 | 3-4-05 | | | |

RESIDENCE ADDRESS

RESIDENCE ADDRESS (BUS. ADDRESS IF VICT. IS BUSINESS)

RESIDENCE ADDRESS

AREA OR CITY, & DATE CRIME OCCUR.

IS THIS STOLEN PROPERTY?   PROBABLE CRIME

IS THIS FOUND PROPERTY?    DATE & TIME FOUND PROPERTY DISCOVERED: 0300  1806 W 42ND PL   395

INVESTIGATIVE UNIT  SOW   PROP. BKD AT  SOW   NOTIFICATIONS-PERSONS & UNITS: SOW DET'S  LATENT PRINTS/PHOTOS BKD, EARLS

Use Of Evidence Continuation: Use only with Arrest Report or, if no Arrest Report, with PIR. Do not use if evidence is related to previously booked evidence. To book evidence, staple this page on top of Arrest face sheet (or PIR face sheet, if no arrest) and forward with evidence.

| ITEM | QUAN | ARTICLE | SERIAL NO. | BRAND NAME | MODEL NO. | MISC. COLOR, SIZE, INSCRIPTION, etc. |
|---|---|---|---|---|---|
| 1 | 1 | HANDGUN | MU41546 | COLT | MUSTANG 80 | BLK SEMI-AUTO 380 CAL |
| 2 | 1 | MAGAZINE | — | COLT | | BLK MAGAZINE |
| 3 | 5 | LIVE ROUNDS | — | CBC | | .380 AUTO |
| 4 | 2 | LIVE ROUNDS | | PMC | | 38 SPECIAL |
| 5 | 1 | LIVE ROUNDS | | HSM | | 9mm LUGER |
| 6 | 1 | NARCOTICS | — | | 15.55 gg | OFF WHT POWDER SUBSTANCE CLEAR PLASTIC BAGGIE CONTAINING |
| 7 | 1 | CROW BAR | — | VAUGHAN | | BLK IN COLOR |
| 8 | 1 | BOX CUTTER | — | — | — | GREY W/ NAME OF "RAY" ON SIDE |
| 9 | 1 | DUCK TAPE | — | — | — | GREY IN COLOR |
| 10 | 1 | BACK PACK | — | EVEREST | — | BLK IN COLOR W/GRAFFITI MARKINGS |

Preliminary Drug Test    SUPERVISOR/INVESTIGATING OFFICER TESTING   SERIAL NO.   WITNESSING OFFICER   SERIAL NO.

Search Warrant #   DATE   ISSUED BY JUDGE   COURT NO.

| SUPERVISOR APPROVING | SERIAL NO. | REPORTING EMPLOYEE | SERIAL NO. | DIV. | DETAIL | PERSON REPORTING (SIGNATURE) |
|---|---|---|---|---|---|---|
| DET II RJM 6R24R2 | | PONCE | 36692 | SOW | 3A15 | X |
| DATE & TIME REPRODUCED | DIVISION | CLERK | | | | |

70-10.01.0 (R 12/98)

| ITEM NO. | QUAN. | ARTICLE | SERIAL NO. / TYPE TEST OF DRUG | BRAND / DRUG WEIGHT, UNITS | MODEL NO. / DRUG TEST RESULT | MISC. COLOR, SIZE, ETC. |
|---|---|---|---|---|---|---|
| 11 | 1 | Sweater | | Roca wear | | Blue in Color worn by susp 1 |
| 12 | 1 | Pants | — | — | | Black in Color     152 |
| 13 | 2 | Shoes | | — | | Black in Color |
| 14 | 1 | Narco | — | 25.80 gg | — | Wht powder substance Clear plastic baggie containing off |
| 15 | 1 | Narco | — | 4.7 4.gg | — | Wht powder substance Clear plastic baggie containing off |

IG
CA0194203   RE: QGB.CA0194203.SER/MU41546
RESPONSE TO QGB INQUIRY
NO RECORD IN AFS
CHECKING NCIC
END AFS RESPONSE.

OUTPUT MSG 307,          FROM          SWO1YYYY03/04/2005 05:29

CLASSIFIC
Evidence -
Non-Evide

PROPERTY
Evidence -
sequence.)
possessor. 5. If 1, 2, 3, and 4 do not apply, book to Department employee.                                    ers in
Non-Evidence - 1. Book to owner. 2. If ownership cannot be determined. . . .inder                          wner or
EXCEPTION: When non-evidence is removed from a vehicle, and the . . . . . .  . ty is . . t . . n, book it to the registered owner. When neither
is known, book it to the employee.

REPORTS REQUIRED FOR BOOKING EVIDENCE:
The employee booking the evidence shall ensure that the correct property information is forwarded with the evidence. (Two copies of reports are
required if the evidence is narcotics or firearms, or if blood or urine is booked within O-VB.)
If the Property Report is an evidence continuation page of an Arrest Report or PIR, staple the Property Report on top of the related Arrest Report
(or PIR if no Arrest Report), and forward with evidence.
NOTE: If multiple arrestees are involved, the face sheet stapled to the property Report should be that of the arrestee to whom the evidence is booked.

EXCEPTIONS TO USE OF COMBINED EVIDENCE / ARREST or PIR:
Use a Property Report completed in its entirety and distributed separately when:
* Evidence is related to previously booked evidence.
* Evidence is booked to other than the primary victim (listed at top) of a multiple victim PIR.
* Reporting more than one license plate (or set of plates).  One plate may be reported using the combined procedure. Each additional plate (or set
of plates) requires a separate complete Property Report and a separate Vehicle DR number.
* The reporting employee's supervisor determines that a separate complete Property Report would be a more expeditious means of booking the
evidence under the given circumstances.

DISTRIBUTION OF COMBINED REPORT (Records Unit): Distribute the Property Report as a page of the related Arrest Report and PIR.
In addition to the distribution, forward one copy of the Property Report independently as follows:
* R & I CMRS (with ADRIS printout) if there is no crime report involved; i.e., if the report is a combined arrest / evidence.
* R & I Crime and Property TT Unit Supervisor, if a firearm is booked. Forward that copy without delay.

EVIDENCE SEIZED DURING SERVICE OF A SEARCH WARRANT:
(1) Items seized which were LISTED on the search warrant shall be listed on the Property Report under the heading "Seized Pursuant to
the Search Warrant - Listed".
(2) Items seized which were NOT LISTED on the search warrant shall be listed on the Property Report under the heading "Seized Pursuant to
the Search Warrant - Unlisted" AND shall start with the next sequential item number.

LOS ANGELES POLICE DEPARTMENT

# FIREARMS SUPPLEMENTAL PROPERTY REPORT

Department employees shall complete the following form for each firearm booked. This form shall become a page of the Property Report, Form 10.01.0, and continue the page numbering sequence. Additional firearms with the same possessor, associates, recovery location, and recovery date and time may be listed on Firearms Supplemental Continuation Sheet, Form 10.01.02, which shall become a page of the Property Report, Form 10.01.0, and continue the page numbering sequence. For additional associates, use appropriate copies of this form as needed.

## FIREARM DESCRIPTION

| 1. ITEM | 2. MANUFACTURER | 3. TYPE * | 4. CATEGORY** | 5. MODEL | 6. CALIBER | 7. BARREL LENGTH |
|---|---|---|---|---|---|---|
| 1 | Colt | P | A | Series 80 Mustang | 380 | 2 ½ |

| 8. SERIAL NUMBER | 9. OTHER MARKINGS OR INFORMATION (finish, grips, etc.) | 10. COUNTRY OF ORIGIN | 11. IMPORTER (Name, City and State) |
|---|---|---|---|
| MU 41546 | | US | Hartford. CT U.S.A |

| 12. WAS FIREARM USED IN A CRIME? ☑ YES ☐ NO    NCIC CODE: 1207 | 13. WAS FIREARM SUSPECTED OF HAVING BEEN USED IN A CRIME? ☑ YES ☐ NO    NCIC CODE: 1207 |
|---|---|

14. WAS FIREARM ILLEGALLY POSSESSED? ☐ YES ☑ NO ☐ UNK    15. WAS FIREARM REPORTED STOLEN? ☐ YES ☑ NO

## FIREARM POSSESSOR AND/OR ASSOCIATE INFORMATION

| 1. NAME OF FIREARM POSSESSOR (Last, First, Middle) | 2. DOB | 3. PLACE OF BIRTH | 4. HT | 5. WT | 6. SEX | 7. RACE |
|---|---|---|---|---|---|---|
| Ravos, Katherine | 11-26-64 | LA | 501 | 170 | F | H |

| 8. STREET ADDRESS | 9. APT NO. | 10. CITY | 11. STATE | 12. ZIP CODE |
|---|---|---|---|---|
| 1806 W 42ND PL | — | LA | CA | 90008 |

| 13. IDENTIFICATION TYPE (Driver License, DMV ID, Social Security Card, Etc.) | 14. STATE | 15. IDENTIFICATION NUMBER |
|---|---|---|
| | | |

| 1. NAME OF ASSOCIATE (Last, First, Middle) | 2. DOB | 3. PLACE OF BIRTH | 4. HT | 5. WT | 6. SEX | 7. RACE |
|---|---|---|---|---|---|---|
| | | | | | | |

| 8. STREET ADDRESS | 9. APT NO. | 10. CITY | 11. STATE | 12. ZIP CODE |
|---|---|---|---|---|
| | | | | |

| 13. IDENTIFICATION TYPE (Driver License, DMV ID, Social Security Card, Etc.) | 14. STATE | 15. IDENTIFICATION NUMBER |
|---|---|---|
| | | |

| 1. NAME OF ASSOCIATE (Last, First, Middle) | 2. DOB | 3. PLACE OF BIRTH | 4. HT | 5. WT | 6. SEX | 7. RACE |
|---|---|---|---|---|---|---|
| | | | | | | |

| 8. STREET ADDRESS | 9. APT NO. | 10. CITY | 11. STATE | 12. ZIP CODE |
|---|---|---|---|---|
| | | | | |

| 13. IDENTIFICATION TYPE (Driver License, DMV ID, Social Security Card, Etc.) | 14. STATE | 15. IDENTIFICATION NUMBER |
|---|---|---|
| | | |

| 1. NAME OF ASSOCIATE (Last, First, Middle) | 2. DOB | 3. PLACE OF BIRTH | 4. HT | 5. WT | 6. SEX | 7. RACE |
|---|---|---|---|---|---|---|
| | | | | | | |

| 8. STREET ADDRESS | 9. APT NO. | 10. CITY | 11. STATE | 12. ZIP CODE |
|---|---|---|---|---|
| | | | | |

| 13. IDENTIFICATION TYPE (Driver License, DMV ID, Social Security Card, Etc.) | 14. STATE | 15. IDENTIFICATION NUMBER |
|---|---|---|
| | | |

## FIREARM RECOVERY INFORMATION

| 1. DATE | 2. RD | 3. RECOVERING OFFICER'S SERIAL NO. | 4. PROB. INVEST. UNIT | 5. PENAL CODE SECTION | 6. CRIME TITLE |
|---|---|---|---|---|---|
| 4-05 | | ELDSON | SOW | 211 | Robbery |

| 7. STREET ADDRESS | 8. APT NO. | 9. CITY | 10. COUNTY | 11. STATE | 12. ZIP CODE |
|---|---|---|---|---|---|
| 31C W 42ND PL | — | LA | LA | CA | 90008 |

**\* Use the following codes to denote the "Type" of weapon:**

| | | |
|---|---|---|
| Cannon | K - Rocket | R - Rifle |
| Submachine Gun | M - Machine Gun | S - Shotgun |
| Rifle/Shotgun Combination | O - Mortar | T - Tear Gas Gun |
| Grenade | P - Pistol | V - Silencer |
| | | Z - All Others |

**\*\* Use the following codes to denote the "Category" of weapon:**

| | | | |
|---|---|---|---|
| A - Automatic | G - Gas or Air | M - Machine | S - Single Shot |
| B - Bolt Action | H - Flintlock | N - Launcher | T - Recoilless |
| C - Carbine | I - Semi-Automatic | O - Over/Under | U - Percussion |
| D - Derringer | J - Jet Propulsion | P - Pump | W - Three Barrels |
| E - Side by Side | K - Blank Pistol | Q - Antique | X - 4 + Barrels |
| F - Flare Gun | L - Lever Action | R - Revolver | |

10.01.01 (R 2/04)

ST. ANDREWS PL

N

150

Alley

POE
Rear Door

1806

POE
Front Door

V-2
V-3
V-4

V-1

Bath
Room

V-5
V-6

UNTHY NOT NEWBURN (323) 913-4721

light post (possible camera)

V = 1 Through 6 ARE Shown Where they were prior to 211.

42 ND PL

SIDEWALK

ITem 6

1810

1816

ITem 1 + 2 + 3

Page of

| DATE THIS REPORT | DATE ORIGINAL RPT. | SPECIFIC TYPE ORIG. RPT. (ADW, TPV, EVID, ARREST/BURG., ETC.) | | R.D. 395 | PCD | DR |
|---|---|---|---|---|---|---|
| 3-7-05 | 3-5-05 | Robbery | | | | |

| VICTIM/ BOOKED TO/ARRESTEE (AS ON ORIGINAL REPORT) | IF RECLASSIFYING TO HOMICIDE | | | BKG. NO. (SUPPL. TO ARREST) | WORK FOLDER |
|---|---|---|---|---|---|
| | SEX | DESCENT | AGE | | PERIOD ORIG. RPT.   INDEX NO. |
| Morris, Gonzalez | VIC'Ts | | | 0503 09786 | |

**CASE STATUS**    1 CLEARED BY ARREST    2 CLEARED OTHER    3 REPORT UNFOUNDED    4 INVESTIGATION CONTINUED

Use this section only to add or correct info - do not repeat info from previous reports. Exception: Complete entire suspect info if making final disposition.

| DATE OCCURRED | CHANGE TO-ON OR BTWN | | | & | | | | TYPE ORIG RPT. CHG. TO | RD - CHG. TO | DR CHANGE TO | INV. DIV CHANGED TO |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | MO | DAY | YEAR | TIME | | MO | DAY | YEAR | TIME | | |

| PROPERTY VALUE: $ | ADDITIONAL LOSS $ | PARTIAL RECOVERY $ | TOTAL RECOVERY $ | DELETE FROM ORIGINAL REPORT | DESCRIPTION CHANGE | ITEM NOS. RECOVERED/DELETED (ON MULT. RPTS. USE NARRATIVE) |
|---|---|---|---|---|---|---|

| S-1 | SEX | DESC | HAIR | EYES | HEIGHT | WEIGHT | DOB | AGE | NAME & ADDRESS (OR NAME & CHARGE, IF ARRESTED) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | ACTION TAKEN | | LA OR BKG NO. |
| 2 | | | | | | | | | NAME & ADDRESS (OR NAME & CHARGE, IF ARRESTED) | | |
| | | | | | | | | | ACTION TAKEN | | LA OR BKG NO. |
| 3 | | | | | | | | | NAME & ADDRESS (OR NAME & CHARGE, IF ARRESTED) | | |
| | | | | | | | | | ACTION TAKEN | | LA OR BKG NO. |

| P/T/D | MULTIPLE RPT.: PCD & DR NOS. | TYPE OF CRIME | RD | VICTIM'S NAME | DATE ORIG. RPT. | VALUE |
|---|---|---|---|---|---|---|

ON PRIO RPT ITEM 14 ADD WEIGHT 25.80gg, ITEM 15 ADD WEIGHT 4.74gg, IN NARRATIVE ADD: SUBSTANCE RESEMBLING COCAINE. TEST FOR COCAINE.

IN NARRATIVE ADD:

ON 3-5-05 AT APPROX 1630 HOURS MY PARTNER AND I CONDUCTED A FOLLOW-UP TO 1806 W 42ND PL. WE FELT THAT WE MAY BE ABLE TO RECOVER ADDITIONAL ITEMS DURING DAYLIGHT HOURS. I ALSO RECOVERED ITEM 14 AND ITEM 15 (CLEAR PLASTIC BAGGIE CONTAINING WHT POWDER SUBSTANCE RESEMBLING COCAINE), IN FRONT OF 1806 W 42ND PL ON THE SIDEWALK.

WHEN MY PARTNER AND I CONDUCTED OUR INVESTIGATION, WE OBS. THE REAR DOOR SCREEN AND WOODEN DOOR WIDE OPEN. THE SCREEN DOOR LOCK HAD BEEN DAMAGED AND THE WOODEN DOOR WAS BROKEN AT THE DEAD BOLT. THE WOODEN DOOR LOCK WAS ON THE GROUND AND THE WOODEN DOOR WAS SEVERELY DAMAGED.

| WAS PROPERTY BOOKED IN CONJUNCTION WITH THIS REPORT OR INCIDENT? | X NO | YES . . . . IF YES, HAS 10.6 BEEN COMPLETED? | | NO | YES |
|---|---|---|---|---|---|

| SUPERVISOR APPROVING | | SERIAL NO. 30162 | REPORTING OFFICER(S) | SERIAL NO. | DIVISION |
|---|---|---|---|---|---|
| | | | CA-VARDA | 3670S | SOU |
| DATE & TIME REPRODUCED | DIVISION | CLERK | Ponce | 36692 | SOU |

APD 03.14.0 (R. 3/85)        I 1 506 5000 245        FOLLOW-UP INVESTIGATION

INCID No. 5063000245

Page 1 of 2   70-03.01.0 (12/91) DH (11/1/96)

# PRELIMINARY INVESTIGATION of
## ROBBERY

INVEST DIV: SOW   DR: 0503097860

### PRELIMINARY CASE SCREENING
- ☐ SUSPECT / VEHICLE NOT SEEN
- ☐ PRINTS OR OTHER EVIDENCE NOT PRESENT
- ☒ MO NOT DISTINCT
- ☒ PROPERTY LOSS LESS THAN $5000
- ☒ NO SERIOUS INJURY TO VICTIM
- ☐ ONLY ONE VICTIM INVOLVED

☐ SHOTS FIRED
☐ USE OF FORCE

VICTIM
LAST NAME, FIRST, MIDDLE (FIRM IF BUSINESS): Rayos, Heladio   SEX: M   DESC: ____   AGE: ____   DOB: ____
ADDRESS: ____   ZIP: ____   PHONE: ____
B:

PREMISES (SPECIFIC TYPE): Single family residence   ATM: –
DR/SERIAL NO. (IF NONE, OTHER ID # ): –   FOREIGN LANGUAGE SPOKEN (IF APPLICABLE): _   OCCUPATION: Business Owner/Operator

ENTRY 458/459PV: ☐   POINT OF ENTRY: Door   POINT OF EXIT: Point of Entry
- ☒ FRONT
- ☒ REAR
- ☐ SIDE
- ☐ ROOF
- ☐ FLOOR
- ☐ OTHER

LOCATION OF OCCURRENCE: SAME AS V5   ☒ RES.   ☐ BUS.   R.D. 395   PRINTS BY PREL. INV. ATTEMPT ☒ Y ☐ N   OBTAINED ☒ Y ☐ N

METHOD: Pried open
DATE & TIME OF OCCURRENCE: 3/4/05, 0108 hours
DATE & TIME REPORTED TO PD: 3/4/05, 0110 hours

INSTRUMENT / TOOL USED: Crow bar
TYPE PROPERTY STOLEN / DAMAGED: U.S. currency, Handgun   ☐ 3.4 GIVEN   STOLEN/LOST: $580.00   RECOVERED: $580.00   EST. DAMAGED ARSON / VAND.: $0

VICT'S VEH. (IF INVOLVED) YEAR, MAKE, TYPE COLOR, LIC. NO.: N/A
NOTIFICATIONS (PERSON & DIVISION): SID Prints/Photos/SW Dets
CONNECTED REPORTS (TYPE & DR):

NARCOTICS STOLEN: MARIJ., CHG.

### MO
IF LONG FORM, LIST UNIQUE ACTIONS. IF SHORT FORM, DESCRIBE SUSPECT'S ACTIONS IN BRIEF PHRASES, INCLUDING WEAPON. REPORT AS NECESSARY. IF ANY OF THE MISSING ITEMS ARE POTENTIALLY IDENTIFIABLE, ITEMIZE AND DESCRIBE ALL ITEMS MISSING IN THIS INCIDENT IN THE NARRATIVE.

Susps entered through rear door using pry tool, susps ransacked residence and threatened victims at gunpoint - susps demanded money, physically assaulted victims, then removed victim's property. Susps fled from location on foot.

MOTIVATED BY HATRED / PREJUDICE ☐   DOMESTIC VIOLENCE ☐

REPORTING EMPLOYEE(S):
| INITIALS, LAST NAME | SERIAL NO. | DIV. / DETAIL |
|---|---|---|
| B. Zavala | 36703 | SOW 3A15 |
| B. Ponce | 36692 | SOW 3A15 |

PERSON REPORTING: SIGNATURE: ____   OR RECEIVED BY PHONE ☐
Addendum to Arrest Report Face Sheet
NOTE: IF SHORT FORM AND VICTIM / PR ARE NOT THE SAME, ENTER PR INFORMATION IN INVOLVED PERSONS SECTION.

☐ BSD (GAS)/ CRASH

Complete below sections if any Preliminary Case Screening boxes are not checked.

SUSP'S VEHICLE:
| | YEAR | MAKE | MODEL | TYPE |
|---|---|---|---|---|
| | | NVS | | |

COLOR(S): ____   VEH. LIC. NO.: ____   STATE: ____

Interior COLOR:
- ☐ 1 BUCKET SEATS
- ☐ 2 DAMAGED INSIDE

Exterior:
- ☐ 1 CUSTOM WHEELS
- ☐ 2 PAINTED INSCRIPT
- ☐ 3 LEVEL ALTERED
- ☐ 4 RUST / PRIMER
- ☐ 5 CUSTOM PAINT
- ☐ 6 VINYL TOP

Body:
- ☐ 1 DAMAGE  ☐ 5 RIGHT
- ☐ 2 MODIFIED  ☐ 6 FRONT
- ☐ 3 STICKER  ☐ 7 REAR
- ☐ 4 LEFT

Windows:
- ☐ 1 DAMAGE  ☐ 5 RIGHT
- ☐ 2 CUST.  ☐ 6 FRONT
- ☐ 3 CURTAINS  ☐ 7 REAR
- ☐ 4 LEFT

| | SEX | DESC | HAIR | EYES | HEIGHT | WEIGHT | AGE | CLOTHING |
|---|---|---|---|---|---|---|---|---|
| S-1 | M | Black | Blk | Bro | 509 | 170 | 28 | |

NAME, ADDRESS, DOB, IF KNOWN; NAME, BKG. NO., CHARGE, IF ARRESTED.: MORRIS, Condalez (DOB: 5/9/76). Booking No. 8480652 (211PC - Robbery)
PERSONAL ODDITIES (UNUSUAL FEATURES, SCARS, TATTOOS, ETC.): ____
Weapon (VERBAL, THREATS, BODILY FORCE, SIMULATED GUN, ETC. IF KNIFE OR GUN, DESCRIBE FULLY): Handgun/Bodily force

| S-2 | M | | | | | | | |

Weapon: Handgun/Bodily force

### INVOLVED PERSONS
W - WITNESS   R - PERSON RPTG.   S - PERSON SECURING (459)   D - PERSON DISCOVERING (459)   P - PARENT   CP - CONTACT PARTY (DOMESTIC VIOLENCE)

| | NAME | SEX | DESC | DOB | ADDRESS | CITY | ZIP | PHONE |
|---|---|---|---|---|---|---|---|---|
| W | CORTEZ, Kimberly | F | Hisp | 8/14/84 | R- Care of Investigating Officer | | | |

DR. LIC. NO. (IF NONE, LIST OTHER ID & NO.): ____   FOREIGN LANGUAGE SPOKEN (IF APPLICABLE): ____   B-

R-
B-

R-
B-

### COMBINED EVID. RPT.
USE THIS SECTION IN LIEU OF PROPERTY REPORT IF NO GUN AND NO MORE THAN THREE ITEMS OF EVIDENCE
LOC. EVID. BKD.: ____   10.10 GIVEN? ☐ Y ☐ N   Preliminary Drug Test: ☐   SUPV./INV. OFCR. TESTING: ____   SER. NO.: ____   WITNESS OFCR.: ____   SER. NO.: ____

| ITEM | QUAN. | ARTICLE | SERIAL NO./TYPE TEST OF DRUG | BRAND / DRUG WEIGHT / UNITS | MODEL NO. / DRUG TEST RESULT | MISC. |
|---|---|---|---|---|---|---|
| | | SEE PROP RPT | | | | |

### NARRATIVE
1) LIST ADD'L SUSPS. & INVOLVED PERSONS. 2) RECONSTRUCT OCCURRENCES, INCL. ALL ELEMENTS OF CORPUS DELECTI. 3) IF NOT USING EVID. CONTINUATION FORM, DESCRIBE EVIDENCE INCLUDING PRINTS. STATE LOCATION FOUND AND BY WHOM. GIVE DISPOSITION. 4) SUMMARIZE OTHER DETAILS, INCL. WHEN AND WHERE PERSONS WITH NO PHONE CAN BE LOCATED. 5) INDICATE TYPE OF TRANSLATOR NEEDED FOR ANY INVOLVED PERSON. 6) LIST ITEMS MISSING.

VICTIM INDEMNIFICATION INFORMATION (IF APPLICABLE)
IS ANY OF THE VICTIM'S PROPERTY MARKED WITH AN OWNER APPLIED IDENTIFICATION NUMBER? YES ☐ NO ☐
IF "YES" EXPLAIN IN NARRATIVE.

### APPROVAL AND REVIEW
SUPERVISOR APPROVING: DET II Keith Gordon   SERIAL NO.: 24262
DATE & TIME REPRODUCED: 3/5/05 0700   CLERK: 3 W
DETECTIVE SUPERVISOR REVIEWING: ____   SERIAL NO.: ____
Category ____

I.D. No. 5063000245

**CITY ATTORNEY DISCLOSURE STATEMENT**

OFFICERS - FORM TO BE COMPLETED ON ALL FELONY AND MISDEMEANOR ARRESTEES
DETECTIVES - FORM TO BE FILED WITH CITY ATTORNEY ONLY
Answer all questions to the best of your personal knowledge.

| Type of Report  ARR | Booking No.  8480652 | DR No.  050309786 |
|---|---|---|

1. Reports: To your knowledge, what reports (except personnel investigations) were prepared in relation to this investigation?
   ☑ Arrest  ☑ Crime  ☑ Property  ☑ PCD  ☐ Follow-up  ☐ Vehicle (CHP180)  ☐ CHP555
   ☐ DMV-DS367   Other: _____

2. The following items exist: Photographs (include C#) 278302   Video tape YES (STATEMENTS)
   Audio tape (including officer's personal tape) ☑ YES  ☐ NO   Other: _____

3. Has there been or is there a pending Use of Force investigation?  ☐ YES  ☑ NO
   If YES, provide the name and serial number of supervisor conducting investigation.
   Name _____      Serial No. _____

4. List the NAME, ADDRESS, PHONE NUMBER and DATE OF BIRTH of all CIVILIAN WITNESSES not named in any report(s), whether interviewed or not.

| Name | Address | Phone No. | DOB |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

5. List the NAME, SERIAL NUMBER, ASSIGNMENT and ROLE of all OFFICERS not named in the report(s) who were percipient witnesses or otherwise involved in this incident:

| Officer Name | Serial No. | Assignment | Officer's Role |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

6. List the NAME, SERIAL NUMBER, DEPARTMENT/AGENCY and UNIT NUMBER of all FIRE DEPARTMENT and EMERGENCY MEDICAL PERSONNEL who responded to this incident, but were not named on the report(s):

| Name | Serial No. | Department/Agency | Unit No. |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

7. List any SUSPECT(S) STATEMENT(S) not included in any report(s):

_____

_____

8. List any CIVILIAN WITNESS(ES) STATEMENT(S) not included in any report(s):

_____

_____

9. Are there any RETAINED OFFICER NOTES or DIAGRAMS not included in any report(s)?  ☐ YES  ☑ NO
   If YES, identify:

| Officer | Serial No. | Assignment | Item |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

10. List any known facts not included in any report(s) that might be considered as favorable to the defense or damaging to the prosecution, or which might negatively reflect on the credibility of any prosecution witness:

_____

_____

All of the answers to the above questions are true to the best of my personal knowledge.

| Signature | Serial No. | Div. of Assignment | Role in Arrest | Date |
|---|---|---|---|---|
|  | 36703 | Sow | ARR/BKD | 3/4 |
|  | 36692 | Sow | ARR/RPT | 05 |

70-5.02.9 (9-03)

# LOS ANGELES POLICE DEPARTMENT



**WILLIAM J. BRATTON**
Chief of Police

**ANTONIO R. VILLARAIGOSA**
Mayor

P. O. Box 30158
Los Angeles, California 90030
Telephone: (213) 978-2100
TDD: (877) 275-5273
Reference Number: 14.4

January 18, 2008

Mr. Condalee Morris
V-96203, B-4-220
Calipatria State Prison
P.O. Box 5003
Calipatria, CA 93322

Dear Mr. Morris:

I have reviewed your request for records pertaining to an incident that occurred on March 4, 2005, involving yourself that is documented under Booking No. 8480652 and DR No. 05-0309786.

In accordance with Government Code Section 6254(f), subsections (f)(1) and (f)(2), records of investigations conducted by, or investigatory files compiled by, any local police agencies for law enforcement purposes are exempt from disclosure under the Act. While Section 6254(f) and its subparts do set forth a list of specific information that must be disclosed from law enforcement investigatory files, this list of information does not include the disclosure of the actual document and need only be provided if it relates to contemporaneous law enforcement activity (see *County of Los Angeles v. Superior Court (Kusar)(1993)* 18 Cal. App. 4th 588.) The records are investigative and non-contemporaneous; therefore, I am denying your request.

If you have any questions regarding this correspondence, please contact the Discovery Section at (213) 978-2100 and ask to speak with a Letter Request Analyst.

Very truly yours,

WILLIAM J. BRATTON
Chief of Police

RAYMOND D. CRISP, Senior Management Analyst
Officer-in-Charge, Discovery Section
Risk Management Group

AN EQUAL EMPLOYMENT OPPORTUNITY - AFFIRMATIVE ACTION EMPLOYER
www.LAPDOnline.org
www.joinLAPD.com

8.  Did you appeal from the conviction, sentence, or commitment?    ☑ Yes.    ☐ No.  If yes, give the following information:

a.  Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

In the Superior Court of the State of California in the county of LA

b.  Result  Multiple Punishment In Count 2-6 did Violate ~~denied~~ P.C 654        c.  Date of decision: Oct 30, 2007

d.  Case number or citation of opinion, if known:  BA279836 / B185476

e.  Issues raised: (1) The trial court submit to the jury an Erroneous legal theory as to Count 6 (2) multiple Punishment on count 2@6 violated P.C. Section 654 (3) Multiple (6) Punishment on count 2 @9 violated PC § 654 (4) Imposition of upper term on firearm use enhancement Pertaining to count 9@10 violated his right to a jury and proof
(3) beyond a reasonable doubt (5) imposition of an upper term on his conviction on count 1 violated his right to a jury trial @ proof beyond a reasonable doubt

f.  Were you represented by counsel on appeal?    ☑ Yes.    ☐ No. If yes, state the attorney's name and address, if known:

Victoria H Stafford 6114 La Salle Ave #161 Oakland CA 94611

9.  Did you seek review in the California Supreme Court?    ☑ Yes    ☐ No.  If yes, give the following information:

a.  Result  Petiton for review denied  ~~Multiple Punishment for count 2-6 did Violate~~  b.  Date of decision: 12-12-2007
654.

c.  Case number or citation of opinion, if known:  ~~S~~ 157856

d.  Issues raised: (1) Whether Punishment for both the assault in count 9 and robbery in count 2 violates Penal code § 654
(2) Whether appellant right to due process and a fair trial were violated when the Prosecutor submitted count 6 to the jury on a legally incorrect theory
(3) The court Decision in black 11 uphold the imposition of an upper term based on Prior conviction on which the trial court did not reliy on

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

My appellant Lawyer told me my ground ~~didnt~~ ~~there~~ ~~poor~~ Or not good at all

11. Administrative Review:

a.  If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].)  Explain what administrative review you sought or explain why you did not seek such review:

_____

_____

_____

_____

_____

_____

_____

b.  Did you seek the highest level of administrative review available?    ☐ Yes.    ☐ No.
*Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction,    MC–275
commitment, or issue in any court? ☑ Yes. If yes, continue with number 13. ☐ No. If no, skip to number 15.

13. a. (1) Name of court: In the Superior court of the state of California in County of L

(2) Nature of proceeding (for example, "habeas corpus petition"): Habeas Corpus

(3) Issues raised: (a) Punishment on count 1@2 violated P.C 654) Punishment on count 1@10
Violated P.C 654

(b) The challenge of the show-up procedure in count 1

(4) Result (Attach order or explain why unavailable): Order Denying writ of Habeas Corpus

(5) Date of decision: May 27, 2008

b. (1) Name of court: In the superior court of State of California in county of Los Ange

(2) Nature of proceeding: additional habeas Corpus Petition

(3) Issues raised: (a) The appellate was subjected to a "non existent" show-up procedure by the LAPD an without being personally present with coun
Mr Lieberman violated the due process Clause of the fourteeth
(b) Amendment for failure to disclose "Material Evidence to the Defense.

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949)
34 Cal.2d 300, 304.)

_____

_____

16. Are you presently represented by counsel? ☐ Yes. ☑ No. If yes, state the attorney's name and address, if known:

_____

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☑ No. If yes, explain:

_____

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

_____

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California
that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief,
and as to those matters, I believe them to be true.

Date: 8/16/08                    (SIGNATURE OF PETITIONER)

# *VERIFICATION*

## STATE OF CALIFORNIA
## COUNTY OF IMPERIAL

### (C.C.P. SEC.446 & 201.5; 28 U.S.C. SEC. 1746)

I, Condalee Morris _____ DECLARE UNDER PENALTY OF PERJURY THAT: I AM THE Petitioner _____ IN THE ABOVE ENTITLED ACTION; I HAVE READ THE FOREGOING DOCUMENTS AND KNOW THE CONTENTS THEREOF AND THE SAME IS TRUE OF MY OWN KNOWLEDGE, EXCEPT AS TO MATTERS STATED THEREIN UPON INFORMATION, AND BELIEF, AND AS TO THOSE MATTERS, I BELIEVE THEM TO BE TRUE.

EXECUTED THIS _____ DAY OF: 10-8- _____ 2008 AT CALIPATRIA STATE PRISON, CALIPATRIA, CALIFORNIA #92233-5002.

(SIGNATURE) _____

(DECLARANT/PRISONER)

## *PROOF OF SERVICE BY MAIL*

### (C.C.P. SEC.1013 (a) & 2015.5; 28 U.S.C. SEC.1746)

I, Petitioner _____ AM A RESIDENT OF CALIPATRIA STATE PRISON, IN THE COUNTY OF IMPERIAL, STATE OF CALIFORNIA. I AM OVER THE AGE OF EIGHTEEN (18) YEARS OF AGE AND AM / NOT A PARTY OF THE ABOVE-ENTITLED ACTION. MY STATE PRISON ADDRESS IS: P.O. BOX 5002. CALIPATRIA, CALIFORNIA #92233-5002.

ON 8-10 _____ 2008 I SERVED THE FOREGOING: Petition for Writ of Habeas Corpus

### (SET FORTH EXACT TITLE OF DOCUMENTS SERVED)

ON THE PARTY (S) HEREIN BY PLACING A TRUE COPY (S) THEREOF, ENCLOSED IN A SEALED ENVELOPE (S), WITH POSTAGE THEREON FULLY PAID, IN THE UNITED STATES MAIL, IN A DEPOSIT BOX SO PROVIDED AT CALIPATRIA STATE PRISON, CALIPATRIA, CALIFORNIA #92233-5002.

Clerk of US District Court Room 4290 880 front str San Diego CA 92101-8900

The Supreme Court 350 Mc Allister str San Francisco, CA 94102-4797

THERE IS DELIVERY SERVICE BY UNITED STATES MAIL AT THE PLACE SO ADDRESSED, AND THERE IS REGULAR COMMUNICATION BY MAIL BETWEEN THE PLACE OF MAILING AND THE PLACE SO ADDRESSED. I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

DATE: 8 / 10 / 08 _____

(DECLARANT/PRISONER)

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

**FILED**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

AUG 12 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**I (a) PLAINTIFFS**

**FILING FEE PAID**
Yes    No

**IFP MOTION FILED**
Yes    No

**COPIES SENT TO**
Court    ProSe

Condalee Morris

**DEFENDANTS**

People of the State of CA

**(b) COUNTY OF RESIDENCE OF FIRST LISTED**  Imperial
**PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Condalee Morris
PO Box 5005
Calipatria, CA 92233
V-96203

**ATTORNEYS (IF KNOWN)**

'08 CV 1468 H POR

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX**
(For Diversity Cases Only)
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT

|  | PT | DEF |  | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).**

## 28 U.S.C. 2254

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reappointment |
| ☐ Marine | ☐ 310 Airplane | ☐ 362 Personal Injury-Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 RR & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | **SOCIAL SECURITY** | ☐ X10 Selective Service |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ X50 Securities/Commodities Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☐ Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Electmant | ☐ 443 Housing/Accommodations | ☐ 530 General | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ Security Act | | ☐ 950 Constitutionality of State |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☒ 1 Original Proceeding  ☐ 2 Removal from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.r.c.p. 23    DEMAND $ _____    Check YES only if demanded in complaint:
JURY DEMAND: ☐ YES  ☐ NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):**  JUDGE _____    Docket Number _____

DATE   8/12/08

SIGNATURE OF ATTORNEY OF RECORD